# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

**Case No.**

NORTH AMERICAN SUGAR INDUSTRIES INC.,

Plaintiff,

v.

XINJIANG GOLDWIND SCIENCE & TECHNOLOGY
CO., LTD., GOLDWIND INTERNATIONAL
HOLDINGS (HK) LTD., DSV AIR & SEA INC.,
BBC CHARTERING USA, LLC, and
BBC CHARTERING SINGAPORE PTE LTD.,

Defendants.

## COMPLAINT

Plaintiff North American Sugar Industries Inc. ("American Sugar"), for its complaint

against defendants Xinjiang Goldwind Science & Technology Co., Ltd. ("Goldwind Science"),

Goldwind International Holdings (HK) Ltd. ("Goldwind International"), DSV Air & Sea Inc.

("DSV"), BBC Chartering USA, LLC ("BBC USA"), and BBC Chartering Singapore Pte Ltd.

("BBC Singapore") (together, "Defendants") in the above-captioned action, alleges on

information and belief as follows:

## NATURE OF ACTION

1.      American Sugar brings this action under the Helms-Burton Act[1] to recover treble

damages and interest totaling hundreds of millions of dollars resulting from Defendants'

deliberate and unlawful trafficking of American Sugar's expropriated property in Cuba for their

---

[1]  Title III of the Cuban Liberty and Democratic Solidarity (LIBERTAD) Act of 1996 (codified
at 22 U.S.C. §§ 6081–85).

own financial gain.  Defendants' misuse of American Sugar's confiscated property—certified by the United States to be worth hundreds of millions dollars today—without a speck of compensation is precisely the type of harm that the Helms-Burton Act was enacted to redress.

2.      For over 50 years, up until the Cuban Revolution, American Sugar owned and operated a thriving business in Cuba producing, refining, and transporting raw sugar.  Through itself and numerous Cuba-based subsidiaries, American Sugar owned and maintained a diverse array of assets for its expansive business operations:  land and crops, farm buildings, power-generation systems, a railroad, and most pertinent here, large commercial shipping ports—including one dubbed Puerto Carupano.

3.      American Sugar's lucrative business did not go unnoticed by the regime formed in the aftermath of the Cuban Revolution.  Within about a year, from 1959 to 1960, the Cuban government destroyed American Sugar's business, expropriating its assets in Cuba without a penny of compensation for this illegal and unjust expropriation.

4.      Since then, the Cuban government has used American Sugar's confiscated property to further its own ends, including permitting for-profit businesses such as Defendants to use and benefit from that property.  Defendants, which are engaged in the wind power equipment and shipping/transportation businesses, used Puerto Carupano (and/or financially benefitted from others' use of that port) to deliver equipment for use in the Herradura Wind Farm Project—the largest wind power project in Cuba, with a price tag in the hundreds of millions of dollars—located just 15 miles away.

5.      Specifically, on at least two occasions in late 2018 and early 2019, Goldwind Science, Goldwind International, and other suppliers to the Herradura Wind Farm Project shipped wind farm equipment to a Cuban state-owned entity associated with the project.  The

equipment was unloaded at Puerto Carupano.  DSV provided transportation and logistical services to these suppliers in order to ship their wind farm equipment to Cuba via Puerto Carupano.  BBC USA and BBC Singapore, in turn, chartered and operated shipping vessels that carried and unloaded wind farm equipment at Puerto Carupano to the benefit of Goldwind Science and other suppliers to the Herradura Wind Farm Project.

6.     Defendants knew full well that they could be required to compensate American Sugar for transporting goods to the Cuban government through Puerto Carupano, and several of them took deliberate steps to conceal that activity.  Among other things, certain Defendants knowingly made false representations in legal documents that the final destination of the wind farm equipment ordered by the Cuban government was Miami—which was merely a refueling stop en route to delivery in Cuba—in an apparent attempt to circumvent being found liable under the Helms-Burton Act and/or U.S. sanctions on Cuba, and in violation of U.S. law prohibiting the falsification of such information.

7.     Sixty years after its business was stolen, American Sugar still has received nothing for its confiscated property, while the Cuban government and Defendants continue to traffic in and use American Sugar's expropriated property for their own profit, including (but not limited to) supplying a multi-hundred-million-dollar wind farm project.  To be sure, in the wake of the Cuban government's actions, the United States established an administrative process for claims against the Cuban government, and certified in 1969 that American Sugar suffered losses equal to just over $97 million—the second-largest claim against the Cuban government ever certified by the United States.  That process, however, did not authorize American Sugar to seek damages against the Cuban government or those who, like Defendants, use American Sugar's property for their own gain in concert with the Cuban government.

3

8.      To redress this problem, in March 1996, President Clinton signed into law the Helms-Burton Act.  Title III of the Act, which took effect in August 1996, imposes liability against persons who "traffic[]" in property expropriated by the Cuban government.  Title III defines "trafficking" broadly to prohibit even the mere "use" of or "benefiting from" expropriated property.  And where (as in this case) the U.S. government has certified a person's claim to ownership of expropriated property, a trafficker is subject to treble damages if found liable, and faces a steep climb to avoid liability:  the certified claim is deemed conclusive proof of the claimant's ownership of the at-issue property, and the loss calculation set forth in the certified claim is the presumptive base damages amount to be trebled, rebuttable only by clear and convincing evidence.

9.      Although Title III's proscription against trafficking has remained in force since August 1996, the private right of action for Title III violations has been suspended by the President (pursuant to authority granted in the Act) up until only recently.  As required by the Act, this suspension was continuously revisited at least every six months.  The suspension of Title III's private right of action was partially lifted in March 2019, and then fully lifted in May of 2019.

10.     Persons trafficking in confiscated property after the enactment of the Helms-Burton Act did so at their own peril, even before the suspension of the private right of action was lifted.  Liability under the Act for such misconduct—especially where the United States had certified a claim for expropriated property in Cuba—was unmistakably clear; the suspension of the private right of action was subject to repeated review and could be lifted in a matter of months; and the Act's two-year limitations period did not begin to run until the trafficking at issue stopped.  Moreover, traffickers who were natural persons also risked being denied entry

into the United States under Title IV of the Act, which has remained in full effect since March 1996.

11.     Accordingly, Defendants knew since 1996 that having business dealings with Cuba, and (among other things) using or benefiting from confiscated property certified by the United States as originally belonging to American Sugar, or profiting from such use or benefit, carried the risk of steep liability under the Helms-Burton Act.  Defendants nevertheless proceeded to traffic in American Sugar's property.  Now that the Act's private right of action is in force, American Sugar seeks long-overdue relief for the uncompensated exploitation of its confiscated property, including Defendants' knowing and intentional use of that property for their own financial gain.

## JURISDICTION AND VENUE

12.     Subject matter jurisdiction is conferred upon this Court by 28 U.S.C. § 1331 because this action arises under the laws of the United States, specifically Title III of the Helms-Burton Act, 22 U.S.C. §§ 6081–85.

13.     Subject matter jurisdiction is also conferred upon this Court by 28 U.S.C. § 1367(a), because American Sugar's civil conspiracy claim is "so related" to its Helms-Burton Act claim that they "form part of the same case or controversy under Article III of the United States Constitution."

14.     As required under Title III of the Helms-Burton Act, the amount in controversy in this action exceeds $50,000, exclusive of compounded interest, treble damages, court costs, and reasonable attorneys' fees.  22 U.S.C. § 6082(b).

15.     Personal jurisdiction is conferred upon this Court by Fla. Stat. §§ 48.193(1)(a)(1) and 48.193(1)(a)(2) because Defendants have operated, conducted, engaged in, and carried on a

business in the state of Florida and have committed a tortious act within Florida.  Alternatively, personal jurisdiction is conferred upon this Court by Fed. R. Civ. P. 4(k)(2), because Defendants are not subject to jurisdiction in any state's courts of general jurisdiction; and exercising jurisdiction is consistent with the United States Constitution and laws.

16.     Exercise of personal jurisdiction by this Court over Defendants is consistent with the United States Constitution as this action arises from or relates to Defendants' activities in Florida or the United States, and Defendants have purposefully availed themselves of the benefits and protections of Florida or the United States.

17.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a "substantial part of the events or omissions giving rise to the claim occurred" in the Southern District of Florida.  Alternatively, venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(3) because at least one Defendant is subject to the Court's personal jurisdiction with respect to this action.

18.     Contemporaneous with this filing, American Sugar has paid the special fee for filing an action under Title III of the Helms-Burton Act, 22 U.S.C. § 6082(i), which is $6,548 pursuant to the fee schedule adopted by the Judicial Conference in September 2018.

## PARTIES

19.     Plaintiff American Sugar, originally known as the Cuban-American Sugar Company, is a United States national and a corporation organized and existing under the laws of the state of New Jersey since September 19, 1906, with its principal place of business in New York, New York.  From its incorporation, American Sugar owned and operated significant commercial operations in Cuba relating to the production, refining, and transportation of raw

sugar.  These operations were forcibly terminated in 1959 and 1960 when the Government of Cuba expropriated the underlying Cuban assets.

20.     Defendant Goldwind Science is a corporation organized and existing under the laws of the People's Republic of China, with its principal place of business at 107 Shanghai Road, Economic Tech Development Zone, Urumqi, Xinjiang Urumqi, 830026 China.  Goldwind Science is a developer and manufacturer of wind generation equipment, including wind turbines and wind turbine components.  Goldwind Science also provides services and other products in support of wind farm development and other related businesses.  Goldwind Science, whose shares trade on the Stock Exchange of Hong Kong, has a market capitalization of $8.5 billion.  In 2019, Goldwind Science reported $5.3 billion in revenue, as well as non-current assets in the United States worth approximately $247 million.  That same year, Goldwind Science also filed 34 applications for patents in the United States.  Goldwind Science is reported as the shipper for about six shipments, and the consignee (i.e., recipient) for one shipment, for goods unloaded at U.S. ports within the last three years.

21.     Defendant Goldwind International is a corporation organized and existing under the laws of the Hong Kong Special Administrative Region of the People's Republic of China, with its principal place of business at 8 Boxing First Road, Economic Tech Development Zone, Beijing, 102600 China.  Goldwind International manufactures wind power equipment products, including wind turbines and wind turbine blades.  Goldwind Science owns and controls Goldwind International.  Goldwind International is reported as the shipper for approximately 46 shipments for goods unloaded at U.S. ports within the last three years.

22.     Defendant DSV is a corporation organized and existing under the laws of the state of Delaware with its principal place of business at 100 Walnut Avenue, Suite 405, Clark, New

Jersey 07066.  DSV provides air and sea freight forwarding services, including transport, warehousing, and logistics services.  DSV is an affiliate of DSV Ocean Transport A/S ("DSV Ocean Transport"), a Danish corporation that similarly provides sea freight-forwarding services. The parent company of both entities is DSV Panalpina A/S, a Danish corporation whose current market capitalization is approximately $23.5 billion.  DSV operates and maintains branch offices in Orlando and Miami.  DSV is reported as the shipper for about 24 shipments, and the consignee for approximately 175 shipments, for goods unloaded at Florida ports (including Miami) within the last three years.

23. Defendant BBC USA is a corporation organized and existing under the laws of the state of Texas, with its principal place of business at 6565 West Loop South, Suite 200, Bellaire, Texas 77401.  BBC USA provides transportation services, specializing in the support of ocean cargo transportation.  BBC USA is owned and controlled by BBC Chartering & Logistic GmbH & Co. KG ("BBC Chartering"), a corporation organized under the laws of the Federal Republic of Germany, and serves as its agent and hub for the United States, Caribbean, and Central America geographic regions.  In 2018, BBC Chartering reported $103 million in revenue.  BBC USA and BBC Singapore—in conjunction with BBC Chartering Carriers GmbH & Co. KG ("BBC Carriers"), a German corporation—are affiliates that, among other things, coordinate the chartering and operation of commercial shipping vessels—including ships named the "BBC Moonstone" and the "BBC Jade."  BBC USA and the other entities identified in this paragraph are all part of a network of companies known as the "Briese Group."  In 2018, Briese Group entities collectively reported at least $1.3 billion in revenue.  BBC USA is reported as the shipper for two shipments, and the consignee for about 119 shipments, for goods unloaded at U.S. ports within the last three years.  Among the 119 shipments where BBC USA is reported as

the consignee, BBC Carriers is listed as the carrier for 69 shipments, and BBC Chartering is listed as the carrier for 50 shipments. Further, of the 119 shipments where BBC USA is reported as the consignee, four shipments of goods—weighing over 56 metric tons in total—were unloaded in Florida ports.

24. Defendant BBC Singapore is a corporation organized and existing under the laws of the Republic of Singapore, with its principal place of business at 8 Shenton Way #22-01, 068811 Singapore. BBC Singapore provides transportation services, specializing in the support of ocean cargo transportation. BBC Singapore serves as BBC Chartering's agent and hub for the East Asia and Southeast Asia geographic regions. With other companies in the Briese Group, identified at paragraph 23, *supra*, BBC Singapore coordinates the chartering and operation of commercial shipping vessels—including the BBC Moonstone and the BBC Jade.

## STATUTORY BACKGROUND

### I. Certification by the U.S. Foreign Claims Settlement Commission

25. On February 3, 1962, in response to the rise of Fidel Castro and Cuba's Communist Revolution, President John F. Kennedy issued Proclamation 3447, Pres. Proc. No. 3447, 76 Stat. 1446, which established a comprehensive trade embargo in order to pressure Cuba to implement democratic reforms. This trade embargo remains substantially in force today.

26. Building on the Cuban trade embargo, and in response to (among other things) the Castro regime's expropriation of Cuban property belonging to U.S. nationals, on October 16, 1964, Congress enacted Title V of the International Claims Settlement Act of 1949 ("ICSA"), Pub. L. 88-666, 78 Stat. 1110 (1964) (codified at 22 U.S.C. §§ 1643–1643k (1964)) which established the Cuba Claims Program to be administered by the United States Foreign Claims Settlement Commission ("FCSC").

27.     The Cuba Claims Program was limited to expropriation and similar claims against the Cuban government that arose between January 1, 1959 and October 15, 1964.  The program was closed on July 6, 1972.

28.     The FCSC is an independent federal agency that determines the validity and amount of each claim of expropriation that United States nationals have against a foreign government, so that those nationals may be compensated for their losses and injuries pursuant to specific programs authorized by law.  *See* Reorganization Plan No. 1 of 1954, 68 Stat. 1279 (1954).

29.     Under the Cuba Claims Program, the FCSC "receive[d] and determine[d] in accordance with applicable substantive law, including international law, the amount and validity of claims by *nationals of the United States* against the Government of Cuba . . . for losses resulting from the nationalization, expropriation, intervention, or other taking of . . . *property* including any rights or interests therein owned wholly or partially, directly or indirectly at the time *by nationals of the United States*."  22 U.S.C. § 1643b(a) (emphases added).

30.     The term "nationals of the United States" includes "persons who are citizens of the United States" and "persons who, though not citizens of the United States, owe permanent allegiance to the United States."  22 U.S.C. § 1621(c).

31.     The term "property" is defined as "any property, right, or interest, including any leasehold interest, and debts owed by the Government of Cuba . . . or by enterprises which have been nationalized, expropriated, intervened, or taken by the Government of Cuba . . . and debts which are a charge on property which has been nationalized, expropriated, intervened, or taken by the Government of Cuba . . . ."  22 U.S.C. § 1643a(3).

32.     In determining the value of an expropriation claim, the FCSC was required to take "into account the basis of valuation most appropriate to the property and equitable to the claimant, including, but not limited to, (i) fair market value, (ii) book value, (iii) going concern value, or (iv) cost of replacement."  22 U.S.C. § 1643b(a).

33.     Upon completion of its review of an expropriation claim, the FCSC "certif[ied] to each individual who has filed a claim . . . the amount determined by the Commission to be the loss or damage suffered by the claimant . . . .  The [FCSC] shall certify to the Secretary of State such amount and the basic information underlying that amount, together with a statement of the evidence relied upon and the reasoning employed in reaching its decision."  22 U.S.C. § 1643f(a).

34.     ICSA originally contemplated that the Secretary of State would use these certified claims to negotiate and enter into a potential settlement agreement with the Cuban government, whereby the Cuban government would compensate U.S. nationals with certified expropriation claims.  Instead, as discussed below, the Helms-Burton Act deems the amount of an FCSC-certified claim to be the damages—before compounded interest, treble damages, court costs, and reasonable attorneys' fees—owed to a plaintiff that prevails in a private right of action brought under the Act.

## II.     The Helms-Burton Act

### A.     Background

35.     On March 12, 1996, President Clinton signed the Helms-Burton Act into law, not only to further strengthen international sanctions and the trade embargo against the Government of Cuba, 22 U.S.C. § 6022(2), but also to "protect United States nationals against confiscatory

takings and the wrongful trafficking in property confiscated by the Castro regime," 22 U.S.C.

§ 6022(6).

36.    Congress recognized that international law, as then structured, "lacks fully

effective remedies" for the "unjust enrichment *from the use of wrongfully confiscated property

by* governments and *private entities* at the expense of the rightful owners of the property."  22

U.S.C. § 6081(8) (emphases added).

37.    According to Congress's findings, this "'trafficking' in confiscated property

provides badly needed financial benefit . . . to the Cuban government and thus undermines the

foreign policy of the United States," which includes "protect[ing] claims of United States

nationals who had property wrongfully confiscated by the Cuban government."  22 U.S.C.

§ 6081(6).

38.    "To deter trafficking," Congress found that "the victims of these confiscations

should be endowed with a judicial remedy in the courts of the United States that would deny

traffickers any profits from economically exploiting Castro's wrongful seizures."  22 U.S.C.

§ 6081(11).

39.    To this end, Title III of the Helms-Burton Act, entitled "Protection of Property

Rights of United States Nationals," imposes liability on persons trafficking in property

confiscated from a U.S. national by the Cuban government on or after January 1, 1959, and

authorizes a private right of action for damages against such traffickers.  *See* 22 U.S.C. § 6082.

40.    A Title III lawsuit may not be brought more than two years after the trafficking

giving rise to the lawsuit has ceased to occur.  *See* 22 U.S.C. § 6084.

41.    The Helms-Burton Act authorizes the President to suspend for periods of up to six

months at a time (1) the Title III private right of action, 22 U.S.C. § 6085(c); and/or (2) the

effective date of Title III of August 1, 1996, 22 U.S.C. § 6085(b).  The President has historically delegated this suspension authority to the Secretary of State.

42.     On July 16, 1996, President Clinton suspended the private right of action under Title III for six months.  The August 1, 1996 effective date, however, was not suspended.

43.     On August 1, 1996, Title III of the Act came into effect.  Starting on that date, traffickers of confiscated property were liable to U.S. nationals with certified claims to that property but could not be sued while the private right of action remained suspended.

44.     Because the operative provisions of the Act became effective and have remained continually in full force and effect since 1996, traffickers in confiscated property had no assurances that they would be forever shielded from liability by a President's discretionary suspension of the private right of action, which could be reinstated at any time, triggering civil liability for any violation of the Act within the two-year limitation period.  Thus, in the event that the suspension was lifted, trafficking from up to two years prior could be the subject of a lawsuit.

45.     President Clinton and subsequent administrations continuously renewed the suspension of the Title III private right of action, typically for six months at a time, by decision of the President and Secretary of State.

46.     On March 19, 2019, Secretary of State Pompeo partially lifted the suspension of Title III's private right of action, allowing United States nationals to sue certain Cuban state-owned entities.  Then on May 2, 2019, Secretary Pompeo fully lifted the suspension.  In remarks addressing this action, Secretary Pompeo stated that "a chance at justice" would now be offered

to those who have "long sought relief for Fidel Castro and his lackeys seizing property without compensation."[2]

47.     While traffickers in confiscated property have been—until recently—unreachable by Title III lawsuits, they have been subject to potential consequences since March 12, 1996. Under Title IV of the Act, the Secretary of State "shall deny a visa to, and the Attorney General shall exclude from the United States any alien who the Secretary of State determines is a person who has traffic[ked] in confiscated property."  22 U.S.C. § 6091(a).  Indeed, this denial and exclusion applies to not only the trafficker in question, but also to the trafficker's agents, corporate officers, principals, and controlling shareholders.  *See id.*

48.     In response to the Helms-Burton Act, the Cuban government enacted Act No. 80, the "Reaffirmation of Cuban Dignity and Sovereignty Act," sanctioning, and potentially criminalizing, "any form of collaboration, direct or indirect, which favors the application of the Helms-Burton Act," including supplying information to an individual for possible application of the Act or assisting another person in supplying such information.  Ley No. 80, Arts. 8–9, Gaceta Oficial No. 2 Extraordinaria, 299–300 (1996).  The evident purpose of Act No. 80 is to hinder the investigation and prosecution of violations of the Helms-Burton Act by those with potential claims under the Act.

### B.     The Helms-Burton Act's Private Right of Action

49.     Title III of the Helms-Burton Act provides the following private right of action:

(1) Liability for trafficking.—(A) Except as otherwise provided in this section, any person that, after the end of the 3-month period beginning on the effective date of this title, traffics in property which was confiscated by the Cuban Government on

---

[2]  Michael R. Pompeo, Secretary of State, Remarks to the Press (Apr. 17, 2019), https://cu.us embassy.gov/remarks-to-the-press-3/.

or after January 1, 1959, shall be liable to any United States national who owns the claim to such property for money damages . . . .

22 U.S.C. § 6082(a)(1).

50.     The Act defines "person" as "any person or entity, including any agency or

instrumentality of a foreign state."  22 U.S.C. § 6023(11).

51.     The Act defines "United States national" to include any "legal entity which is

organized under the laws of the United States, or of any State, the District of Columbia, or any

commonwealth, territory, or possession of the United States, and which has its principal place of

business in the United States."  22 U.S.C. § 6023(15).

52.     A person "traffics" in confiscated property if that person "knowingly, and

intentionally":

(i)  sells, transfers, distributes, dispenses, brokers, manages, or otherwise disposes of confiscated property, or purchases, leases, receives, possesses, obtains control of, manages, uses, or otherwise acquires or holds an interest in confiscated property,

(ii) engages in a commercial activity using or otherwise benefiting from confiscated property, or

(iii) causes, directs, participates in, or profits from, trafficking (as described in clause (i) or (ii)) by another person, or otherwise engages in trafficking (as described in clause (i) or (ii)) through another person,

without the authorization of any United States national who holds a claim to the property.

22 U.S.C. § 6023(13).

53.     The Act defines "property" as "any property (including patents, copyrights,

trademarks, and any other form of intellectual property), whether real, personal, or mixed, and

any present, future, or contingent right, security, or other interest therein, including any leasehold

interest."  22 U.S.C. § 6023(12).

54.     The Act defines "confiscated" in relevant part as "the nationalization, expropriation, or other seizure by the Cuban government of ownership or control of property, on or after January 1, 1959—(i) without the property having been returned or adequate and effective compensation provided; or (ii) without the claim to the property having been settled pursuant to an international claims settlement agreement or other mutually accepted settlement procedure." 22 U.S.C. § 6023(4)(A).

55.     The term "knowingly" under the Act means "with knowledge or having reason to know."  22 U.S.C. § 6023(9).

56.     The Helms-Burton Act adopts the definition of "commercial activity" under 28 U.S.C. § 1603(d), *see* 22 U.S.C. § 6023(3), which defines the term as "either a regular course of commercial conduct or a particular commercial transaction or act.  The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose."  28 U.S.C. § 1603(d).

**C.     Remedies Under the Helms-Burton Act's Private Right of Action**

57.     A person who "traffics" in a United States national's confiscated property under the Helms-Burton Act is liable to a plaintiff for money damages equal to:

(i) the amount which is *the greater of*—

> (I) *the amount, if any, certified to the claimant by the [FCSC] under the [ICSA], plus interest*;
>
> (II) the amount determined [by a court-appointed special master, which may include the FCSC], plus interest; or
>
> (III) the fair market value of that property, calculated as being either the current value of the property, or the value of the property when confiscated plus interest, whichever is greater[.]

22 U.S.C. § 6082(a)(1)(A) (emphases added).

58.     Interest under the Act accrues from "the date of confiscation of the property

involved to the date on which the action is brought."  22 U.S.C. § 6082(a)(1)(B).  This interest is

calculated pursuant to 28 U.S.C. § 1961 "at a rate equal to the weekly average 1-year constant

maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System"

for the calendar week preceding the date of confiscation and compounded annually.  28 U.S.C.

§ 1961(a) (incorporated by reference in 22 U.S.C. § 6082(a)(1)(B)).

59.     A person who "traffics" in a United States national's confiscated property under

the Act is also liable for a plaintiff's court costs and reasonable attorneys' fees.  *See* 22 U.S.C.

§ 6082(a)(1)(A)(ii).

60.     In addition, the Helms-Burton Act adopts "a presumption that the amount for

which a person is liable . . . is the amount that is certified [by the FCSC under the ICSA]."  22

U.S.C. § 6082(a)(2).  That presumption is only "rebuttable by clear and convincing evidence."

*Id.*  A court must also "accept as conclusive proof of ownership of an interest in property a

certification of a claim to ownership of that interest that has been made by the [FCSC under the

ICSA]."  22 U.S.C. § 6083(a)(1).

61.     Further, the Act provides that "[a]ny person that traffics in confiscated property

for which liability is incurred" shall be liable for treble damages to a United States national who

owns a certified claim to that property.  22 U.S.C. § 6082(a)(3)(A), (C).

62.     Congress intentionally conferred these presumptions to certified claims.  The

Report from the Conference Committee states that "courts shall give a strong presumption to the

findings of the FCSC" and further states:

> The committee of conference recognizes the importance of a decision by the
> Foreign Claims Settlement Commission in certifying a claim and, accordingly,
> believes that no court should dismiss a certification in an action brought under [Title
> III].  The committee of conference also notes the recognized special expertise of

17

the FCSC in determining the amount and validity of claims to confiscated properties overseas.

H.R. Rep. No. 104-468, at 63 (1996).

## FACTUAL ALLEGATIONS

### I.      Cuba's Expropriation of American Sugar's Property

#### A.      American Sugar's Property in Cuba

63.     When it was initially incorporated in 1906, American Sugar held five sugar-producing companies that owned and operated large commercial shipping ports, raw sugar mills, cane land, and a cane sugar refinery in Cuba.  Over the ensuing several decades, American Sugar greatly expanded operations in Cuba, and by 1959 and 1960 it came to hold not only two of the largest raw sugar mills in the world at that time but also two shipping ports integral to its sugar mill operations and various other assets.

64.     American Sugar's property in Cuba (the "Confiscated Property") consisted of various Cuban corporate subsidiaries and their numerous assets across Cuba, including large commercial shipping ports, land and crops, farm buildings, raw sugar mills, power-generating equipment, a railroad, and a sugar refinery.  American Sugar's raw sugar mills, known as Central Mercedita, Central Chaparra, and Central Delicias, were notable for their productivity and high output.  Central Mercedita produced 30,000 tons of sugar in 1959.  Centrals Chaparra and Delicias, which comprised about 300,000 acres of land, produced 250,250 tons of sugar in 1959—and, together, ranked in the top 10 sugar producers in all of Cuba.  The high output and efficient processes were due to American Sugar's substantial investment in the maintenance and modernization of the raw sugar mills, and the related equipment and infrastructure.  Exhibit 1 (attached hereto) includes a more detailed description of the Confiscated Property and its value.

65.     The Confiscated Property also includes Puerto Carupano, a large commercial shipping port located in Cayo Juan Claro, which is in the Cuban municipality of Puerto Padre and the Cuban province of Las Tunas.  It is the only commercial shipping port in all of Puerto Padre.  Puerto Carupano is also referred to as "Port of Cayo Juan Claro," "Port of Carupano," or "Port of Puerto Padre."

66.     Puerto Carupano (hereinafter the "Confiscated Port") encompasses associated docks, warehouses, tanks, transportation facilities, pump houses, an electric substation, dwellings, barracks, office buildings, piers, shops, and other related installations.

67.     The Confiscated Port was critical to American Sugar's business operations in Cuba and abroad.  The port was a hub not only for transportation, storage, and shipping of all exported raw sugar and molasses produced by American Sugar at Centrals Chaparra and Delicias, but also for much of the imported heavy capital equipment, oil, merchandise, and food for the surrounding area.  Because the port was adjacent to fertile lands housing two of American Sugar's largest raw sugar mills, American Sugar incurred minimal expenses in transporting its sugar products to the Confiscated Port for shipment.

**B.      Cuba Confiscates American Sugar's Property—Including the Confiscated Port**

68.     On January 1, 1959, as part of the Cuban Revolution, Fidel Castro took control of the Cuban government.  His administration immediately began promulgating a series of laws and resolutions that effectively confiscated virtually all private property in Cuba owned by United States nationals in various economic sectors.  The Cuban government made no effort to compensate United States nationals for expropriating their property, as required under generally accepted rules of international law.

69.     American Sugar was no exception to this mass seizure of private property.  The Cuban government's expropriation of the Confiscated Property began in 1959 and came to a head on July 20, 1960.  On that date, Cuba's National Agrarian Reform Institute issued Resolution No. 195, through which the Cuban government seized full control and ownership of the Confiscated Property.

70.     The Cuban government's expropriation of the Confiscated Property—without even a jot of compensation as required under generally accepted rules of international law, *see* Exh. 1 at 3—effectively terminated American Sugar's operations in Cuba.

71.     Upon seizing the Confiscated Port, the Cuban government openly and notoriously used, and continues to use, that port for its own commercial activities and those of private parties doing business with Cuba.

72.     On January 20, 1978, for example, Fidel Castro made a public speech at the Confiscated Port regarding a new bulk sugar terminal that had been built at the port.  Alluding to the Cuban government's expropriation of commercial ports such as the Confiscated Port, Castro proudly proclaimed in the speech that the ports, which had been previously owned by "property owners and the capitalists," were now the "property of the [Cuban] people."[3]  He reiterated that the "ports [have] ceased to be operated by private enterprise."[4]

73.     In the 1980s, the Confiscated Port handled approximately 8% of Cuba's annual production of sugar and sugar byproducts, valued in excess of $370 million.  Products from the

---

[3]  *See* Fidel Castro, President of Cuba, *Dedication of bulk sugar terminal in Puerto Carupano*, Las Tunas Province (Jan. 20, 1978), available at http://lanic.utexas.edu/project/castro/db/1978/19780120.html.

[4]  *Id.*

Central Chaparra mill and the Central Delicias mill—both confiscated from American Sugar—were routinely transported through the Confiscated Port.

74.     To this day, the Confiscated Port remains one of Cuba's key shipping ports and a hub of substantial commercial activity—much of which is in support of, or substantially related to, projects spearheaded by the Cuban government and its state-owned companies.  Indeed, the Cuban government has sought to encourage foreign investment by regularly touting the Confiscated Port as one of the country's principal shipping ports.[5]

75.     To this day, American Sugar has not received any compensation for the expropriation of the Confiscated Property, nor has any part of the Confiscated Property been returned to American Sugar.  Moreover, American Sugar's claim to the Confiscated Property has never been settled by an international claims settlement agreement or other settlement agreement between the United States and Cuba.

**C.     American Sugar's Claim Is Certified in 1969 for Over $97 Million**

76.     In response to the expropriation of its Confiscated Property and the resultant financial loss, American Sugar submitted a claim to the FCSC for determination under the Cuba Claims Program.  American Sugar's certified claim is publicly accessible[6] and has been the subject of news reports.[7]

---

[5]  *See, e.g.*, Cuba Ministry of Foreign Commerce and Investments, Cuba: Portfolio of Opportunities for Foreign Investment 2016–2017, at 204 (listing "Carupano" as one of 12 "Principal Cuban Ports"), available at https://arwtc.org/wp-content/uploads/2017/05/Portfolio_Opportunities_Foreign_Investment_2016-2017.pdf (last visited on June 5, 2020).

[6]  *See* FCSC, Final Opinions and Orders, https://www.justice.gov/fcsc/final-opinions-and-orders-5 (last visited on June 5, 2020).

[7]  *See, e.g.*, Nick Miroff, *The 20 Largest U.S. property claims in Cuba*, THE WASHINGTON POST, Dec. 8, 2015 (American Sugar has second-largest certified claim), available at https://www.washingtonpost.com/news/worldviews/wp/2015/12/08/the-20-largest-u-s-property-claims-in-cuba/.

77.     The FCSC found that American Sugar qualified as a "national of the United States" within the meaning of the ICSA.  *See* Exh. 1 at 2.

78.     The FCSC evaluated the value of American Sugar's claim by reviewing, among other things, a value appraisal, photographs, engineering surveys, maps, statements of noncapital assets, and a prior report submitted by American Sugar to the Department of State in 1961 asserting the values of the individual confiscated properties.  *See* Exh. 1 at 3.

79.     After an extensive review of the evidence regarding the value of the Confiscated Property, the FCSC "certifie[d] that [American Sugar] suffered a loss, as a result of actions of the Government of Cuba" in the amount of $97,373,414.72.  Exh. 1 at 21.

80.     The amount of American Sugar's loss certified under the Cuba Claims Program is the second-highest amount ever certified by the FCSC for an individual or entity.

81.     American Sugar's expropriation claim against the Government of Cuba regarding the Confiscated Property has never been settled pursuant to a settlement agreement between the United States and Cuba.

**II.     Defendants' Deliberate Use of American Sugar's Confiscated Property**

    **A.     The Herradura Wind Farm Project**

82.     The Confiscated Port has been the main artery for imports of (among other things) wind turbines, related equipment, structures, and other materials needed to build one of Cuba's largest ongoing public works projects:  the Herradura Wind Farm Project, which is located about 15 miles from the Confiscated Port.

83.     Indeed, the Cuban Ministry of Transportation published a news article regarding the Confiscated Port, which states that "[t]he technological equipment of the La Herradura 1

wind farm, which is built on the coast of the municipality of Jesús Menéndez, has entered

through this port enclave and will continue to do so . . . ."[8]

84.    The Herradura Wind Farm Project is part of the Cuban government's publicized

goal of significantly reducing its dependence on imported foreign oil.  By 2030, Cuba aims to

produce almost a quarter of its electricity, or 2,269 megawatts ("MW") of energy, from

renewable sources.  To support this shift to renewable energy, Cuba has secured an estimated $4

billion in foreign investment.

85.    Located in the Jesús Menéndez municipality of the Cuban province of Las Tunas,

the Herradura Wind Farm Project is composed of two separate wind farms known as "Herradura

1" and "Herradura 2."  Herradura 1 is set to house 34 wind turbines, whereas Herradura 2 is set

to contain 20 wind turbines.  The project is estimated to cost hundreds of millions of dollars to

construct and is expected to generate 101 MW of energy into Cuba's central electrical grid—

more than any other existing Cuban wind farm project, and a 61% increase in the renewable

energy capacity in Cuba.  A Cuban state official has stated that the project is estimated to save

the Government of Cuba nearly 79,000 tons of fuel each year.[9]

86.    A host of Cuban state-owned entities are involved in the planning, construction,

and implementation of the Herradura Wind Farm Project, including Empresa Importadora-

---

[8]  Periódico 26, Día del Trabajador Marítimo Portuario: En Puerto Carúpano al Jolgorio Después del Trabajo, MINISTERIO DEL TRANSPORTE, REPUBLICA DE CUBA (June 14, 2019), https://www.mitrans.gob.cu/es/noticias/dia-del-trabajador-maritimo-portuario-en-puerto-carupano-al-jolgorio-despues-del-trabajo (Original Spanish: "Por este enclave portuario ha entrado – y lo continuará haciendo – el equipamiento tecnológico del parque eólico La Herradura 1, que se edifica en el litoral del municipio de Jesús Menéndez . . .").

[9]  See Raimundo Urrechaga, Chinese technology helps Cuba build largest wind farm, XINHUA, Jan. 22, 2018), http://www.xinhuanet.com/english/2018-01/22/c_136914462.htm.

Exportadora de Objetivos Electro-Energéticos ("Energoimport")—a component of Cuba's Ministry of Energy and Mining.

87.     Energoimport arranges the logistics supporting the delivery of wind farm equipment through the Confiscated Port and to the Herradura Wind Farm Project.  Energoimport describes itself as "in charge of guaranteeing the delivery . . . of the supplies necessary for the execution of investments, imports and exports, [and] the maintenance and operation of [Cuba's] National Electro-energy System."[10]

### B.     Goldwind International Signs on to the Herradura Project

88.     In December 2013, a consortium composed of Goldwind International and non-party Avic International Holding Corporation ("Avic") entered into a commercial agreement with Energoimport to provide wind farm designs, equipment, supplies, technical support, operations, and maintenance for Herradura 1.

89.     As part of this agreement, Goldwind International agreed with Energoimport to supply Herradura 1 with, among other equipment, 34 customized units of its GW 77/1500 PMDD wind turbines.  All of the wind turbines at Herradura 1 would originate from Goldwind International.

90.     On June 23, 2017, the Goldwind International-Avic consortium, in collaboration with the Cuban government, secured project financing from the Export-Import Bank of China and the China Export and Credit Insurance Corporation.

---

[10]  UNE, *ENERGOIMPORT*, UNE: Unión Eléctrica, https://www.unionelectrica.cuenergoimport/ (last modified on Nov. 29, 2018).

91.     Goldwind International touted the details of its involvement in the Herradura Wind Farm Project in a published report.[11]

92.     Goldwind Science participated directly in the Herradura Wind Farm Project by, among other things, shipping certain wind farm equipment to the Confiscated Port, by way of Florida, for use in the project.

**C.     Defendants' Shipments of Equipment to the Confiscated Port for the Herradura Wind Farm Project**

93.     In order to deliver the promised millions of dollars of wind farm equipment to their final destination for the Herradura Wind Farm Project, Goldwind International and Goldwind Science arranged for the transport of that equipment by sea to the Confiscated Port. Other suppliers of wind farm equipment to the Herradura Wind Farm Project also arranged for the delivery of equipment to the Confiscated Port.

94.     To ship wind farm equipment by sea, one or more carriers are typically hired to handle transportation logistics that include, among other things, identifying and booking available space on a shipping vessel, operating the vessel itself, coordinating pick-up and drop-off of the equipment, and planning the shipping route.

95.     There are two types of carriers:  those that operate shipping vessels (known as Vessel Operating Common Carriers ("VOCCs")), and those that do not (known as Non-Vessel Operating Common Carriers ("NVOCCs")).[12]  If an exporter hires an NVOCC to execute a shipment, that NVOCC must then engage a VOCC to charter space on and operate the vessel

---

[11]  *See* Goldwind International, GWI Quarterly Q2 2017, Volumes 8, 10, available at http://www.goldwindinternational.com/media/index.html#bro (last visited on June 5, 2020).

[12]  *See, e.g.*, 46 U.S.C. § 40102 (17)(A) (NVOCCs are common carriers that "do[] not operate the vessels by which the ocean transportation is provided.").

carrying the transported goods.  Together, the NVOCC and VOCC determine which vessels are able to hold and transport the relevant cargo; plan the voyage for the cargo from port of origin to port of destination; and provide operational and logistical support at all ports of entry.

96.     A shipping vessel intending to enter the United States carrying foreign-origin cargo must electronically submit information regarding such cargo to the U.S. Customs and Border Protection ("CBP") at least 24 hours before the cargo is picked up at the foreign port (hereinafter, a "Cargo Declaration").  *See* 19 C.F.R. § 4.7(b)(2).  The NVOCC must either itself submit the Cargo Declaration to CBP, or forward it to the relevant VOCC to submit.  *See id.* § 4.7(b)(3)(i).

97.     Those carriers that have registered with the National Motor Freight Traffic Association must use their unique Standard Carrier Alpha Code in their Cargo Declarations.  *See* 19 C.F.R. § 4.7a(c)(2)(iii).

98.     A Cargo Declaration must also contain accurate information regarding the relevant "bills of lading."  *See id.* § 4.7a(c), (f).

99.     A bill of lading is a legal document issued by a carrier to a shipper that details, among other things, the cargo being shipped; the vessel carrying the cargo; the origin and destination of the cargo; the ports of lading and unlading (i.e., loading and unloading); and the exporter, carrier, and consignee (i.e., recipient) of the cargo.  The bill of lading is signed by both the carrier and the shipper.

100.     Where both an NVOCC and a VOCC are engaged for a shipment, there are two types of bills of lading.  The "house" bill of lading is issued by the NVOCC (which is listed as "carrier") to the *actual* shipper of the cargo.  The "master" bill of lading[13] is issued by the VOCC

---

[13] The "master" here refers to the master of the relevant shipping vessel.

(which is listed as "carrier") to the NVOCC (which is listed as "shipper").  Thus, to ascertain the true identity of the shipper, the house bill of lading is the critical document.  In most other respects, the house and master bills of lading are identical.

101.    At a shipment's origin, the bills of lading function as receipts verifying that the goods have transferred from the shipper to the NVOCC, and then from the NVOCC to the VOCC.  At a shipment's destination, the bills of lading function as proof of title to the goods.  Per industry practice, the consignee listed presents the house bill of lading to the carrier in order to secure release of the shipment and claim ownership.

102.    In general, and at all times, the cargo described in the house and master bills of lading must match the manifest records kept by the shipping vessel carrying the cargo.

103.    As detailed below, in late 2018 and early 2019, Defendants—which include both exporters and carriers of wind farm equipment—coordinated at least two separate voyages that delivered and unloaded equipment at the Confiscated Port, by way of Florida, for use in the Herradura Wind Farm Project.  In this way, Defendants, in collaboration, used and commercially benefited from the Confiscated Port.

> **D.    Deliveries via the BBC Moonstone**

> > i.    The Shippers of Wind Farm Equipment

104.    A commercial shipping vessel named the "BBC Moonstone," after a refueling stop in Florida, docked at the Confiscated Port in February 2019 and unloaded wind farm equipment on behalf of Goldwind Science and another supplier of the Herradura Wind Farm Project (hereinafter, the "BBC Moonstone Voyage").  The BBC Moonstone, International Maritime Organization ("IMO") No. 9563732, is owned by a Briese Group entity.

105.    Goldwind Science arranged for the BBC Moonstone to deliver its wind farm equipment (the "Goldwind Equipment") to Energoimport via the Confiscated Port, knowing that a preceding refueling stop would be made in Florida.

106.    Goldwind International, which was contracted to supply wind farm equipment to Energoimport for use in the Herradura Wind Farm Project, *see supra* paragraphs 88–89— directed or otherwise caused Goldwind Equipment to be delivered at the Confiscated Port, knowing that a preceding refueling stop would be made in Florida.

107.    Another entity that agreed to provide equipment for the Herradura Wind Farm Project also arranged for the BBC Moonstone to deliver its wind farm equipment (the "Moonstone Equipment") to Energoimport via the Confiscated Port, by way of Florida.

ii.    The Carriers of Wind Farm Equipment

108.    DSV acted as the NVOCC, and non-party BBC Carriers acted as the VOCC, for the Goldwind Equipment and the Moonstone Equipment deliveries at the Confiscated Port, with both entities knowing that a preceding refueling stop in Florida would occur.

109.    Goldwind Science hired and paid DSV, an NVOCC, to deliver the Goldwind Equipment to the Confiscated Port.  On information and belief, such hiring and payment was conducted through one of DSV's offices located in the United States.

110.    DSV then hired and paid BBC Carriers, a VOCC, to use a Briese Group shipping vessel, the BBC Moonstone, to carry out the delivery, and for related ship operational and chartering services.  On information and belief, such hiring and payment was conducted through one of DSV's offices located in the United States.

28

111.    On information and belief, BBC USA and BBC Singapore, corporate affiliates of BBC Carriers, were also VOCCs charged with operating and chartering the BBC Moonstone for shipment of the Goldwind Equipment and the Moonstone Equipment.

112.    BBC USA and BBC Singapore are the BBC Chartering agents responsible for, respectively, the Caribbean region and the Far East region.  Since the Goldwind Equipment and Moonstone Equipment originated from the Far East and were destined for a location in the Caribbean, both BBC USA and BBC Singapore would have provided logistical support to the shipping vessels entering or departing their respective regions.  From a ship-chartering perspective, they would have managed and tracked the cargo on all shipping vessels entering or departing their respective regions.

113.    DSV and BBC Carriers provided or otherwise supported the following services: (a) determining the shipping route taken by the BBC Moonstone; (b) tracking, at all times, the location of the BBC Moonstone and the equipment onboard at all relevant stops; (c) handling logistics, such as those involving local government authorities (or engaging third parties to do so); (d) coordinating with Goldwind Science, Energoimport, and other relevant shippers, carriers, and consignees; (e) overseeing and troubleshooting the execution of the deliveries; and (f) engaging in any necessary transactions to implement the foregoing.  On information and belief, DSV's Miami office was involved, at least in part, in providing the aforementioned services.

114.    On DSV's website, shippers can utilize the "Track & Trace" function to "follow [their] shipments online from the moment [they] place the order to delivery at the final destination."[14]

115.    On information and belief, BBC USA and BBC Singapore provided or otherwise supported the following services:  (a) determining the shipping route taken by the BBC Moonstone; (b) tracking, at all times, the location of the BBC Moonstone and the equipment onboard at all relevant stops; (c) handling logistics, such as those involving local government authorities (or engaging third parties to do so); (d) coordinating with Goldwind Science, Energoimport, and other relevant shippers, carriers, and consignees; (e) overseeing and troubleshooting the execution of the deliveries; and (f) engaging in any necessary transactions to implement the foregoing.

iii.    <u>Goldwind Equipment's Documentation Falsely States Miami Destination</u>

116.    DSV, or BBC Carriers on behalf of DSV, electronically submitted to CBP a Cargo Declaration regarding the Goldwind Equipment (the "Goldwind Declaration"), which states in relevant part:

| House Bill of Lading Number | DSVFHPR0023755 |
|---|---|
| Master Bill of Lading Number | BBHYTIACAR002 |
| Cargo | Blade Root Frames & Tip Frames |
| Vessel | BBC Moonstone |
| Shipment Origin | China |
| Shipment Destination | Miami, Florida |
| Port of Lading | Tianjin, China |
| Port of Unlading | Miami Seaport; Miami, Florida |
| Shipper | Goldwind Science |

---

[14]  DSV, *About DSV*, DSV GLOBAL TRANSPORT AND LOGISTICS, https://www.us.dsv.com/about-DSV (last visited on June 5, 2020).

| Consignee | Energoimport[15] |
|-----------|------------------|
| Carrier | DSVF |

117.    DSV is registered under the Standard Carrier Alpha Code "DSVF."  Indeed, on its website, DSV identifies "DSVF" as its "NVOCC SCAC Code."[16]

118.    Given that the Goldwind Declaration identifies DSVF as the carrier, and DSVF is the prefix of the house bill of lading number, DSV was the NVOCC officially named responsible for this shipment of the Goldwind Equipment.

119.    BBC Carriers is registered under the Standard Carrier Alpha Code "BBHY." Given that the Goldwind Declaration displays BBHY as the prefix of the master bill of lading number, BBC Carriers was the VOCC officially named responsible for this shipment of the Goldwind Equipment.

120.    The Goldwind Declaration falsely states the shipment destination and port of unlading as Miami, Florida, and the Miami Seaport, respectively—in violation of U.S. law.[17] While the Defendants routed the cargo to include a refueling stop in Miami, the true shipment destination was Cuba, and the true port of unlading was the Confiscated Port, *see infra* paragraphs 135–39.

121.    As evident from the Goldwind Declaration, DSV issued and signed a house bill of lading to Goldwind Science (the "Goldwind House BOL") which also misrepresented the

---

[15]  The Goldwind Declaration refers to Energoimport by its full name, "Empresa Importadora-Exportadora de Objetivos Electro-Energéticos."

[16]  DSV, *Fact Sheet*, DSV Global Transport and Logistics, https://www.us.dsv.com/about-DSV/press/fact-sheet (last visited on June 5, 2020).

[17]  It is a violation of the applicable CBP regulations for a VOCC or NVOCC to transmit electronically any information or documentation that is "forged, altered, or false."  19 C.F.R. § 4.7a.

shipment destination and port of unlading as Miami, Florida, and the Miami Seaport, respectively—in violation of U.S. law.[18] Goldwind Science also signed the Goldwind House BOL.

122. As evident from the Goldwind Declaration, BBC Carriers issued a master bill of lading (the "Goldwind Master BOL") to DSV which similarly misrepresented the shipment destination and port of unlading as Miami, Florida, and the Miami Seaport, respectively—in violation of U.S. law.[19] DSV also signed the Goldwind Master BOL.

123. On information and belief, a U.S. office of DSV issued and signed the Goldwind House BOL, and also received and signed the Goldwind Master BOL.

124. The Goldwind Declaration, Goldwind Master BOL, and Goldwind House BOL are collectively referred to hereinafter as the "Goldwind Documents."

    iv.   <u>Moonstone Equipment's Documentation Falsely States Miami Destination</u>

125. DSV, or BBC Carriers on behalf of DSV, electronically submitted to CBP a Cargo Declaration regarding the Moonstone Equipment (the "Moonstone Declaration"), which states in relevant part:

| | |
|---|---|
| **House Bill of Lading Number** | DSVFHPR0023752 |
| **Master Bill of Lading Number** | BBHYTIACAR001 |
| **Vessel** | BBC Moonstone |
| **Shipment Origin** | China |
| **Shipment Destination** | Miami, Florida |
| **Port of Lading** | Tianjin, China |
| **Port of Unlading** | Miami Seaport; Miami, Florida |

---

[18] Under the Federal Bills of Lading Act, falsely making a bill of lading; uttering, publishing or issuing a falsely made bill of lading; or negotiating or transferring for value a bill of lading containing a false statement is subject to a fine, imprisonment for not more than five years, or both. *See* 49 U.S.C. § 80116.

[19] *See supra* note 18.

| Consignee | Energoimport[20] |
|---|---|
| **Carrier** | DSVF |

126.     Given that the Moonstone Declaration identifies DSVF as the carrier, and DSVF is the prefix of the house bill of lading number, DSV was the NVOCC officially named responsible for this shipment of the Moonstone Equipment.

127.     Given that the Moonstone Declaration displays BBHY as the prefix of the master bill of lading number, BBC Carriers was the VOCC officially named responsible for this shipment of the Moonstone Equipment.

128.     The Moonstone Declaration falsely states the shipment destination and port of unlading as Miami, Florida, and the Miami Seaport, respectively—in violation of U.S. law.[21] While the Defendants routed the cargo to include a refueling stop in Miami, the true shipment destination was Cuba, and the true port of unlading was the Confiscated Port, *see infra* paragraphs 135–39.

129.     As evident from the Moonstone Declaration, DSV issued and signed a house bill of lading (the "Moonstone House BOL") which also misrepresented the shipment destination and port of unlading as Miami, Florida, and the Miami Seaport, respectively—in violation of U.S. law.[22]

130.     As evident from the Moonstone Declaration, BBC Carriers issued and signed a master bill of lading (the "Moonstone Master BOL") to DSV which similarly misrepresented the

---

[20]  The Moonstone Declaration refers to Energoimport by its full name, "Empresa Importadora-Exportadora de Objetivos Electro-Energéticos."

[21]  *See supra* note 17.

[22]  *See supra* note 18.

shipment destination and port of unlading as Miami, Florida, and the Miami Seaport, respectively—in violation of U.S. law.[23]  DSV also signed the Moonstone Master BOL.

131.    On information and belief, a U.S. office of DSV issued and signed the Moonstone House BOL, and also received and signed the Moonstone Master BOL.

132.    The Moonstone Declaration, Moonstone Master BOL, and Moonstone House BOL are collectively referred to hereinafter as the "Moonstone Documents."

> v.    Delivering the Goldwind and Moonstone Equipment to the Confiscated Port

133.    On December 24, 2018, the BBC Moonstone arrived in Tianjin, China, to pick up the Goldwind Equipment and the Moonstone Equipment.  The BBC Moonstone departed Tianjin on December 25, 2018, for the Panama Canal.

134.    On January 26, 2019, the BBC Moonstone arrived at the Panama Canal, and proceeded to travel to Florida.

135.    On January 30, 2019, the BBC Moonstone—carrying the Goldwind Equipment and Moonstone Equipment for receipt by Energoimport, a Cuban state-owned entity—entered the Miami Seaport in apparent violation of United States sanctions on Cuba.[24]

136.    Contrary to the Goldwind Documents and Moonstone Documents, none of the wind farm equipment for receipt by Energoimport was unloaded in Miami—in fact, while in Miami, no cargo on the BBC Moonstone was unloaded whatsoever.

---

[23]  *See supra* note 18.

[24]  Pursuant to the Cuba sanctions regulations, unless separate authorization is provided by the Treasury Department, "[n]o vessel carrying goods or passengers to or from Cuba or carrying goods in which Cuba or a Cuban national has an interest may enter a U.S. port with such goods or passengers on board."  31 C.F.R. § 515.207(b).

137.    Instead, the BBC Moonstone "bunkered," meaning refueled and resupplied, at the Miami Seaport.  Refueling and resupplying the BBC Moonstone enabled it to immediately proceed to the Confiscated Port in Cuba to unload the wind farm equipment.

138.    Later that same day, on January 30, 2019, the BBC Moonstone departed the Port of Miami but falsely reported to Miami Seaport officials that the BBC Moonstone's next destination would be the Dominican Republic.  The BBC Moonstone's true next destination was the Confiscated Port.

139.    On February 4, 2019, the BBC Moonstone arrived at the Confiscated Port, and over the course of three days, unloaded the Goldwind Equipment and the Moonstone Equipment, delivering it to Energoimport for transportation by road to the Herradura Wind Farm Project.  On information and belief, at or around the time of delivery, the Goldwind House BOL and Moonstone House BOL, which misrepresented the unloading port and shipment destination as Miami, were presented by Energoimport to the operators of the BBC Moonstone.

140.    On February 7, 2019, the BBC Moonstone departed the Confiscated Port for Port Arthur in Texas, and arrived in Port Arthur on February 10, 2019.  While at Port Arthur, the BBC Moonstone unloaded equipment which had been picked up prior to stopping in Tianjin on December 24, 2018 (the "BBC Equipment").  The BBC Equipment was delivered to BBC USA on behalf of parent company BBC Chartering.  In arranging for this delivery, which stopped first at the Confiscated Port, BBC USA used, and engaged in a transaction benefiting from, the Confiscated Port.

141.    On February 17, 2019, the BBC Moonstone departed Port Arthur.

35

142.     In the subsequent 180 days after departure from the Confiscated Port, the BBC Moonstone entered a U.S. port on at least 16 occasions in apparent violation of United States sanctions on Cuba.[25]

143.     In sum, and in relevant part, the BBC Moonstone (1) stopped in Tianjin, China, to pick up the wind farm equipment for receipt by Energoimport; (2) passed through the Panama Canal; (3) stopped in Miami, Florida, to refuel and resupply; (4) stopped at the Confiscated Port in Cuba to unload the wind farm equipment; and (5) stopped in Port Arthur, Texas, to unload the BBC Equipment.  These events are depicted in Figure 1 below.

---

[25]  Pursuant to the Cuba sanctions regulations, unless separate authorization is provided by the Treasury Department, "[n]o vessel that enters a port or place in Cuba to engage in the trade of goods or the purchase or provision of services, may enter a U.S. port for the purpose of loading or unloading freight for a period of 180 days from the date the vessel departed from a port or place in Cuba."  31 C.F.R. § 515.207(a) (titled "Entry of vessels engaged in trade with Cuba").



*Figure 1: BBC Moonstone Voyage*

vi.     Defendants Knew the Confiscated Port Was the True Port of Unlading

144.    As previously stated, the Goldwind Documents and the Moonstone Documents

misrepresented the shipment destination and port of unlading as Miami, Florida, and the Miami

Seaport, respectively, in violation of U.S. laws.[26]  While the route taken by the BBC Moonstone

included a refueling stop in Miami, the true shipment destination was Cuba, and the true port of

unlading for the Goldwind Equipment and Moonstone Equipment was the Confiscated Port.

---

[26] *Supra* notes 17–18.

145.    On information and belief, the false shipping destination in the Goldwind Documents and the Moonstone Documents was intended to conceal Defendants' scheme and their violations of U.S. sanctions regulations regarding Cuba, and to protect them from liability under Title III of the Helms-Burton Act, as discussed at paragraphs 135–42, *supra*.

146.    As the NVOCC that submitted, issued, and/or signed each of the Goldwind Documents and Moonstone Documents, DSV knew that the Confiscated Port was the true destination of the Goldwind Equipment and the Moonstone Equipment, and that the shipping route included a stop in Miami.  DSV tracked the Goldwind Equipment and Moonstone Equipment, and arranged for logistical support for the shipments while it was in Miami.

147.    As the VOCC that issued the Goldwind Master BOL and Moonstone Master BOL, BBC Carriers knew that the Confiscated Port was the true destination of the Goldwind Equipment and Moonstone Equipment, and that the shipping route included a stop in Miami. BBC Carriers tracked the BBC Moonstone—which carried the Goldwind Equipment, Moonstone Equipment, and BBC Equipment—and arranged for logistical support for the shipments while it was in Miami.

148.    As the shipper that signed the Goldwind House BOL, Goldwind Science knew that the Confiscated Port was the true destination of the Goldwind Equipment, and that the shipping route included a stop in Miami.  On information and belief, Goldwind Science tracked the Goldwind Equipment while it was in Miami using DSV's "Track & Trace" tool, *see supra* paragraph 114.

149.    On information and belief, Goldwind International also knew that the Goldwind Equipment would be delivered to the Confiscated Port by way of Miami, and directed Goldwind

Science to make such delivery—consistent with Goldwind International's contractual obligations with Energoimport to supply equipment to the Herradura Wind Farm Project.

150.    On information and belief, BBC USA and BBC Singapore, as providers of operation and chartering services for the BBC Moonstone Voyage, also knew that the Confiscated Port was the true destination of the Moonstone Equipment—and that the shipping route included a stop in Miami—and arranged for logistical support for the shipment.

151.    As the consignee listed on both the Goldwind House BOL and Moonstone House BOL, Energoimport knew that the Confiscated Port was the true destination of the Goldwind Equipment and Moonstone Equipment, and that the shipping route included a stop in Miami.

152.    On information and belief, BBC USA, as the recipient of the BBC Equipment, tracked the location of the BBC Moonstone as it transported the BBC Equipment en route to the Confiscated Port and benefited by using the space on the ship to efficiently ship its goods to Port Arthur in Texas.

153.    On information and belief, Defendants Goldwind Science, Goldwind International, DSV, BBC USA, and BBC Singapore agreed to deliver the Goldwind Equipment via the BBC Moonstone to the Confiscated Port, despite the Helms-Burton Act.  In carrying out their activities, Defendants engaged in a concerted scheme, described in detail above, whereby a refueling stop in Florida would help them conceal their scheme and avoid liability under the Helms-Burton Act and other U.S. laws.  Falsified documentation—i.e., the Goldwind Documents—represented that the Goldwind Equipment was to be unloaded in Florida, rather than the Confiscated Port.  Moreover, local authorities at the Miami Seaport were told falsely that the BBC Moonstone would be traveling to the Dominican Republic rather than the Confiscated Port.

### E.     Delivery via the BBC Jade

####         i.     The Shipper and Carriers of Wind Farm Equipment

154.    A commercial shipping vessel named the "BBC Jade," owned by the Briese Group, after a refueling stop in Florida, docked at the Confiscated Port in January 2019 and unloaded wind farm equipment on behalf of a supplier of the Herradura Wind Farm Project (hereinafter, the "BBC Jade Voyage").  The BBC Jade, IMO No. 9421116, is owned by a Briese Group entity.

155.    This supplier—not Goldwind Science or Goldwind International—arranged for the BBC Jade to deliver its wind farm equipment (the "Jade Equipment") to Energoimport via the Confiscated Port.

156.    Non-party DSV Ocean Transport acted as the NVOCC, and non-party BBC Chartering acted as the VOCC, for the Jade Equipment delivery at the Confiscated Port, with both entities knowing that a preceding refueling stop in Florida would occur.

157.    On information and belief, BBC USA and BBC Singapore, corporate affiliates of BBC Chartering, also acted as carriers for the Jade Equipment delivery at the Confiscated Port, serving as VOCCs charged with operating and chartering the BBC Jade with knowledge of the preceding refueling stop in Florida.

158.    BBC USA and BBC Singapore are the BBC Chartering agents responsible for, respectively, the Caribbean region and the Far East region.  Because the Jade Equipment originated from the Far East and was destined for a location in the Caribbean, BBC USA and BBC Singapore would have provided logistical support to the shipping vessels entering or departing their respective regions.  From a ship-chartering perspective, they would have

managed and tracked the cargo on all shipping vessels entering or departing their respective regions.

159.     DSV Ocean Transport and BBC Chartering provided or otherwise supported the following services:  (a) determining the shipping route taken by the BBC Jade; (b) tracking, at all times, the location of the BBC Jade and the equipment onboard at all relevant stops; (c) handling logistics, such as those involving local government authorities (or engaging third parties to do so); (d) coordinating with the project supplier, Energoimport, and other relevant shippers and carriers; (e) overseeing and troubleshooting the execution of the deliveries; and (f) engaging in any necessary transactions to implement the foregoing.

160.     On information and belief, BBC USA and BBC Singapore provided or otherwise supported the following services:  (a) determining the shipping route taken by the BBC Jade; (b) tracking, at all times, the location of the BBC Jade and the equipment onboard at all relevant stops; (c) handling logistics, such as those involving local government authorities (or engaging third parties to do so); (d) coordinating with the project supplier, Energoimport, and other relevant shippers and carriers; (e) overseeing and troubleshooting the execution of the deliveries; and (f) engaging in any necessary transactions to implement the foregoing.

ii.     Jade Equipment's Documentation Falsely States Miami Destination

161.     DSV Ocean Transport, or BBC Chartering on behalf of DSV Ocean Transport, electronically submitted to CBP a Cargo Declaration regarding the Jade Equipment (the "Jade Declaration"), which states in relevant part:

| Bill of Lading Type | House |
|---|---|
| Bill of Lading Number | DFDSHPR0023522 |
| Vessel | BBC Jade |
| Shipment Origin | China |
| Shipment Destination | Miami, Florida |

| Port of Lading | Tianjin, China |
|---|---|
| Port of Unlading | Miami Seaport; Miami, Florida |
| Consignee | Energoimport[27] |
| Carrier | DFDS |
| Master Bill of Lading Number | BBCHTIAPUE002 |

162.    DSV Ocean Transport is registered under the Standard Carrier Alpha Code "DFDS."  Given that the Jade Declaration identifies DFDS as the carrier, and DFDS is the prefix of the house bill of lading number, DSV Ocean Transport was the NVOCC officially named responsible for this shipment of the Jade Equipment.

163.    BBC Chartering is registered under the Standard Carrier Alpha Code "BBCH." Given that the Jade Declaration displays BBCH as the prefix of the master bill of lading number, BBC Chartering was the VOCC officially named responsible for this shipment of the Jade Equipment.

164.    The Jade Declaration misrepresented the shipment destination and port of unlading as Miami, Florida, and the Miami Seaport, respectively—in violation of U.S. law.[28] While Defendants routed the cargo to include a refueling stop in Miami, the true shipment destination was Cuba, and the true port of unlading was the Confiscated Port, *see infra* paragraphs 170–74.

165.    Per the Jade Declaration, DSV Ocean Transport issued and signed a house bill of lading (the "Jade House BOL"), which also misrepresented the shipment destination and port of unlading as Miami, Florida, and the Miami Seaport, respectively—in violation of U.S. law.[29]

---

[27]  The Jade Declaration refers to Energoimport by its full name, "Empresa Importadora-Exportadora de Objetivos Electro-Energéticos."

[28]  *Supra* note 17.

[29]  *Supra* note 18.

166.     Per the Jade Declaration, BBC Chartering issued and signed a master bill of lading (the "Jade Master BOL") to DSV Ocean Transport, which similarly misrepresented the shipment destination and port of unlading as Miami, Florida, and the Miami Seaport, respectively—in violation of U.S. law.[30]  DSV Ocean Transport also signed the Jade Master BOL.

167.     The Jade Declaration, Jade Master BOL, and Jade House BOL are collectively referred to hereinafter as the "Jade Documents."

iii.     Delivering the Jade Equipment to the Confiscated Port

168.     On November 13, 2018, the BBC Jade arrived at Tianjin, China, picked up the Jade Equipment, and departed two days later on November 15, for the Panama Canal.

169.     On December 25, 2018, the BBC Jade arrived at the Panama Canal, traveled through it, and departed the next day, December 26, heading toward Florida.

170.     On December 30, 2019, the BBC Jade—carrying the Jade Equipment for receipt by Energoimport, a Cuban state-owned entity—entered the Miami Seaport in apparent violation of United States sanctions on Cuba.[31]

171.     Contrary to the Jade Documents, the Jade Equipment was not unloaded in Miami—in fact, while in Miami, no cargo on the BBC Jade was unloaded whatsoever.

172.     Instead, the BBC Jade "bunkered," meaning refueled and resupplied, at the Miami Seaport.  Refueling and resupplying the BBC Jade enabled it to immediately proceed to the Confiscated Port in Cuba to unload the Jade Equipment.

173.     On December 31, 2018, the BBC Jade departed Miami for the Confiscated Port.

---

[30]  *Supra* note 18.

[31]  *Supra* note 24.

174.     On January 6, 2019, the BBC Jade arrived at the Confiscated Port, and over the course of three days, unloaded the Jade Equipment—delivering it to Energoimport for transportation by road to the Herradura Wind Farm Project.  On information and belief, at or around the time of delivery, the Jade House BOL, which falsely declared the unloading port and shipment destination as Miami, was presented by Energoimport to the operators of the BBC Jade.

175.     On January 9, 2019, the BBC Jade departed the Confiscated Port.

176.     In the subsequent 180 days after departure, the BBC Jade entered a U.S. port on at least seven occasions in apparent violation of United States sanctions on Cuba.[32]

177.     In sum, and in relevant part, the BBC Jade (1) stopped in Tianjin, China, to pick up the Jade Equipment; (2) passed through the Panama Canal; (3) stopped in Miami, Florida, to refuel and resupply; and (4) stopped at the Confiscated Port in Cuba to unload the Jade Equipment.  These events are depicted in Figure 2 below.

---

[32] *Supra* note 25.



*Figure 2: BBC Jade Voyage*

    iv.    <u>Defendants BBC USA and BBC Singapore Knew the Confiscated Port Was the True Port of Unlading</u>

178.    As previously stated, the Jade Documents misrepresented the shipment destination and port of unlading as Miami, Florida and the Miami Seaport, respectively, in violation of U.S. laws.[33]  While the route taken by the BBC Jade included a refueling stop in Miami, the true shipment destination was Cuba, and the true port of unlading for the Jade Equipment was the Confiscated Port.

---

[33] *Supra* notes 17–18.

179.     On information and belief, the false shipping destination in the Jade Documents was intended to conceal Defendants' scheme and their violations of U.S. sanctions regulations regarding Cuba, and to protect them from liability under Title III of the Helms-Burton Act, as discussed at paragraphs 170–76, *supra*.

180.     As the NVOCC that submitted, issued, and/or signed each of the Jade Documents, DSV Ocean Transport knew that the Confiscated Port was the true destination of the Jade Equipment, and that the shipping route included a stop in Miami.  DSV Ocean Transport tracked the Jade Equipment, and arranged for logistical support for the shipment while it was in Miami.

181.     As the VOCC that issued and signed the Jade Master BOL, BBC Chartering knew that the Confiscated Port was the true destination of the Jade Equipment, and that the shipping route included a stop in Miami.  BBC Chartering tracked the BBC Jade—which carried the Jade Equipment—and arranged for logistical support for the shipment while it was in Miami.

182.     On information and belief, BBC USA and BBC Singapore, as providers of operation and chartering services for the BBC Jade Voyage, also knew that the Confiscated Port was the true destination of the Jade Equipment, and that the shipping route included a stop in Miami and arranged for logistical support for the shipment.

183.     As the consignee listed on the Jade House BOL, Energoimport knew that the Confiscated Port was the true destination of the Jade Equipment, and that the shipping route included a stop in Miami.

**F.     Other Deliveries by Goldwind Science and/or Goldwind International**

184.     In light of the role that the Confiscated Port has played in the importation of equipment to Cuba for use in the project, *see supra* paragraphs 82–92, multiple other shipments

of equipment from Goldwind Science and/or Goldwind International have arrived in Cuba at the Confiscated Port for use in the Herradura Wind Farm Project.

185.    For example, on or around December 14, 2018, wind farm equipment belonging to Goldwind Science and/or Goldwind International, and destined for the Herradura Wind Farm Project, was unloaded at the Confiscated Port by an unidentified ship.

186.    By December 15, 2018, at least 11 of Goldwind International's wind turbines had arrived in Cuba for use at Herradura 1.  News of the arrival of these 11 wind turbines, and their shipment from the People's Republic of China, was reported by Radio Libertad—a local radio broadcaster in Puerto Padre, Cuba.[34]

187.    As of July 11, 2019, at least 22 of Goldwind International's wind turbines had arrived in Cuba for use at Herradura 1.  News of the arrival of these 22 wind turbines was reported by the Cuban News Agency, a news outlet owned and operated by the Cuban government.[35]

188.    Goldwind International arranged for the shipment of these 22 wind turbines to Cuba via the Confiscated Port.

**FIRST CAUSE OF ACTION**
**Trafficking in Confiscated Property in Violation of 22 U.S.C. § 6082**
**(Against Goldwind International and Goldwind Science)**

189.    American Sugar incorporates by reference paragraphs 1 through 188 as though fully set forth herein.

---

[34]  Radio Libertad, *Primeros aerogeneradores de parques eólicos en Puerto Carúpano*, RADIO LIBERTAD (Dec. 15, 2018), http://www.radiolibertad.cu/2018/12/15/primeros-aerogeneradores-de-parques-eolicos-en-puerto-carupano-audio-galeria/.

[35]  Naily Barrientos Matos, *Avanzan en Las Tunas obras en el parquet eólico La Herradura Uno*, AGENCIA CUBANA DE NOTICIAS (July 11, 2019), available at http://www.acn.cu/medio-ambiente/46995-avanzan-en-las-tunas-obras-en-el-parque-eolico-la-herradura-uno.

190.    Title III of the Helms-Burton Act provides that any person who "traffics" in property which was confiscated by the Cuban government on or after January 1, 1959, shall be liable to any U.S. national who owns the claim to such property for monetary damages.  22 U.S.C. § 6082(a)(1).

191.    American Sugar is incorporated in New Jersey with its principal place of business in New York, and is thereby a "United States National" under the Helms-Burton Act.  *See* 22 U.S.C. § 6023(15).

192.    As a "United States National," American Sugar is entitled to sue "any person that . . . traffics in property which was confiscated by the Cuban government on or after January 1, 1959." 22 U.S.C. § 6082(a)(1).

193.    As detailed in this complaint, the Confiscated Property was expropriated by Cuba on or after January 1, 1959.

194.    American Sugar's certified claim is "conclusive proof of ownership" of American Sugar's interest in the Confiscated Property.  22 U.S.C. § 6083(a)(1).

195.    The certified loss of $97,373,414.72 in American Sugar's certified claim is the presumed amount a trafficker in the Confiscated Property owes American Sugar under Title III of the Helms-Burton Act, exclusive of interest, treble damages, court costs, and reasonable attorneys' fees.  *See* 22 U.S.C. § 6082(a)(2).  That presumption is only "rebuttable by clear and convincing evidence."  *Id.*

196.    A trafficker in the Confiscated Property is liable to American Sugar for compounded interest on the presumed amount, treble damages, court costs, and reasonable attorneys' fees.  *See* 22 U.S.C. § 6082(a)(3)(A) & (3)(C); 22 U.S.C. § 6082(a)(1)(A).

197.     Goldwind International and Goldwind Science each "knowingly and intentionally":  (1) "use[d]" the Confiscated Property; (2) "engage[d] in a commercial activity using or otherwise benefiting from" the Confiscated Property; and/or (3) "cause[d], direct[ed], participate[d] in, or profit[ed] from," the trafficking described in (1) and (2) by another person, or otherwise "engage[d] in" such trafficking through another person.  22 U.S.C. § 6023(13)(A).

198.     Specifically, Goldwind International and Goldwind Science intentionally used, trafficked in, and benefited from the Confiscated Port and caused others to use, traffic in, and benefit from the Confiscated Port by supplying wind farm equipment that they knew or had reason to know would be unloaded at the Confiscated Port for use in the Herradura Wind Farm Project.

199.     Goldwind International intentionally entered into and profited from a commercial contract using, trafficking in, and commercially benefiting from the Confiscated Port.  The contract with Energoimport was to supply wind turbines and related equipment to the Herradura Wind Farm Project, and Goldwind International knew or had reason to know that, due to the nature and location of the project and the location of the Confiscated Port and its importance in the Cuban economy, the equipment would be delivered to the Confiscated Port—and that at least one such shipment (of the Goldwind Equipment) was delivered there by way of Florida.

200.     Goldwind Science intentionally shipped the Goldwind Equipment to Energoimport using, trafficking in, and commercially benefiting from the Confiscated Port, and knew or had reason to know the Goldwind Equipment would be unloaded, via Florida, at the Confiscated Port in February 2019.  As the counterparty to Energoimport and participant in the Herradura Wind Farm Project, Goldwind International intentionally caused and profited from

this shipment of the Goldwind Equipment by its affiliate, and knew or should have known that it would be unloaded at the Confiscated Port by way of Florida.

201. Goldwind International and Goldwind Science intentionally supplied wind farm equipment—other than the Goldwind Equipment—to the Herradura Wind Farm Project using, trafficking in, and commercially benefiting from the Confiscated Port, and knew or had reason to know that such equipment would be unloaded at the Confiscated Port in 2018 and 2019. This is evident by, among other things, the 22 wind turbines already delivered to the project.

202. With respect to the BBC Moonstone Voyage, Goldwind Science intentionally and knowingly directed, caused, participated in, and profited from the use of, trafficking in, and commercial benefiting from the Confiscated Port (via Florida) by Goldwind International, BBC USA, BBC Singapore, and DSV; and by non-parties BBC Carriers and Energoimport.

203. As a supplier for the Herradura Wind Farm Project and counterparty to Energoimport, Goldwind International intentionally and knowingly caused and profited from the use of, trafficking in, and commercial benefiting from the Confiscated Port (via Florida) by Goldwind Science, BBC USA, BBC Singapore, and DSV; and by non-parties BBC Carriers and Energoimport.

204. At no point in time did Goldwind International or Goldwind Science use the Confiscated Property with the authorization of American Sugar. *See* 22 U.S.C. § 6023(13).

205. Goldwind Science and Goldwind International engaged in unlawful trafficking after November 1, 1996, the end of the three-month grace period the Helms-Burton Act provided after it became effective on August 1, 1996. *See* 22 U.S.C. § 6082(a)(1)(A).

206. Therefore, American Sugar is entitled to damages in the amount of the certified claim, plus applicable pre-judgment interest. American Sugar is also entitled to treble damages,

attorneys' fees, costs, and post-judgment interest.  *See* 22 U.S.C. § 6082(a)(1), (3); 28 U.S.C.

§ 1961.

## <u>SECOND CAUSE OF ACTION</u>
### Trafficking in Confiscated Property in Violation of 22 U.S.C. § 6082
### (Against DSV)

207.    American Sugar incorporates by reference paragraphs 1 through 206 as though

fully set forth herein.

208.    Title III of the Helms-Burton Act provides that any person who "traffics" in

property which was confiscated by the Cuban government on or after January 1, 1959, shall be

liable to any U.S. national who owns the claim to such property for monetary damages.  22

U.S.C. § 6082(a)(1).

209.    American Sugar is incorporated in New Jersey with its principal place of business

in New York, and is thereby a "United States National" under the Helms-Burton Act.  *See* 22

U.S.C. § 6023(15).

210.    As a "United States National," American Sugar is entitled to sue "any person that

. . . traffics in property which was confiscated by the Cuban government on or after January 1,

1959."  22 U.S.C. § 6082(a)(1).

211.    As detailed in this complaint, the Confiscated Property was expropriated by Cuba

on or after January 1, 1959.

212.    American Sugar's certified claim is "conclusive proof of ownership" of American

Sugar's interest in the Confiscated Property.  22 U.S.C. § 6083(a)(1).

213.    The certified loss of $97,373,414.72 in American Sugar's certified claim is the

presumed amount a trafficker in the Confiscated Property owes American Sugar under Title III

of the Helms-Burton Act, exclusive of interest, treble damages, court costs, and reasonable

attorneys' fees.  22 U.S.C. § 6082(a)(2).  That presumption is only "rebuttable by clear and convincing evidence."  *Id*.

214.    A trafficker in the Confiscated Property is liable to American Sugar for compounded interest on the presumed amount, treble damages, court costs, and reasonable attorneys' fees.  *See* 22 U.S.C. § 6082(a)(3)(A) & (3)(C); 22 U.S.C. § 6082(a)(1)(A).

215.    DSV "knowingly and intentionally":  (1) "use[d]" the Confiscated Property; (2) "engage[d] in a commercial activity using or otherwise benefiting from" the Confiscated Property; and/or (3) "cause[d], direct[ed], participate[d] in, or profit[ed] from," the trafficking described in (1) and (2) by another person, or otherwise "engage[d] in" such trafficking through another person.  22 U.S.C. § 6023(13)(A).

216.    Specifically, DSV intentionally used, trafficked in, and benefited from the Confiscated Port and caused others to use, traffic in, and benefit from the Confiscated Port by providing transportation services in support of the BBC Moonstone Voyage.  In doing so, DSV knew or had reason to know that wind farm equipment would be unloaded at the Confiscated Port, by way of Florida.

217.    With respect to the BBC Moonstone Voyage, DSV also intentionally and knowingly directed, caused, participated in, and profited from the use of, trafficking in, and commercial benefiting from the Confiscated Port (via Florida) by Goldwind Science, Goldwind International, BBC USA, and BBC Singapore; and by non-parties BBC Carriers and Energoimport.

218.    At no point in time did DSV use the Confiscated Property with the authorization of American Sugar.  *See* 22 U.S.C. § 6023(13).

219.     DSV engaged in unlawful trafficking after November 1, 1996, the end of the

three-month grace period the Helms-Burton Act provided after it became effective on August 1,

1996.  *See* 22 U.S.C. § 6082(a)(1)(A).

220.     Therefore, American Sugar is entitled to damages in the amount of the certified

claim, plus applicable pre-judgment interest.  American Sugar is also entitled to treble damages,

attorneys' fees, costs, and post-judgment interest.  *See* 22 U.S.C. § 6082(a)(1), (3); 28 U.S.C.

§ 1961.

### THIRD CAUSE OF ACTION
**Trafficking in Confiscated Property in Violation of 22 U.S.C. § 6082
(Against BBC USA and BBC Singapore)**

221.     American Sugar incorporates by reference paragraphs 1 through 220 as though

fully set forth herein.

222.     Title III of the Helms-Burton Act provides that any person who "traffics" in

property which was confiscated by the Cuban government on or after January 1, 1959, shall be

liable to any U.S. national who owns the claim to such property for monetary damages.  22

U.S.C. § 6082(a)(1).

223.     American Sugar is incorporated in New Jersey with its principal place of business

in New York, and is thereby a "United States National" under the Helms-Burton Act.  *See* 22

U.S.C. § 6023(15).

224.     As a "United States National," American Sugar is entitled to sue "any person that

. . . traffics in property which was confiscated by the Cuban government on or after January 1,

1959."  22 U.S.C. § 6082(a)(1).

225.     As detailed in this complaint, the Confiscated Property was expropriated by Cuba

on or after January 1, 1959.

226.    American Sugar's Certified Claim is "conclusive proof of ownership" of American Sugar's interest in the Confiscated Property.  22 U.S.C. § 6083(a)(1).

227.    The certified loss of $97,373,414.72 in American Sugar's certified claim is the presumed amount a trafficker in the Confiscated Property owes American Sugar under Title III of the Helms-Burton Act, exclusive of interest, treble damages, court costs, and reasonable attorneys' fees.  *See* 22 U.S.C. § 6082(a)(2).  That presumption is only "rebuttable by clear and convincing evidence."  *Id*.

228.    A trafficker in the Confiscated Property is liable to American Sugar for compounded interest on the presumed amount, treble damages, court costs, and reasonable attorneys' fees.  *See* 22 U.S.C. § 6082(a)(3)(A) & (3)(C); 22 U.S.C. § 6082(a)(1)(A).

229.    BBC USA and BBC Singapore "knowingly and intentionally":  (1) "use[d]" the Confiscated Property; (2) "engage[d] in a commercial activity using or otherwise benefiting from" the Confiscated Property; and/or (3) "cause[d], direct[ed], participate[d] in, or profit[ed] from," the trafficking described in (1) and (2) by another person, or otherwise "engage[d] in" such trafficking through another person.  22 U.S.C. § 6023(13)(A).

230.    Specifically, BBC USA and BBC Singapore intentionally used, trafficked in, and benefited from the Confiscated Port and caused others to use, traffic in, and benefit from the Confiscated Port by providing ship operation and chartering services in support of the BBC Moonstone Voyage and the BBC Jade Voyage.  For both voyages, BBC USA and BBC Singapore knew or had reason to know that wind farm equipment would be unloaded at the Confiscated Port in January and February 2019, and that there would be a prior refueling stop in Florida.

231.    For the BBC Moonstone Voyage, BBC USA also intentionally engaged in transactions to receive equipment in Texas that benefited from a prior stop at the Confiscated Port, and BBC USA knew or had reason to know of such stop—and also knew or had reason to know of the prior refueling stop in Florida.

232.    With respect to the BBC Moonstone Voyage, BBC USA and BBC Singapore also intentionally and knowingly directed, caused, participated in, and profited from the use of, trafficking in, and commercial benefiting from the Confiscated Port (via Florida) by each other; by Goldwind Science, Goldwind International, and DSV; and by non-parties BBC Carriers and Energoimport.

233.    With respect to the BBC Jade Voyage, BBC USA and BBC Singapore also intentionally and knowingly directed, caused, participated in, and profited from the use of, trafficking in, and commercial benefiting from the Confiscated Port (via Florida) by each other, and by non-parties BBC Chartering, DSV Ocean Transport, and Energoimport.

234.    At no point in time did BBC USA or BBC Singapore use the Confiscated Property with the authorization of American Sugar.  22 U.S.C. § 6023(13).

235.    BBC USA and BBC Singapore engaged in unlawful trafficking after November 1, 1996, the end of the three-month grace period the Helms-Burton Act provided after it became effective on August 1, 1996.  *See* 22 U.S.C. § 6082(a)(1)(A).

236.    Therefore, American Sugar is entitled to damages in the amount of the certified claim, plus applicable pre-judgment interest.  American Sugar is also entitled to treble damages, court costs, reasonable attorneys' fees, and post-judgment interest.  *See* 22 U.S.C. § 6082(a)(1), (3); 28 U.S.C. § 1961.

## FOURTH CAUSE OF ACTION
### Civil Conspiracy under Florida Law
### (Against All Defendants)

237.     American Sugar incorporates by reference paragraphs 1 through 236 as though fully set forth herein.

238.     Each of the Defendants agreed to transport the Goldwind Equipment from China to Energoimport in Cuba via the Confiscated Port, in violation of the Helms-Burton Act.

239.     Each of the Defendants knew that the Goldwind Equipment was to be delivered to Energoimport at the Confiscated Port in Cuba.

240.     Each of the Defendants was aware that the shipment of the Goldwind Equipment to Energoimport at the Confiscated Port would subject them to the risk of liability or penalties under the Helms-Burton Act and/or other U.S. laws, including economic sanctions related to Cuba.

241.     In order to further their conspiracy and avoid potential liabilities or penalties, Defendants implemented a scheme whereby DSV, BBC USA, and/or BBC Singapore directed the BBC Moonstone to stop in Miami to refuel and resupply before proceeding to the Confiscated Port, and in advance of and/or while in Miami, presented false legal documentation (namely, the Goldwind Documents) representing that the Goldwind Equipment would be unloaded in Miami.

242.     The stopover of the BBC Moonstone in Miami was an essential aspect of Defendants' use of the Confiscated Port in violation of the Helms-Burton Act.

243.     Each of Defendants aided in the scheme to transport the Goldwind Equipment from China to Energoimport in Cuba.  Among other things, Goldwind International and Goldwind Science arranged for the transport of the Goldwind Equipment by sea to the

Confiscated Port.  Goldwind Science reviewed and signed the Goldwind House BOL, which falsely represented that the Goldwind Equipment would be unloaded in Miami.  DSV (1) was involved in planning the BBC Moonstone's route and/or requested the BBC Moonstone route the Goldwind Equipment to Miami before delivery to the Confiscated Port, (2) issued and signed the Goldwind House BOL and received and signed the Goldwind Master BOL (which also falsely represented that the Goldwind Equipment would be unloaded in Miami), and (3) provided logistics services in relation to the BBC Moonstone's stopover at Miami.  As the responsible BBC Chartering entity for the Far East Region, BBC Singapore provided logistics services to the BBC Moonstone while it traveled from China with the Goldwind Equipment in BBC Singapore's assigned region.  As the responsible BBC Chartering entity for the United States and Caribbean regions, BBC USA provided logistics services to the BBC Moonstone upon its entry into these regions and during the BBC Moonstone's stopover in Miami.

244.    As a result of the aforementioned acts as part of their conspiracy, Defendants successfully trafficked in the Confiscated Port, without authorization from, or compensation to, American Sugar.

245.    Therefore, American Sugar is entitled to damages from all Defendants in the amount of the certified claim, plus applicable pre-judgment interest.  American Sugar is also entitled to treble damages, court costs, reasonable attorneys' fees, and post-judgment interest. *See* 22 U.S.C. § 6082(a)(1), (3); 28 U.S.C. § 1961.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, American Sugar demands a trial by jury in this action of all issues so triable.

**PRAYER FOR RELIEF**

WHEREFORE, American Sugar respectfully requests that judgment be entered in its favor and against Defendants:

1. Awarding American Sugar actual damages in the amount of the certified claim, namely $97,373,414.72;

2. Awarding American Sugar pre-judgment compounded interest pursuant to 22 U.S.C. § 6082(a)(1)(B) accruing from the relevant dates of confiscation;

3. Awarding American Sugar treble damages pursuant to 22 U.S.C. § 6082(a)(3);

4. Ordering Defendants to pay American Sugar's reasonable attorneys' fees and costs incurred in this action pursuant to 22 U.S.C. § 6082(a)(1)(A)(ii);

5. Awarding American Sugar post-judgment interest pursuant to 28 U.S.C. § 1961; and

6. Granting all other relief that the Court deems just and proper.

Respectfully submitted,

Miguel A. Estrada (to be admitted *pro hac vice)*
Audi K. Syarief (to be admitted *pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, NW
Washington, DC 20036-5306
Telephone: (202) 955-8257
Facsimile:  (202) 530-9616
mestrada@gibsondunn.com
asyarief@gibsondunn.com

Andrea E. Neuman (to be admitted *pro hac vice*)
Rahim Moloo (to be admitted *pro hac vice*)
Casey Kyung-Se Lee (to be admitted *pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue, 47th Floor
New York, NY 10166-0193
Telephone: (212) 351-3883
Facsimile:  (212) 351-5303

aneuman@gibsondunn.com
rmoloo@gibsondunn.com
clee@gibsondunn.com


David S. Mandel
FBN 38040
Mandel & Mandel LLP
169 East Flagler Street, Suite 1224
Miami, FL 33131
Telephone:  (305) 374-7771
Facsimile:   (305) 374 7776
dsm@mandel.law

*Counsel for Plaintiff*
*North American Sugar Industries Inc.*