**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**CASE NO.:  20-cv-22471-GAYLES/Otazo-Reyes**

NORTH AMERICAN SUGAR INDUSTRIES INC.,

       Plaintiff,

v.

XINJIANG GOLDWIND SCIENCE & TECHNOLOGY
CO., LTD., GOLDWIND INTERNATIONAL
HOLDINGS (HK) LTD., DSV AIR & SEA INC.,
BBC CHARTERING USA, LLC, and
BBC CHARTERING SINGAPORE PTE LTD.,

      Defendants.

_____/

**<u>DEFENDANTS' MOTION TO DISMISS COMPLAINT</u>**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES ................................................................................................ iii

INTRODUCTION ............................................................................................................... 1

FACTUAL BACKGROUND ............................................................................................. 3

I.      The Cuban Government's Confiscation of Plaintiff's Properties and Assets .................... 3

II.     Defendants' Alleged "Trafficking" in Plaintiff's Confiscated Property ........................... 5

III.    Plaintiff's Recent Bankruptcy Proceedings ...................................................... 7

IV.    The Core of Plaintiff's Claims in This Action ................................................... 9

LEGAL STANDARD ........................................................................................................ 10

ARGUMENT ..................................................................................................................... 10

I.      The Complaint Should Be Dismissed Because Plaintiff Lacks Article III
Standing ........................................................................................................... 10

II.     Plaintiff's Decision Not to Disclose in Its Recent Bankruptcy Proceedings
the Alleged Rights It Asserts Here Bar This Action ....................................... 16

       A.    The Hexicon Debtors Did Not Disclose the Certified Claim or the
HBA Related Claims to the Bankruptcy Court and Thus Are
Judicially Estopped From Pursuing Them Here .................................... 17

             i.    *Plaintiff Took a Position in Its Bankruptcy Proceeding That is
Inconsistent with Its Claim Here* ............................................... 19

             ii.   *Plaintiff's Lack of Disclosure Amounts to Bad Faith and Makes
a Mockery of the Judicial System* .............................................. 22

       B.    Plaintiff Lacks Standing to Bring this Action Due to Its Lack of
Sufficient Disclosure in the Bankruptcy Case ...................................... 25

III.    Plaintiff Fails to State a Claim for Trafficking in the "Confiscated Property" ................. 29

i

**TABLE OF CONTENTS - Continued**

**Page**

IV.    Plaintiff Is Precluded From Bringing a Count Under the Act
        Along With a Common-Law Count for Conspiracy .......................................................... 32

CONCLUSION ....................................................................................................................... 34

CERTIFICATE OF SERVICE ............................................................................................... 36

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*A&M Mgmt. Inc. v. Deme*,
    No. 18-CV-63099, 2019 WL 7344821 (S.D. Fla. May 14, 2019) ....................................34

*Allston-Wilson v. Philadelphia Newspapers, Inc.*,
    No. CIV.A. 05-4056, 2006 WL 1050281 (E.D. Pa. Apr. 20, 2006) .................................26

*AquaDry Plus Corp. v. Rockhill Ins. Co.*,
    No. 19-CV-62331-CIV, 2020 WL 927440 (S.D. Fla. Feb. 26, 2020) ..............................34

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ..........................................................................................9, 10, 31, 32

*BedRoc Ltd., LLC v. United States*,
    541 U.S. 176 (2004) ......................................................................................................33

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ..........................................................................................9, 10, 31, 32

*Bochese v. Town of Ponce Inlet*,
    405 F.3d 964 (11th Cir. 2005) .........................................................................................9

*BPP Illinois, LLC v. Royal Bank of Scotland Grp. PLC*,
    859 F.3d 188 (2d Cir. 2017).....................................................................................17, 23

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013) ......................................................................................................15

*Collins v. Compass Grp., Inc.*,
    965 F. Supp. 2d 1321 (N.D. Ala. 2013) .........................................................................33

*Cueto Iglesias v. Pernod Ricard*,
    No. 20-CV-20157 (S.D. Fla. Aug. 17, 2020).................................................................16

## <u>TABLE OF AUTHORITIES - Continued</u>

<u>Page(s)</u>

*DeMeo v. State Farm Mut. Auto. Ins. Co.,*
    639 F.3d 413 (8th Cir. 2011) ............................................................29

*Fla. Wildlife Fed'n, Inc. v. S. Fla. Water Mgmt. Dist.,*
    647 F.3d 1296 (11th Cir. 2011) .......................................................9

*Forsyth v. NHC Place/Anniston, LLC, Inc.,*
    No. 18-CV-00663, 2018 WL 4909953 (N.D. Ala. Oct. 10, 2018) ...................................33

*Glen v. Am. Airlines, Inc.,*
    No. 20-CV-482-A, 2020 WL 4464665 (N.D. Tex. Aug. 3, 2020) ........................ 15, 16, 30, 31

*Glen v. Club Mediterranee, S.A.,*
    450 F.3d 1251 (11th Cir. 2006) ...............................................13, 16

*Glen v. Club Mediterranee S.A.,*
    365 F. Supp. 2d 1263 (S.D. Fla. 2005) ............................................29

*Gonzalez v. Amazon.com, Inc.,*
    No. 19-23988-CIV, 2020 WL 1169125 (S.D. Fla. Mar. 11, 2020) ..................................31

*Griffin v. Verizon Commc'ns Inc.,*
    746 F. App'x 873 (11th Cir. 2018)...................................................7

*Hagy v. Demers & Adams,*
    882 F.3d 616 (6th Cir. 2018) ......................................................14

*Harris v. Orange S.A.,*
    636 F. App'x 476 (11th Cir. 2015) ...........................................13, 16

*Harstad v. First Am. Bank,*
    39 F.3d 898 (8th Cir. 1994) .......................................................26

*Havana Docks Corp. v. Royal Caribbean Cruises, Ltd.,*
    No. 19-CV-23590, 2020 WL 1905219 (S.D. Fla. Apr. 17, 2020)..........................................13

*Henderson v. Franklin,*
    782 F. App'x 866 (11th Cir. 2019) .............................................18, 19, 22, 23

iv

## TABLE OF AUTHORITIES - Continued

**Page(s)**

*Henderson v. U.S. Sec. Assocs., Inc.*,
No. 17-CV-3329, 2018 WL 5044634 (N.D. Ga. Oct. 17, 2018) ...................................... 23

*Henry v. Jefferson Cnty. Personnel Bd.*,
519 F. Supp. 2d 1171 (N.D. Ala. 2007) ................................................................. 33

*Howard v. Highlands Med. Ctr.*,
No. 15-CV-00393-CLS, 2015 WL 4730079 (N.D. Ala. Aug 10, 2015) ................................ 33

*In re Ampace Corp.*,
279 B.R. 145 (Bankr. D. Del. 2002) ................................................................ 27, 29

*In re Bridgeport Holdings, Inc.*,
326 B.R. 312 (Bankr. D. Del. 2005) .................................................................. 27

*In re Coastal Plains, Inc.*,
179 F.3d 197 (5th Cir. 1999) ....................................................................... 19, 24

*In re Hart Oil & Gas, Inc.*,
534 B.R. 35 (Bankr. D.N.M. 2015) ................................................................... 27

*In re Ice Cream Liquidation, Inc.*,
319 B.R. 324 (Bankr. D. Conn. 2005) ................................................................. 26

*In re Kane*,
628 F.3d 631 (3d Cir. 2010) ......................................................................... 26

*In re Mosaic Mgmt. Grp., Inc.*,
614 B.R. 615 (Bankr. S.D. Fla. 2020) ................................................................. 27

*In re Pen Holdings, Inc.*,
316 B.R. 495 (Bankr. M.D. Tenn. 2004) ......................................................... 25, 26, 27

*In re Transit Grp., Inc.*,
332 B.R. 45 (Bankr. M.D. Fla. 2005) ................................................................. 26

*In re United Operating, LLC*,
540 F.3d 351 (5th Cir. 2008) ......................................................................... 26

**TABLE OF AUTHORITIES - Continued**

**Page(s)**

*In re USN Commc'ns, Inc.*,
  280 B.R. 573 (Bankr. De. Del. 2002) ...............................................................27

*Indulgence Yacht Charters Ltd. v. Ardell Inc.*,
  No. 08-60739, 2008 WL 4346749 (S.D. Fla. Sept. 16, 2008) .............................4

*Jacobs v. A-C Prod. Liab. Tr.*,
  No. 09-CV-30143-ER, 2015 WL 5818388 (E.D. Pa. Oct. 6, 2015) ..................26

*Jones v. United States*,
  467 F. App'x 815 (11th Cir. 2012) ...................................................................17

*Kawa Orthodontics, LLP v. Sec'y, U.S. Dep't of the Treasury*,
  773 F.3d 243 (11th Cir. 2014) .........................................................................12

*King v. Adtran, Inc.*,
  No. 13-CV-1362-CLS, 2014 WL 6983312 (N.D. Ala. Dec. 10, 2014)............33

*Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. General Motors Corp.*,
  337 F.3d 314 (3d Cir. 2003)........................................................................ *passim*

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992)....................................................................................11, 12

*Michel v. NYP Holdings, Inc.*,
  816 F.3d 686 (11th Cir. 2016) .........................................................................32

*Miller v. Gizmodo Media Grp., LLC*,
  No. 18-24227-CIV, 2019 WL 5864176 (S.D. Fla. June 5, 2019).....................34

*Miller v. Gizmodo Media Grp., LLC*,
  No. 18-24227-CIV, 2019 WL 1790248 (S.D. Fla. Apr. 24, 2019)...................34

*Nicklaw v. Citimortgage, Inc.*,
  839 F.3d 998 (11th Cir. 2016) .........................................................................14

**TABLE OF AUTHORITIES - Continued**

**Page(s)**

*Nunnelee v. United States*,
    573 F. App'x 886 (11th Cir. 2014) ...........................................................................13, 16

*Oneida Motor Freight, Inc. v. United Jersey Bank*,
    848 F.2d 414 (3d Cir. 1988)...................................................................................17, 18

*Oxford Asset Mgmt., Ltd. v. Jaharis*,
    297 F.3d 1182 (11th Cir. 2002) .....................................................................................10

*Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*,
    81 F.3d 355 (3d Cir. 1996)..............................................................................17, 18, 23

*Salcedo v. Hanna*,
    936 F.3d 1162 (11th Cir. 2019) .....................................................................................11

*Schlesinger v. Reservists Comm. to Stop the War*,
    418 U.S. 208 (1974)........................................................................................................15

*Slater v. United States Steel Corp.*,
    871 F.3d 1174 (11th Cir. 2017) .....................................................................17, 18, 19, 23

*Smith v. Haynes & Haynes P.C.*,
    940 F.3d 635 (11th Cir. 2019) ......................................................................17, 18, 19, 22

*Spokeo, Inc. v. Robins*,
    136 S. Ct. 1540 (2016) .......................................................................................... *passim*

*Thole v. U.S. Bank N.A.*,
    140 S. Ct. 1615 (2020) ...............................................................................11, 14, 15, 16

*Trichell v. Midland Credit Mgmt., Inc.*,
    964 F.3d 990 (11th Cir. 2020) .........................................................................10, 11, 16

*United States v. Amodeo*,
    916 F.3d 967 (11th Cir. 2019) .......................................................................................13

*United States v. Ross*,
    963 F.3d 1056 (11th Cir. 2020) .....................................................................................10

## TABLE OF AUTHORITIES - Continued

**Page(s)**

*Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.,*
    454 U.S. 464 (1982) ........................................................................................................ 15

**Statutes**

11 U.S.C. § 101 .................................................................................................................. 7

11 U.S.C. § 521(a) ............................................................................................................ 17

11 U.S.C. § 1123(b)(3) ..................................................................................................... 26

11 U.S.C. § 1141 ............................................................................................................... 26

22 U.S.C. § 6021 ......................................................................................................... *passim*

22 U.S.C. § 6023(13) .................................................................................................... 1, 30

22 U.S.C. § 6082 ............................................................................................................... 31

22 U.S.C. § 6082(a) ............................................................................................................ 1

22 U.S.C. § 6082(a)(1)(A) ............................................................................................... 29

22 U.S.C. § 6082(a)(1)(A)(i) ........................................................................................... 12

22 U.S.C. § 6082(a)(3) ....................................................................................................... 9

22 U.S.C. § 6082(f) .......................................................................................................... 32

22 U.S.C. § 6085(c) ............................................................................................................ 1

29 U.S.C. § 1001 ............................................................................................................... 14

**Rules**

Fed. R. Civ. P. 10(c) ........................................................................................................... 4

## <u>TABLE OF AUTHORITIES - Continued</u>

**<u>Page(s)</u>**

Fed. R. Civ. P. 12(b)(1) .................................................................................................1, 9

Fed. R. Civ. P. 12(b)(6) .............................................................................................1, 9, 29

**Other Authorities**

U.S. Const. art. III .................................................................................................. *passim*

U.S. Const. art. III, § 1 ...................................................................................................10

U.S. Const. art. III, § 2 ...................................................................................................10

New Oxford American Dictionary 1738 (3d ed. 2010) ...................................................29

Defendants Goldwind International Holdings (HK) Ltd. ("Goldwind International"), DSV Air & Sea Inc. ("DSV US"), BBC Chartering USA, LLC and BBC Chartering Singapore PTE Ltd. (together, "BBC" and collectively with Goldwind International and DSV US, "Defendants"),[1] pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) and this Court's Notice of Court Practice (ECF No. 4), move the Court for the entry of an Order dismissing the Complaint filed by North American Sugar Industries Inc. ("Plaintiff") for lack of subject-matter jurisdiction and failure to state a claim upon which relief can be granted.[2]

## INTRODUCTION

The basis of Plaintiff's suit is Title III of the Cuban Liberty and Democratic Solidarity (LIBERTAD) Act. *See* 22 U.S.C. § 6021, *et seq.* (the "Act" or "Title III"). The Act, which until May 2019 had been suspended since its enactment nearly twenty-five years ago, creates a statutory cause of action for Americans who own claims to confiscated Cuban property against a person who "traffics . . . knowingly and intentionally" in that property. *Id.* §§ 6023(13), 6082(a). The Act grants the President the ability to suspend the right to bring an action under it for successive six-month periods. *Id.* § 6085(c). Shortly after the Act was enacted in March 1996, President Clinton suspended the right to bring an action under Title III and renewed the suspension during the remainder of his presidency. Presidents Bush and Obama did the same for each succeeding six-month period thereafter. President Trump continued the suspension, for a time. Then, more than two decades after the Act's passage, on May 2, 2019, the suspension of the right to bring a Title III action was permitted to expire. Plaintiff now seeks to recover from each Defendant extraordinary statutory damages (which have never previously been awarded in

---

[1]    As of the date of the filing of this Motion, Xinjiang Goldwind Science & Technology Co., Ltd. has not been served.

[2]    Each Defendant is also separately and contemporaneously filing a Motion to Dismiss for Lack of Personal Jurisdiction.

any other case) for purported trafficking in Plaintiff's confiscated property and for conspiring to do precisely the same.  *See* Compl. ¶¶ 189–245.  Plaintiff's case, however, should be dismissed for at least four independent reasons.

> *First*, Plaintiff lacks standing under Article III of the United States Constitution because Plaintiff does not – and cannot – allege an injury in fact that is fairly traceable to any Defendant's conduct.

> *Second*, aside from this threshold issue of Article III standing, Plaintiff is judicially estopped from pursuing these claims, and lacks standing to do so, because of its recent federal bankruptcy proceedings.  Last year, Plaintiff, along with its parent companies and thirteen additional co-debtors, successfully exited their "pre-packaged," jointly-administered Chapter 11 bankruptcy case (the "Bankruptcy Case") filed in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") by obtaining that court's confirmation of a bankruptcy reorganization plan (the "Reorganization Plan").  In the Bankruptcy Case, Plaintiff did not disclose or identify as assets either the certified claim from the Foreign Claims Settlement Commission ("FCSC") (the "Certified Claim," now attached to Plaintiff's Complaint as Exhibit 1) or any cause(s) of action under the Act or for conspiring to do the same (collectively, the "HBA Related Claims").  In this action, however, Plaintiff now takes the position that it owns such assets and is therefore entitled to damages allegedly in excess of the disclosed going concern and asset-liquidation values of itself and all its former co-debtors *combined*.  Given these circumstances, Plaintiff is judicially estopped from pursuing its claims in this Court.  In addition, the asset-vesting terms and reservation-of-rights provisions of the Reorganization Plan provided neither notice that Plaintiff owned the Certified Claim or the HBA Related Claims nor any indication of their value to creditors.  Because Plaintiff failed to disclose ownership of these assets, and affirmatively swore that Plaintiff owned no litigation claims or

other assets, the Bankruptcy Court was deprived of the ability to administer these assets (*i.e.,* of the ability to do its job), and therefore, Plaintiff's Certified Claim and HBA Related Claims remain the property of Plaintiff's estate and are exclusively within the Bankruptcy Court's jurisdiction. Plaintiff thus lacks standing to bring the HBA Related Claims, and this Court lacks subject-matter jurisdiction.

***Third***, the Complaint does not contain ***any*** factual allegations that Defendants knowingly and intentionally trafficked in the "Confiscated Property" (as defined in the Complaint). While the Complaint alleges facts regarding trafficking in Puerto Carupano – one of the dozens of assets that make up the "Confiscated Property" – there are ***no*** allegations that Defendants trafficked in the broader "Confiscated Property" that Plaintiff alleges is valued at $97.37 million (as opposed to Puerto Carupano's valuation of just over $2 million). To state a claim for relief, Title III requires facts showing that Defendants engaged in commercial activity using or otherwise benefiting from confiscated property. The Complaint fails to allege any facts that these Defendants engaged in any activity where they used or benefitted from any confiscated property other than Puerto Carupano. The Complaint thus fails to state a claim that Defendants trafficked in the "Confiscated Property."

***Fourth***, the Act mandates that a plaintiff may not bring a cause of action under Title III and also bring an independent common-law claim, such as the claim of civil conspiracy alleged here. Plaintiff's Complaint does exactly that, and thus violates the express language of the Act and should be dismissed.

## FACTUAL BACKGROUND

### I.    The Cuban Government's Confiscation of Plaintiff's Properties and Assets

Plaintiff, through a number of subsidiary companies, allegedly once owned various real and personal property as well as a variety of intangible assets in Cuba "relating to the production,

refining, and transportation of raw sugar."  Compl. ¶¶ 19, 64; *id.* at Ex. 1, at 2.  Plaintiff alleges

that in 1960 the Castro regime confiscated these various related companies and their properties

and assets located across the island nation (the "Confiscated Property").  *Id.* ¶ 3.  According to

Plaintiff's allegations and the Certified Claim issued by the FCSC,[3] the Confiscated Property

ranged from harvested lands, windmills, and warehouses, to trucks, plows, work animals, cash,

and small tools.  *See generally id.* at Ex. 1.  The Confiscated Property also included accounts

receivable, livestock, breeding mares, inventory of planting and growing cane, marine

equipment, harvested crops, unharvested crops, factory pumps, electric motors, a carpenter shop,

an evaporating plant, wharves, unexpired insurance, railroad tracks, railroad stations, telephone

systems, and turbogenerators, among other assets.  *Id.*  The tangible assets were physically

located in at least four different Cuban provinces.  *Id.*  One of the dozens of assets allegedly

confiscated by the Cuban government was Puerto Carupano (referred to in the Complaint as the

"Confiscated Port"),[4] a commercial shipping port located in Cayo Juan Claro, Cuba.  *Id.* ¶¶ 65–

66.

On March 26, 1969, the FCSC – a body given jurisdiction over claims of U.S. nationals

against the Government of Cuba, *see id.* at Ex. 1, at 1 – issued the Certified Claim, finding that

the total value of the Confiscated Property that Plaintiff lost as a result of the actions of the

---

[3]     Plaintiff defines "Confiscated Property" in its Complaint to include the dozens of assets individually listed and valued in the Certified Claim attached as Exhibit 1 to the Complaint. Compl. ¶ 64 ("Exhibit 1 (attached hereto) includes a more detailed description of the Confiscated Property and its value.").  The Court may consider Exhibit 1 to the Complaint at the motion to dismiss stage.  Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes."); *see also Indulgence Yacht Charters Ltd. v. Ardell Inc.*, No. 08-60739-CMA, 2008 WL 4346749, at *4 (S.D. Fla. Sept. 16, 2008) ("[W]hile courts accept the facts in a complaint as true in considering a motion to dismiss, they can be trumped by contradictory facts presented in an exhibit or attachment to the pleading.").

[4]     Puerto Carupano is also referred to as "Port of Cayo Juan Claro."  Compl. ¶ 65.  In the Certified Claim, Port of Cayo Juan Claro is listed as part of the Confiscated Property on page 14. *Id.* at Ex. 1, at 14.

Cuban government was $97,373,414.72. *Id.* at Ex. 1, at 21. The Certified Claim shows that only $2,228,000 of the $97.37 million value of the Confiscated Property is attributable to Puerto Carupano. *See id.* at Ex. 1, at 14.

## II.   **Defendants' Alleged "Trafficking" in Plaintiff's Confiscated Property**

According to the Complaint, "[a] host of Cuban state-owned entities" are currently "involved in the planning, construction, and implementation" of "one of Cuba's largest ongoing public works projects," known as the "Herradura Wind Farm Project." Compl. ¶¶ 82, 86.

Plaintiff alleges that Defendants trafficked in Puerto Carupano in late 2018 and early 2019 by "coordinat[ing] at least two separate voyages that delivered and unloaded equipment [from China] at [Puerto Carupano], by way of Florida, for use in the Herradura Wind Farm Project." *Id.* ¶¶ 103, 198–203, 216–17, 230–33. Goldwind International, along with other non-party, unnamed suppliers, is alleged to have manufactured, sold, and "shipped wind farm equipment to a Cuban state-owned entity associated with the project" that was ultimately "unloaded at Puerto Carupano." *Id.* ¶ 5. DSV US, in turn, is alleged to have "provided transportation and logistical services to these suppliers in order to ship their wind farm equipment to Cuba via Puerto Carupano." *Id.* Lastly, BBC's is alleged to have "chartered and operated shipping vessels that carried and unloaded wind farm equipment." *Id.*

Plaintiff's Complaint alleges two deliveries to Puerto Carupano that occurred on separate vessels: the BBC Moonstone and the BBC Jade. *Id.* ¶¶ 104–83.[5] With respect to the alleged delivery via the BBC Moonstone, Plaintiff alleges that DSV US was engaged to coordinate this delivery of windfarm equipment to Puerto Carupano. *Id.* ¶¶ 104–109, 113. BBC, in turn, is alleged to have been "charged with operating and chartering the BBC Moonstone for shipment"

---

[5]     For DSV US and Goldwind International, the Complaint alleges they trafficked in Puerto Carupano for one of these two voyages, not both. Compl. ¶¶ 106, 109, 155–56.

of the equipment to Puerto Carupano.[6]  *Id.* ¶¶ 111, 115.   The BBC Moonstone purportedly completed this delivery in February 2019.  *Id.* ¶ 139.

The other delivery to Puerto Carupano was allegedly made by the BBC Jade.  *Id.* ¶ 154. The Complaint specifically alleges that a non-party to this action was the supplier of the wind farm equipment delivered on this vessel.  *Id.* ¶ 155.  In fact, the only party to this suit alleged to have been involved in the delivery of the equipment on the BBC Jade is BBC, which was purportedly completed in January 2019.  *Id.* ¶¶ 155–57, 174.  Aside from these early 2019 deliveries, Plaintiff conclusorily alleges that other shipments from Goldwind International have been delivered to Puerto Carupano, but provides no further details beyond that one such shipment is alleged to have occurred on or about December 14, 2018.  *Id.* ¶¶ 184–85, 188.

With regard to the BBC Moonstone and the BBC Jade delivering the equipment to Puerto Carupano "by way of Florida," Plaintiff alleges merely that during one voyage, the BBC Moonstone arrived at and departed from the Port of Miami on the same day, *id.* ¶¶ 135, 138, and during the other voyage, the BBC Jade arrived at the Port of Miami one day and departed the next.  *Id.* ¶¶ 170, 173.  Plaintiff also alleges that several days after leaving the Port of Miami, the vessels "stopped at the [Puerto Carupano] in Cuba to unload the wind farm equipment" destined for the Herradura Wind Farm Project.  *Id.* ¶¶ 143, 177.

There are no factual allegations about Defendants trafficking in the Confiscated ***Property*** as opposed to the Confiscated ***Port***.  Indeed, other than Puerto Carupano, the Complaint does not allege that Defendants trafficked in ***any*** of the various warehouses, farms, equipment, crops, railroads, or many other properties and assets confiscated by the Cuban government and defined as the Confiscated Property.

---

[6]      The BBC Moonstone also allegedly delivered equipment for the Herradura Wind Farm Project shipped by another entity entirely unrelated to Goldwind International.  Compl. ¶ 107.

### III.    Plaintiff's Recent Bankruptcy Proceedings

Some sixty years after the Castro regime seized the Confiscated Property, on April 1, 2019, Plaintiff and its parent companies and thirteen additional co-debtors (collectively, the "Hexion Debtors") filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code").[7]  *See generally* Holbert Decl. Ex. A, at Exs. BA-1–BA-4.  The Hexion Debtors were owned pre-bankruptcy by highly sophisticated investors and were represented during the bankruptcy proceedings by legal counsel Latham & Watkins LLP and Richards, Layton & Finger, P.A.; by financial advisor Moelis & Company; and by restructuring advisor AlixPartners.  *Id.* at Exs. BA1-BA-4, BA-14, BA-17.

As part of its bankruptcy proceedings, Plaintiff was required to disclose to the Bankruptcy Court and creditors its assets, liabilities, and the status of its financial affairs.  *See id.* at Exs. BA-5, BA-9.  None of the documents submitted by Plaintiff to the Bankruptcy Court and its creditors, however, ever mentioned the Certified Claim or the HBA Related Claims.  *See id.*; *see also id.* at Exs. BA-6–BA-8, BA-10–BA-12.  The Hexion Debtors instead advanced the position that Plaintiff either (a) possessed no litigation claims or (b) could not identify and list

---

[7]    For the Court's convenience and ease of reference, the Bankruptcy Pleading Appendix annexed to the Declaration of Lynn W. Holbert (the "Holbert Decl."), attached to this Motion as Exhibit "A," includes an index of the titles and defined terms used for each pleading referenced herein, as well as copies of each relevant pleading from the bankruptcy cases of each of the Hexion Debtors, obtained from the publicly available docket maintained by the Bankruptcy Court.  Defendants respectfully request that the Court take judicial notice of Bankruptcy Case filings enumerated in the Bankruptcy Pleading Appendix.  In the Eleventh Circuit, "'a district court may consider judicially noticed documents' . . . at any stage of the proceeding."  *Griffin v. Verizon Commc'ns Inc.*, 746 F. App'x 873, 876 (11th Cir. 2018).  "Courts typically take judicial notice of record documents from other judicial proceedings."  *Id.* (citations omitted) (holding that district court properly took judicial notice of other court filings in considering a Rule 12 motion because "[t]he documents submitted by [defendant] are from the public dockets of federal judicial proceedings.  That being the case, they are not subject to reasonable dispute, and the district court did not err by taking judicial notice of them").  Here, Plaintiff's existence, title to the HBA Related Claims, and standing as a reorganized debtor to bring the HBA Related Claims depends on the documents filed with and approved by the Bankruptcy Court.  These documents are, in turn, attached to the Holbert Declaration.

any such assets "despite reasonable efforts." *See*, *e.g.*, *id.* at Exs. BA-5–BA-8 (including in the "Global Notes" and "Schedule A/B: Assets – Real and Personal Property" sections no mention of the FCSC Certified Claim as an asset in response to question 70 of its Schedules, which requests a list of "[a]ll other assets", including "[c]auses of action against third parties (whether or not a lawsuit has been filed)"); *id.* at Ex. BA-6, at question no. 15, line 15.42 (ascribing "undetermined" or unknown distributable value to Plaintiff).

Further, neither the Reorganization Plan nor the disclosure statement in support of the Reorganization Plan (the "Disclosure Statement") mentioned the FCSC Certified Claim or the HBA Related Claims, either. *See id.* at Exs. BA-14, BA-17. These assets were not disclosed in the general reservation of rights and asset-vesting provisions or the "Preservation of Rights of Action" section. *See id.* at Exs. BA-14, BA-17. Nor were they included in the Liquidation Analysis or Valuation Analysis annexed to the Disclosure Statement. *See id.* at Ex. BA-17. Instead, the Liquidation Analysis reflected that Plaintiff had ***no*** balance sheet value. *Id*. Moreover, although the Plan Supplement contained a list of "Retained Causes of Action," that list did ***not*** include the HBA Related Claims that Plaintiff asserts here. *See id.* at Ex. BA-15.

Within three months of the commencement of the Bankruptcy Case, on June 25, 2019, the Bankruptcy Court entered its Findings of Fact, Conclusions of Law, and Order Confirming Second Amended Joint Chapter 11 Plan of Reorganization of Hexion Holdings LLC and its Debtor Affiliates under Chapter 11 of the Bankruptcy Code (the "Confirmation Order"). *See id* at Ex. BA-13. The Confirmation Order confirmed the Reorganization Plan, which became effective on July 1, 2019, and Plaintiff and the other Hexion Debtors successfully exited the bankruptcy proceedings they had commenced just three months earlier. *See id.* at Ex. BA-16.

### IV.    The Core of Plaintiff's Claims in This Action

At its core, then, the Complaint alleges that Defendants on two discrete occasions (or, for some Defendants, just once) "trafficked" in the Confiscated *Port*, which comprises 2% ($2,228,000) of the total value of Plaintiff's Confiscated *Property* ($97,373,414.72) expropriated by the Cuban government.  Nonetheless, in this action, Plaintiff seeks to recover the total value of its Confiscated Property without alleging that Defendants knowingly and intentionally trafficked in any Confiscated Property beyond the Confiscated Port.  Plaintiff also seeks compounded interest accruing over the last sixty years, trebled under 22 U.S.C. § 6082(a)(3), and attorneys' fees and costs.  *See* Compl. at Prayer for Relief ¶¶ 1, 3.

For the reasons explained below, the Complaint should be dismissed.

### LEGAL STANDARD

A motion to dismiss for lack of standing is governed by Rule 12(b)(1) because standing is jurisdictional.  *See Fla. Wildlife Fed'n, Inc. v. S. Fla. Water Mgmt. Dist.*, 647 F.3d 1296, 1302 (11th Cir. 2011).  Standing is a "threshold jurisdictional question" that must be addressed "prior to and independent of the merits of a party's claims."  *Bochese v. Town of Ponce Inlet*, 405 F.3d 964, 974 (11th Cir. 2005) (citation omitted).  "The plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing" each element of standing.  *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016).

Under Rule 12(b)(6), a complaint must be dismissed unless it "contain[s] sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (citation omitted).  "[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration in original) (citation omitted).  "Factual

allegations must be enough to raise a right to relief above the speculative level," *id.*, meaning that a plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. And while the Court must accept a plaintiff's well-pled facts as true, it need not accept "conclusory allegations, unwarranted deductions of fact[]," *Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d 1182, 1188 (11th Cir. 2002), or "legal conclusion[s] couched as a factual allegation." *Twombly*, 550 U.S. at 555 (quotation omitted).

## ARGUMENT

### I.   The Complaint Should Be Dismissed Because Plaintiff Lacks Article III Standing

Plaintiff lacks Article III standing because it does not (and cannot) allege that it suffered a "concrete" injury, traceable to the shipments of equipment to Puerto Carupano, Cuba on which this action is based, that is distinct from the injury it sustained sixty years ago when the Cuban government nationalized that port. The Court therefore lacks subject matter jurisdiction and should dismiss this action.

The doctrine of standing is embodied in the constitutional requirement that courts are empowered to resolve only "Cases" or "Controversies." U.S. Const. art. III, §§ 1–2; *see also Trichell v. Midland Credit Mgmt., Inc.*, 964 F.3d 990, 996 (11th Cir. 2020) (citing *Spokeo*, 136 S. Ct. at 1547). If a plaintiff lacks standing, then a court lacks subject matter jurisdiction and must dismiss the case. *United States v. Ross*, 963 F.3d 1056, 1062 (11th Cir. 2020) (standing "is a threshold jurisdictional question which must be addressed prior to and independent of the merits of a party's claims") (quotation marks and citation omitted).

The legal standards governing standing are well established; the Supreme Court and the Eleventh Circuit have recently reiterated and applied them. The "irreducible constitutional minimum of standing consists of three elements. . . . The plaintiff must have (1) suffered an

injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo*, 136 S. Ct. at 1547 (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 559–60 (1992)) (internal quotations omitted); *Trichell*, 964 F.3d at 996–97 (same). The plaintiff bears the burden of establishing these elements. *Spokeo*, 136 S. Ct. at 1547. At the pleadings stage, plaintiff "must clearly . . . allege facts demonstrating each element." *Id*. (alteration in original) (internal quotations omitted).

To establish an injury in fact, "a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Id*. at 1548 (quoting *Lujan*, 504 U.S. at 560). A concrete injury "must be '*de facto*'; that is, it must actually exist." *Spokeo*, 136 S. Ct. at 1548.

And, crucial to this case, a plaintiff does ***not*** automatically have standing simply because it alleges the elements of a cause of action created by Congress. The Supreme Court "has rejected the argument that a plaintiff automatically satisfies the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right. . . . Article III standing requires a concrete injury even in the context of a statutory violation." *Thole v. U.S. Bank N.A.*, 140 S. Ct. 1615, 1620–21 (2020) (quoting *Spokeo*, 136 S. Ct. at 1549) (internal quotations omitted); *Salcedo v. Hanna*, 936 F.3d 1162, 1167 (11th Cir. 2019) (same); *see also Spokeo*, 136 S. Ct. at 1548 ("Congress cannot erase Article III's standing requirements by statutorily granting the right to sue to a plaintiff who would not otherwise have standing.") (quotation marks and citation omitted).

Plaintiff does not and cannot allege the first two "irreducible" requirements to establish standing – that is, that Plaintiff "suffered an injury in fact" and that such injury "is fairly traceable to the challenged conduct" of Defendants.

11

*First*, the Complaint seeks relief based **only** and **entirely** on an injury it allegedly sustained in 1959 and 1960 at the hands of the Cuban government. Based on the value of the property, the FCSC certified that Plaintiff suffered a loss in the amount of $97,373,414.72, **between November 1959 and July 1960, as a result of the Cuban government's** confiscation of Plaintiff's various properties in Cuba. *See* Compl. ¶¶ 68–69 (describing confiscation of Confiscated Property), 76–81 (describing valuation of Confiscated Property); *id.* at Ex. 1. Plaintiff seeks damages in that amount plus interest, treble damages, attorneys' fees and costs, *see* Compl. at Prayer for Relief, which are precisely the damages that the Act facially provides for. *See* 22 U.S.C. § 6082(a)(1)(A)(i); *see also* Comp. ¶¶ 57–62.

The only relief that Plaintiff seeks in this case, therefore, is in respect to the injury it sustained in 1959 and 1960 as a result of Cuba's confiscation of the Confiscated Property. Plaintiff fails to allege that it suffered any ***other*** injury. The word "injury" (or other forms thereof) appears in the Complaint once, in paragraph 28. That allegation confirms that the harm Plaintiff seeks to redress here consists of the "losses and injuries" it suffered from Cuba's "expropriation" of its property. The word "damages" (or other forms thereof) appears many times in the Complaint; in every instance, it refers only to the statutory damages under the Act or the losses determined by the Certified Claim. *E.g.*, Compl. ¶¶ 39, 57, 190, 195, 206, 213, 220, 236, 245. Plaintiff's losses as determined in the Certified Claim were caused by Cuba in 1960 when it took Plaintiff's property, but those losses are not "traceable" to Defendants' alleged uses of Puerto Carupano in 2018. *Kawa Orthodontics, LLP v. Sec'y, U.S. Dep't of the Treasury*, 773 F.3d 243, 247 (11th Cir. 2014) ("To establish causation, [plaintiff] must demonstrate its alleged injury is fairly traceable to the challenged action of the defendant.") (quoting *Lujan,* 504 U.S. at 560) (internal quotation marks omitted).

**Second**, the alleged use of Puerto Carupano by Defendants (or anyone else) does not, as a matter of law constitute an injury-in-fact to Plaintiff, because Plaintiff does not own any property interest in Puerto Carupano (which the Complaint labels the "Confiscated Port") itself.  Plaintiff currently owns only a "claim" relating to the Confiscated Port.  *Glen v. Club Mediterranee, S.A.*, 450 F.3d 1251, 1255 (11th Cir. 2006) ("*Club Med*") (rejecting plaintiffs' argument that the Act rendered Cuba's expropriation of property ineffective and, therefore, that they held an "ownership interest" in the property).[8]  Because Plaintiff does not own the Confiscated Port – and has not owned it since 1960 – it could not have been injured by Defendants' use of the Confiscated Port in connection with the shipments approximately sixty years later in 2018.

It is well settled that a plaintiff who does not own property lacks standing to assert a claim for allegedly wrongful use of that property.  *United States v. Amodeo*, 916 F.3d 967 (11th Cir. 2019) (finding that once the United States government took ownership of property through forfeiture, the former owner lacked standing to object to how the government chose to dispose of the property); *Harris v. Orange S.A.*, 636 F. App'x 476, 484 (11th Cir. 2015) (finding that plaintiff who did not own trademark lacked standing to pursue trade secrets claim); *Nunnelee v. United States*, 573 F. App'x 886, 887 (11th Cir. 2014) (same); s*ee also Club Med*, 450 F.3d at 1254–55 (holding that former owners of confiscated property in Cuba could not sue current users of the property for trespass).

**Third**, Plaintiff is in the same position today as **before** the alleged shipments in this case were unloaded at Puerto Carupano.  And, it would have been in the same position if **no** shipments, or if **thousands** of shipments, had been unloaded at that port.  Plaintiff held, and still holds, a Certified Claim for more than $97.37 million **against Cuba**.  The shipments alleged in

---

[8]     *See also Havana Docks Corp. v. Royal Caribbean Cruises, Ltd.*, No. 19-CV-23590, 2020 WL 1905219, at *7 (S.D. Fla. Apr. 17, 2020) (finding "the Cuban Government's confiscation of property extinguished any ownership rights of those who owned the property prior to the expropriation").

this case in no way affected that Certified Claim (on which Plaintiff stands to collect in any eventual settlement between the United States and Cuba).  Plaintiff still would not own or be able to exclude others from using the Confiscated Port even if the shipments had not occurred.

The Supreme Court recently reconfirmed the core constitutional principle that, when the violation of a statute does not change a plaintiff's position, that plaintiff lacks standing.  *Thole*, 140 S. Ct. at 1620–21.  Plaintiffs in *Thole* were retirees who received fixed monthly payments under a company retirement plan.  They alleged that the company made poor investment decisions, in violation of the Employee Retirement Income Security Act (ERISA), 29 U.S.C. §§ 1001 *et seq.*, which caused the plan to lose $750 million.  Appealing the dismissal of their claims for lack of standing, plaintiffs argued that ERISA affords them a "cause of action to sue for restoration of plan losses and other equitable relief."  140 S. Ct. at 1620.  The Supreme Court held, however, that merely satisfying the elements of a cause of action under a statute is not enough, because "Article III standing requires a concrete injury even in the context of a statutory violation."  *Id*. at 1620–21 (quoting *Spokeo*¸ 136 S. Ct. at 1549).  Plaintiffs' position did not change, and would not change in the future, even if the company defendant violated the statute, because plaintiffs continued to receive and would be entitled to receive their fixed monthly benefits for their lifetimes.  Plaintiffs therefore sustained no concrete injury and thus lacked standing.

Similarly in this case, simply because Plaintiff has alleged (and even if it could prove) the elements of "trafficking" under the Act does not mean that it has Article III standing.  "Although Congress may 'elevate' harms that 'exist' in the real world before Congress recognized them to actionable legal status, it may not simply enact an injury into existence, using its lawmaking power to transform something that is not remotely harmful into something that is."  *Hagy v. Demers & Adams*, 882 F.3d 616, 622 (6th Cir. 2018); *see also Nicklaw v. Citimortgage, Inc.*, 839

F.3d 998, 1003 (11th Cir. 2016) (finding that "the requirement of concreteness under Article III is not satisfied every time a statute creates a legal obligation and grants a private right of action for its violation").

Plaintiff may argue that, if it lacks standing to sue – despite alleging all elements of the civil action under the Act and holding a $97.37 million Certified Claim – then few or no claimants would have standing to pursue a trafficking claim, which would allegedly defeat Congress's intent in creating the Act's civil remedy provision. That argument, however, has been soundly rejected by the Supreme Court. "The assumption that if [Plaintiff has] no standing to sue, no one would have standing, is not a reason to find standing." *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 227 (1974); *see also Thole*, 140 S. Ct. at 1621 (same).[9]

The district court in *Glen* recently dismissed a trafficking claim under the Act for lack of Article III standing. 2020 WL 4464665, at *2. In *Glen*, the plaintiff's claim was to beachfront property, which the Cuban government confiscated from his mother and aunt in 1960, and on which luxury hotels were later built. *Id.* at *1. The plaintiff alleged that the defendant airline "trafficked" in the property by booking reservations online for hotels on that property. *Id.* The court, after stating the standards for Article III standing, *id.* at **4–5, concluded that the plaintiff lacked standing because he was not harmed by the airline's doing business with the hotels. *Id.* at *2 ("Defendant did not deprive plaintiff of the Properties or the profits he might make if he

---

[9]     *See also Glen v. Am. Airlines, Inc.*, No. 20-CV-482-A, 2020 WL 4464665, at *3 (N.D. Tex. Aug. 3, 2020) ( "Plaintiff also argues that a finding that he lacks standing 'would write Title III out of existence' . . . . Even if such a statement is true, '[t]he assumption that if [plaintiff has] no standing to sue, no one would have standing, is not a reason to find standing.') (citing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 420–21 (2013)); *Valley Forge Christian Coll. V. Am. United for Separation of Church & State, Inc.*, 454 U.S. 464, 489 (1982).

owned and operated hotels on the Properties.").  His position remained the same regardless of how many reservations the airline booked, or whether it booked any at all.[10]

As in *Glen*, here Plaintiff was injured when Cuba confiscated its property in 1959 and 1960.  The Certified Claim, issued in 1969, confirmed and determined the amount of ***that loss***.  Plaintiff now seeks to recover ***that very loss*** from Defendants – not the Cuban government – because Defendants allegedly used a small portion of the Confiscated Property, the Confiscated Port, in connection with two shipments in 2018 and 2019.  Plaintiff has thus neither alleged nor sustained any injury, separate from the Cuban government's confiscation, that is traceable to Defendants.  Plaintiff therefore lacks Article III standing and this action should be dismissed for lack of subject-matter jurisdiction.  *Harris*, 636 F. App'x at 484; *Nunnelee*, 573 F. App'x at 887; *Club Med*, 450 F.3d at 1254–55.

## II.    Plaintiff's Decision Not to Disclose in Its Recent Bankruptcy Proceedings the Alleged Rights It Asserts Here Bar This Action

Aside from a lack of Article III standing, there are two other related and insurmountable threshold standing issues to Plaintiff's ability pursue its claims in this Court.  Namely, Plaintiff omitted the Certified Claim and HBA Related Claims from all of the filings that creditors and the Bankruptcy Court relied upon in allowing Plaintiff and its co-debtors to exit the bankruptcy

---

[10]     A different judge in this District recently denied a motion to dismiss a trafficking claim under the Act for lack of Article III standing.  *Cueto Iglesias v. Pernod Ricard*, No. 20-CV-20157, ECF No. 55 at 16-18 (S.D. Fla. Aug. 17, 2020).  Defendants respectfully submit that that ruling is incorrect.  Not only was that conclusion *dicta* (the court had already found that the plaintiffs had failed to establish personal jurisdiction over the defendant), but the court, in deeming the plaintiffs' allegations that the defendant trafficked under the Act as sufficient to allege injury for purposes of standing, did not address the legal standards governing standing and in particular did not discuss the authority from *Thole*, *Spokeo* or *Trichell*.  The *Iglesias* court's order, therefore, did not analyze or apply binding case law holding that the violation of a federal statute, by itself, does not create standing.

proceeding.  Because Plaintiff denied in its Bankruptcy Case that these assets exist, Plaintiff is

now estopped from pursuing this case, and has no standing to do so.[11]

> A.    The Hexion Debtors Did Not Disclose the Certified
>        Claim or the HBA Related Claims to the Bankruptcy
>        Court and Thus Are Judicially Estopped From Pursuing Them Here

Throughout their bankruptcy proceedings, the Hexion Debtors had "an affirmative duty

of full disclosure." *Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 362 (3d

Cir. 1996) (debtor must disclose contingent and unliquidated claims of every nature and provide

an estimated value for each); *see also* 11 U.S.C. § 521(a) (requiring that a debtor file a schedule

of assets).  "That 'duty to disclose is a continuing one,'" *Smith v. Haynes & Haynes P.C.*, 940

F.3d 635, 643 (11th Cir. 2019) (citation omitted), and applies to any potential and likely causes

of action.  *See Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. Gen. Motors Corp.*, 337 F.3d

314, 322 (3d Cir. 2003) (holding that undisclosed, known claims are subject to judicial estoppel);

*Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 417 (3d Cir. 1988) ("It has

been  specifically  held  that  a  debtor  must  disclose  any  litigation  likely  to  arise  in  a  non-

---

[11]    The  same  result  is  reached  under  precedent  from  either  the  Eleventh  Circuit,  where
Plaintiff has chosen to pursue the instant action, or from the Third Circuit, where Plaintiff's
bankruptcy case was venued.  In *BPP Illinois, LLC v. Royal Bank of Scotland Grp. PLC*, 859
F.3d 188 (2d Cir. 2017), for example, the Second Circuit applied precedent from the Fifth Circuit
to judicially estop a debtor that failed to disclose litigation claims in its prior Texas bankruptcy
case.  In analyzing judicial estoppel in a context such as this, however, courts in the Eleventh
Circuit have applied Eleventh Circuit law without regard for the venue of the prior bankruptcy
case.  *See Jones v. United States*, 467 F. App'x 815, 818–19 (11th Cir. 2012) (finding that the
district court "did not abuse its discretion in applying judicial estoppel to [plaintiff's Federal Tort
Claims Act] claim" where plaintiff failed to disclose the existence of this claim during the course
of her bankruptcy proceedings in United States Bankruptcy Court of the Southern District of
Iowa).  Because Plaintiff's bankruptcy proceeding was venued in Delaware, precedents from
both the Eleventh Circuit and the Third Circuit are included in this analysis.  As stated, under
each, the result is the same.  Further, in deciding issues like those presented here, the Eleventh
Circuit has not surprisingly looked to guidance from the Third Circuit, which includes Delaware,
itself a leading authority on corporate and bankruptcy law.  *E.g. Slater v. United States Steel
Corp.*, 871 F.3d 1174, 1181 (11th Cir. 2017) (citing *Ryan* for the proposition that the Third
Circuit could apply judicial estoppel to preclude post-bankruptcy claim because "absent any
good explanation, a party should not be allowed to gain an advantage by litigation on one theory,
and then seek an inconsistent advantage by pursuing an incompatible theory").

bankruptcy context").

The disclosure obligation is "crucial to the effective functioning of the federal bankruptcy system," as "creditors and the bankruptcy court rely heavily on the debtor's disclosure statement in determining whether to approve a proposed reorganization plan." *Ryan*, 81 F.3d at 362. In the Third Circuit, in which the Bankruptcy Case was venued, "if a debtor has enough information prior to confirmation to suggest that it may have a possible cause of action, then that is a 'known' cause of action such that it must be disclosed." *Krystal*, 337 F.3d at 323 (alteration and citation omitted). The same obligation exists in the Eleventh Circuit. *E.g.*, *Smith,* 940 F.3d at 643–44 (holding that "'[w]hen an individual files for bankruptcy, [s]he must file sworn disclosures listing h[er] debts and h[er] assets, including any pending civil claims' . . . That 'duty to disclose is a continuing one that does not end once the forms are submitted to the bankruptcy court; rather, a debtor must amend h[er] financial statements if circumstances change.' . . . even after confirmation of the petitioner's plan") (citation omitted; gender-changing brackets in original).

Parties to bankruptcy proceedings are bound by such disclosures, and judicial estoppel prevents those parties from subverting the judicial process and undermining the integrity of the bankruptcy system by "deliberately changing positions according to the exigencies of the moment." *Henderson v. Franklin*, 782 F. App'x 866, 870 (11th Cir. 2019) (*en banc*) (internal quotations omitted) (citing *Slater v. United States Steel Corp.*, 871 F.3d 1174, 1180 (11th Cir. 2017)); *Krystal,* 337 F.3d at 325 (holding that judicial estoppel barred post-bankruptcy debtor's assertion of claims known to debtor, but not disclosed, during bankruptcy case because "[s]uch nondisclosures [of known litigation claims] affect creditors' willingness to negotiate their claims and enhance the debtor's bargaining position by making the pot that creditors look to for recovery appear smaller than it really is"); *Oneida Motor Freight*, 848 F.2d at 416 (observing

that it is a "long-standing tenet of bankruptcy law" that one seeking benefits under the terms of the Bankruptcy Code is required to schedule all interests and property rights).[12]

In *Slater*, the Eleventh Circuit reaffirmed "that a district court may apply judicial estoppel when a two-part test is satisfied: the plaintiff (1) took a position under oath in the bankruptcy proceeding that was inconsistent with plaintiff's pursuit of the civil lawsuit and (2) intended to make a mockery of the judicial system." 871 F.3d at 1180.  These prongs are met here.

      i.     *Plaintiff Took a Position in Its Bankruptcy*
                *Proceeding That Is Inconsistent with Its Claims Here*

The first element of judicial estoppel is "that the plaintiff took a position under oath in the bankruptcy proceeding that was inconsistent with the plaintiff's pursuit of the civil lawsuit." *Smith*, 940 F.3d at 643–44 ("Courts consider the omission of a legal claim from a bankruptcy asset schedule to be a denial that the claim exists. And a complaint in district court seeking damages on the same claim is considered an assertion that the claim does indeed exist. By failing to disclose a pending district court claim to the bankruptcy court, a plaintiff is thus deemed to be taking inconsistent positions. And that inconsistency can satisfy the first prong of the judicial estoppel test.") (citations omitted); *see also Henderson*, 782 F. App'x at 871 ("Step one is satisfied when the plaintiff fails to disclose a claim against a third party in a bankruptcy proceeding (regardless of chapter) and then pursues that claim in court.").

Here, Plaintiff failed to sufficiently disclose or otherwise identify the Certified Claim or the HBA Related Claims (or their values) as an asset in its disclosures made to creditors and the

---

[12]     As the Fifth Circuit succinctly explained in *In re Coastal Plains, Inc.*, "courts will not permit a debtor to obtain relief from the bankruptcy court by representing that no claims exist and then [allow the debtor] subsequently to assert those claims for his own benefit in a separate proceeding. The interests of both the creditors, who plan their actions in the bankruptcy proceeding on the basis of information supplied in the disclosure statements, and the bankruptcy court, which must decide whether to approve the plan of reorganization on the same basis, are impaired when the disclosure is incomplete."  179 F.3d 197, 205–06 (5th Cir. 1999) (emphases and citations omitted).

Bankruptcy Court at any point during the Bankruptcy Case.  Holbert Decl. A, at Exs. BA-5, BA-9.  The other Hexion Debtors failed to do so as well.  *Id.* at Exs. BA-6–BA-8, BA-10–BA-12.  The Hexion Debtors instead advanced the position that Plaintiff either (a) possessed no litigation claims or (b) could not identify and list any such assets despite reasonable efforts:



*Id.* at Ex. BA-5; *see id.* at Exs. BA-6–BA-8 (including in the "Global Notes" and "Schedule A/B: Assets – Real and Personal Property" sections no mention of the FCSC Certified Claim as an asset in response to question 70 of its Schedules, which requests a list of "[a]ll other assets," including "[c]auses of action against third parties (whether or not a lawsuit has been filed)").  Perplexingly, Plaintiff's parent ascribed an "undetermined value" to Plaintiff:



*See id.* at Ex. BA-6.

Further, neither the Reorganization Plan nor the Disclosure Statement mentions the FCSC Certified Claim or the HBA Related Claims.  *Id.* at Exs. BA-14, BA-17.  One would reasonably expect to find such disclosure at least in the asset-vesting provisions and general reservation of rights (at least by type or category, such as "claims related to confiscated property" or "Helms-Burton Act claims").  But there is nothing of the sort there.  *See id.* at Ex. BA-17, Article IV, ¶ D.  Alternatively, Plaintiff or any of the other Hexion Debtors could have listed them by value in the "Preservation of Rights of Action" section.  But there is nothing of that sort in that section, either.  *Id.* ¶ P.  Looking even more closely, the FCSC Certified Claim and the HBA Related Claims and their values could have been – but were not – included in the Liquidation Analysis or Valuation Analysis annexed to the Disclosure Statement of the bankruptcy proceeding.  *Id.* at Ex. BA-17, Exs. H, I.  To the contrary, the Liquidation Analysis reflected that Plaintiff had ***no*** balance sheet value:

*Id.* at Ex. BA-17, Ex. H.  Moreover, although the Plan Supplement specifically listed "Retained Causes of Action," that list did not include the Certified Claim or the HBA Related Claims either.  *Id.* at Ex. BA-15.

In short, despite having plentiful opportunities to do so, Plaintiff did not disclose the Certified Claim or the HBA Related Claims or their values as an asset in any disclosure made to the Bankruptcy Court and its creditors.  And yet, these assets now are the necessary basis of the action Plaintiff pursues in this Court.  Thus, the Complaint's and the bankruptcy disclosures' inconsistent positions concerning the existence of Plaintiff's Certified Claim and the HBA Related Claims "satisfies the first prong of the judicial estoppel test."  *Smith*, 940 F.3d at 644.

      ii.     *Plaintiff's Lack of Disclosure Amounts to Bad Faith and Makes a Mockery of the Judicial System*

The second element of the judicial estoppel analysis is whether the inconsistent positions were taken in "bad faith" or were "calculated to make a mockery of the judicial system." *Henderson*, 782 F. App'x at 871 (citations omitted).  Here, the Hexion Debtors' intentional non-disclosure of the Certified Claim and the HBA Related Claims allowed them to play "fast and loose" with the Bankruptcy Court.

Courts presume bad faith "when averments in the pleadings demonstrate both knowledge of a claim and a motive to conceal that claim in the face of an affirmative duty to disclose."

22

*Krystal*, 337 F.3d at 321 (establishing rebuttable inference of bad faith); *Ryan*, 81 F.3d at 363 (motive to conceal may be apparent from the size of damages sought, which may have affected the size of the bankruptcy estate).

Although the Eleventh Circuit does not apply an outright presumption of bad faith in such circumstances, it does mandate a review of "all the facts and circumstances" in order to determine "whether a plaintiff intended to mislead the court." *Slater*, 871 F.3d at 1185–86. And when there are indicia of intentional misleading, the Eleventh Circuit has empowered district courts to find that a plaintiff intended to "make a mockery of the judicial system" and apply judicial estoppel. *Id.*; *see also Henderson v. U.S. Sec. Assocs., Inc.*, No. 17-CV-3329, 2018 WL 5044634, at *3 (N.D. Ga. Oct. 17, 2018), *aff'd sub nom. Henderson*, 782 F. App'x at 866 (applying judicial estoppel to bar claims even where plaintiff was pro se and plaintiff had not initiated lawsuit until after bankruptcy). To assist district courts like this one in assessing intent, the *Slater* Court provided the following guidance:

> When the plaintiff's inconsistent statement comes in the form of an omission in bankruptcy disclosures, the court may consider such factors as the plaintiff's level of sophistication, whether and under what circumstances the plaintiff corrected the disclosures, whether the plaintiff told his bankruptcy attorney about the civil claims before filing the bankruptcy disclosures, whether the trustee or creditors were aware of the civil lawsuit or claims before the plaintiff amended the disclosures, whether the plaintiff identified other lawsuits to which he was a party, and any findings or actions by the bankruptcy court after the omission was discovered.

*Slater*, 871 F.3d at 1185. This list of factors to consider is non-exhaustive, and the Eleventh Circuit has underscored the district court's freedom "to consider any fact or factor it deems relevant to the intent inquiry." *Id.* at n.9.

Here, no one can dispute that the Hexion Debtors were owned pre-bankruptcy by highly sophisticated investors, *see* Hexion Inc., Annual Report for Fiscal Year Ending Dec. 31, 2018 (Form 10-K), https://investors.hexion.com/node/13866/html#s2028C3E051CB6C12EF5415B25

DB3D2EC, and that they were represented by well-qualified counsel, investment advisors and financial advisors.  During the Bankruptcy Case, the Hexion Debtors' bankruptcy legal advisors were Latham & Watkins LLP and Richards, Layton & Finger, P.A.[13]  Holbert Decl. Ex. A, at Ex. BA-17.  Their financial advisor was Moelis & Company.  *Id.*  Their restructuring advisor was AlixPartners. *Id.*  In addition, despite the fact that the suspension of the prohibition of Title III's private right of action was lifted ***during the pendency of the Bankruptcy Case***, there were no amendments addressing the Certified Claim or HBA Related Claims.  *See id.* at Ex. BA-14 (filing of amended Plan of Reorganization on June 20, 2019, which includes no mention of the Certified Claim or HBA Related Claims).  In short, these parties cut a deal that they imposed on non-consenting creditors, the Bankruptcy Court, and the public by obtaining the Bankruptcy Court's approval based on a record bare of any mention of the existence or value of the Certified Claim or the HBA Related Claims.

Had the Bankruptcy Court and creditors been provided notice that the Hexion Debtors owned an asset now alleged to be worth treble the sum of $97.37 million and interest purportedly compounded over more than sixty years – more than the entire value of the bankruptcy estate – those creditors and the Bankruptcy Court might very well have insisted that some of that additional value be distributed to those junior classes.[14]  *See In re Coastal Plains*, 179 F.3d at 205–206, 208 (holding that plaintiff was estopped from asserting undisclosed claims and stating

---

[13]     Shortly after Plaintiff filed the bankruptcy petition, and before the Bankruptcy Court confirmed the Reorganization Plan, the Hexion Debtors' bankruptcy counsel's own firm issued a comprehensive client alert concerning causes of action under the Act.  *See* Latham & Watkins Client Alert Commentary, 10 Things to Know: US Allows Lawsuits Relating to "Trafficking" in Confiscated Property in Cuba, May 3, 2019, No. 2497, available at https://www.lw.com/thoughtLeadership/10-Things-to-Know-US-Allows-Lawsuits-Relating-to-Trafficking-in-Confiscated-Property-in-Cuba.

[14]     *See* Holbert Decl. Ex. A, at Ex. BA-17, at Ex. A (reporting "total enterprise value of $3.1 billion"); *see id.* at Ex. BA-17, at Ex. I (reporting "the midpoint of our enterprise value range is $3,100 million").

that, "[t]he interests of both the creditors, who plan their actions in the bankruptcy proceeding on the basis of information supplied in the disclosure statements, and the bankruptcy court, which must decide whether to approve the plan of reorganization on the same basis, are impaired when the disclosure is incomplete") (citation and emphasis omitted); *cf. In re Pen Holdings, Inc.*, 316 B.R. 495, 500–501 (Bankr. M.D. Tenn. 2004) ("at issue in § 1123(b)(3) is . . . notice to creditors generally that there are assets yet to be liquidated that are being preserved for prosecution by the reorganized debtor or its designee").

In analyzing this second prong it is significant that the home forum of the bankruptcy mandates disclosure.  When a party – like Plaintiff here – has failed to make such a disclosure, it evidences improper intent.  *See BPP Illinois*, 859 F.3d 188 (estopping a debtor from asserting claims that it failed to disclose in its prior Texas bankruptcy case because nondisclosure was improper in the Fifth Circuit where the bankruptcy was located).  Plaintiff cannot now seek damages based on a Certified Claim of which it alleges to have been aware for decades, but denied owning when it was required to comply with the mandated duty of disclosure in bankruptcy.  Judicial estoppel prevents Plaintiff from profiting from such a sleight of hand in the Bankruptcy Court and in this Court.  *See Krystal*, 337 F.3d at 325.

      B.      Plaintiff Lacks Standing to Bring this Action Due to
              <u>Its Lack of Sufficient Disclosure in the Bankruptcy Case</u>

Aside from being judicially estopped from asserting the present causes of action, Plaintiff's conduct in the Bankruptcy Case also deprives it of standing before (and hence subject matter jurisdiction in) this Court.  In order for Plaintiff to have preserved the causes of action it now asserts related to its Certified Claim and HBA Related Claims, it must have adequately disclosed them in its bankruptcy proceeding.  Plaintiff did not, because its sole boilerplate reservation did not put creditors sufficiently on notice to identify and evaluate the assets potentially available for distribution.  Plaintiff therefore lacks standing.

Although the Bankruptcy Code allows debtors to reserve causes of action to a post-bankruptcy representative of the estate, *see* 11 U.S.C. § 1123(b)(3), "the reservation [by the plan] [must] be worded sufficiently to 'allow creditors to identify and evaluate the assets potentially available for distribution.'" *In re Transit Grp., Inc.,* 332 B.R. 45, 57 (Bankr. M.D. Fla. 2005) (citing *Pen Holdings*, 316 B.R. at 504). "After confirmation . . . the ability of the [debtor] to enforce a claim once held by the estate is limited to that which has been retained in the plan." *In re United Operating, LLC,* 540 F.3d 351, 356–57 (5th Cir. 2008) (holding that "[i]f a debtor has not made an effective reservation, the debtor has no standing to pursue a claim that the estate owned before it was dissolved") (citation omitted; alteration in original). Absent identification of the type and category or value of a known cause of action, courts are in accord that Bankruptcy Code Section 1141, which vests assets in the post-petition debtor, does not overcome the disclosure required under Section 1123(b)(3) so as to reserve standing to pursue the undisclosed cause of action post-petition. *E.g., Harstad v. First Am. Bank*, 39 F.3d 898, 903 (8th Cir. 1994) (without satisfying the notice requirement of 1123(b)(3) by putting creditors on notice of claims the debtor intends at the time of the case to pursue post-petition, plan does not vest post-confirmation debtor with standing to pursue those claims); *In re Ice Cream Liquidation, Inc.,* 319 B.R. 324, 333 (Bankr. D. Conn. 2005) ("[I]f the Plan contains the requisite provision [reserving a cause of action], the Debtor has standing . . . However, if an adequate Plan provision is lacking, the Debtor lacks standing.").[15]

---

[15]    Moreover, because the Certified Claim and the HBA Related Claims were not scheduled, those assets were neither administered in the Bankruptcy Case nor abandoned to the "Reorganized" Hexion Debtors, and thus they remain "property of the estate." *See Jacobs v. A-C Prod. Liab. Tr.*, No. 09-CV-30143, 2015 WL 5818388, at *6 (E.D. Pa. Oct. 6, 2015) (citing *Allston-Wilson v. Philadelphia Newspapers, Inc.,* No. CIV.A. 05-4056, 2006 WL 1050281, at *1 (E.D. Pa. Apr. 20, 2006)) ( "Pursuant to 11 U.S.C. § 554(d), a cause of action, which a debtor fails to schedule, remains property of the estate because it was not abandoned and not administered."); *In re Kane*, 628 F.3d 631, 637 (3d Cir. 2010) (same).

Courts apply slightly varied standards to determine whether plan provisions reserving causes of action and vesting assets in post-bankruptcy entities are sufficiently worded to be effective. [16] Generally, however, reservations and asset-vesting provisions are held to be sufficiently informative only if they specifically "indicat[e] the type or category of claims to be preserved." *In re Ampace Corp.*, 279 B.R. 145, 155 (Bankr. D. Del. 2002) (finding a categorical reservation is sufficient to preserve avoidance actions that may be so numerous that precise identification prior to confirmation is onerous); *In re USN Commc'ns, Inc.,* 280 B.R. 573, 593 (Bankr. D. Del. 2002). [17]   In *In re Bridgeport Holdings*, the bankruptcy court held that preservation of causes of action for post-confirmation adjudication requires "clear and unambiguous retention provisions . . . that specify the category of causes of action to be preserved and the potential effect of the pursuit of those causes of action."  326 B.R. 312, 327 (Bankr., D. Del. 2005).  *Id.*  The *Bridgeport Holdings* court found categorical identification of avoidance actions to be sufficient, but distinguished numerous cases in which debtors' failure to specifically identify knowable, existing non-bankruptcy claims were barred by res judicata, judicial estoppel, and lack of standing.  *Id.*  As one court framed the question: "[T]he words sufficient to satisfy § 1123(b)(3) must be measured in the context of each case and the particular claims at issue: Did the reservation allow creditors to identify and evaluate the assets potentially available for distribution?"  *Pen Holdings*, 316 B.R. at 504.  Here, the answer to that question is a resounding "***no***."

---

[16]     The bankruptcy court's decision in *In re Hart Oil & Gas, Inc.,* 534 B.R. 35, 48 (Bankr. D.N.M. 2015) provides a comprehensive summary of the various standards and the circumstances in which each applies.

[17]     "The uniformity requirement of the bankruptcy clause forbids . . . arbitrary regional differences in the provisions of the Bankruptcy Code."  *In re Mosaic Mgmt. Grp., Inc.*, 614 B.R. 615, 624 (Bankr. S.D. Fla. 2020) (quotations and citations omitted).

The Complaint's fifty-eight pages and 245 paragraphs recite the history, knowledge, and alleged value of the Certified Claim and the HBA Related Claims in which Plaintiff purports to have held an interest as early as 1969.  The contents and detail of the pleading – filed a mere *months* after Plaintiff's successful bankruptcy reorganization – confirms that the Hexion Debtors were long ago ***fully aware*** of the specific causes of action Plaintiff asserts here.  *E.g.*, Compl. ¶ 7 (alleging that American Sugar certified its claim for confiscated property back in 1969 and that since 1996 it was known that business dealings with Cuba raised liability risks); *id.* ¶ 91 (referencing a 2017 report (notably pre-Hexion Bankruptcy) on defendants' activities in Cuba). Yet in the schedules filed with the Bankruptcy Court, Plaintiff and the other Hexion Debtors did no more than assert boilerplate language allegedly reserving generic "causes of action."  *See* Holbert Decl. Ex. A, at Exs. BA-5–BA-8.

Notably, the Reorganization Plan's use of the phrase "causes of action" makes no reference to claims of the sort asserted in the Complaint (*e.g.*, rights or causes of action created by the Certified Claim or Title III) and does not even suggest a potential litigation right to damages for trafficking in property confiscated by Cuba.  *Id.* at Ex. BA-14.  Nor was there any reference even to litigation rights created by federal law in general other than avoidance actions and defenses under the Bankruptcy Code.  *Id.*  The closest to any kind of disclosure is in the Global Notes to the Schedules, as "General Disclosures Applicable to Schedules and Statements," where each of the Hexion Debtors, including Plaintiff, included the following pattern language regarding "Causes of Action" – which cagily avoided addressing the issue at all:

> **General Disclosures Applicable to Schedules and Statements**
>
>    1.    **Causes of Action**.  Despite their reasonable efforts to identify all known assets, the Debtors may not have listed all of their causes of action or potential causes of action against third parties as assets in their Schedules and Statements. The Debtors reserve all of their rights with respect to any claims or causes of action and neither these Global Notes nor the Schedules and Statements shall be deemed a waiver of any such claims or causes of actions or in any way prejudice or impair the assertion of such claims.

*See id.* at Ex. BA-5; *see also* BA-6–BA-8.  That was patently insufficient to preserve the causes of action Plaintiff seeks to assert now, and thus, Plaintiff lacks standing to assert those claims. *See, e.g.*, *In re Ampace*, 279 B.R. at 155.

### III.    Plaintiff Fails to State a Claim for Trafficking in the "Confiscated Property"

Plaintiff's Complaint should also be dismissed under Rule 12(b)(6) for failure to state a claim.  More basically, the Complaint fails to allege facts plausibly showing that Defendants knowingly and intentionally trafficked in the Confiscated ***Property***; it only alleges facts that the Defendants trafficked in the Confiscated ***Port***.

Under Title III, "any person that . . . traffics in property which was confiscated by the Cuban Government on or after January 1, 1959, shall be liable to any United States national who owns the claim to ***such*** property."  22 U.S.C. § 6082(a)(1)(A) (emphasis added).  To be liable under Title III, a person must "traffic[] . . . ***in such property***." *Glen v. Club Mediterranee S.A.,* 365 F. Supp. 2d 1263, 1269 (S.D. Fla. 2005) ("Title III permits any U.S. national 'who owns a claim to such [confiscated] property for money damages' to sue those *who traffic in such property*." (alteration in original; emphasis added and citation omitted)); *see also DeMeo v. State Farm Mut. Auto. Ins. Co.,* 639 F.3d 413, 416 (8th Cir. 2011) (quoting New Oxford American Dictionary 1738 (3d ed. 2010) ("The plain meaning of the modifier 'such' is, 'of the type previously mentioned.'")).  There must be facts alleging that Defendants "traffic[ked]…in such

property" that Plaintiff claims is the basis for its damages.  The Complaint alleges no facts that Defendants "trafficked in" the Confiscated Property for which Plaintiff claims $97.37 million in damages; at most, the Complaint only alleges Defendants trafficked in only the Confiscated Port, which the FCSC valued at $2.228 million.  Compl., Ex. 1 at 14.

Under the Act, "a person 'traffics' in confiscated property if that person knowingly and intentionally . . . *engages in a commercial activity using or otherwise benefiting from confiscated property*."  22 U.S.C. § 6023(13) (emphasis added); *see also Glen*, 2020 WL 4464665, at *6 ("To commit trafficking under the Act, a person must know that the property was confiscated by the Cuban government and intend that such property be the subject of their commercial behavior.").  To state a claim under Title III, Plaintiff must allege that Defendants engaged in commercial activity using or benefitting from the assets identified as the Confiscated Property and that each Defendant did so "knowingly and intentionally."  Plaintiff has not.

The Confiscated Property includes "various Cuban corporate subsidiaries and their numerous assets across Cuba," including the dozens of assets described in the Certified Claim. *See* Compl. ¶¶ 64–66, 69.  These assets include, for example, harvested lands and work animals as well as hundreds of thousands of acres of real properties.  *See generally*, Compl., Ex. 1.  But absent from the Complaint are any factual allegations that Defendants trafficked in, used, or otherwise benefitted from any of these assets.  Indeed, of the dozens of assets enumerated in Plaintiff's Certified Claim, and therefore included in Plaintiff's definition of Confiscated Property, Plaintiff only alleges that Defendants "trafficked in" Puerto Carupano.[18]  As for the balance of the Confiscated Property, Plaintiff pleads *only* conclusory allegations that merely recite the elements of a Title III cause of action.  *See* Compl. ¶¶ 197, 215, 229.  ("[Defendant] "knowingly and intentionally: (1) used the Confiscated Property, (2) engaged in commercial

---

[18]     Defendants deny they knowingly and intentionally trafficked in Puerto Carupano and only accept those allegations as true for the purpose of this Motion.

activity in using or otherwise benefitting from the Confiscated Property; and/or (3) caused, directed, participated in, and profited from the trafficking . . . or otherwise engaged in such trafficking through another person."). These conclusory allegations are plainly insufficient to state a claim for relief. *See Twombly,* 550 U.S. at 545 ("a formulaic recitation of a cause of action's elements will not do"); *Iqbal*, 556 U.S. at 678 (Rule 8 requires more than "naked assertions devoid of further factual enhancement.").

Not only does Plaintiff fail to allege facts that Defendants trafficked in the assets listed in the Certified Claim (except Puerto Carupano), Plaintiff also fails to allege facts showing that Defendants trafficked in those assets "knowingly and intentionally" – as it must to state a Title III claim. 22 U.S.C. § 6082 (requiring that a party "knowingly and intentionally" engaged in prohibited trafficking); *see also Glen*, 2020 WL 4464665, at *6 ("To commit trafficking under the Act, a person must know that the property was confiscated by the Cuban government and intend that such property be the subject of their commercial behavior."). Plaintiff alleges no facts showing that Defendants knew of and intended for the dozens of assets identified in the Certified Claim – *i.e.*, the Confiscated Property at large – to be the subject of their commercial activity. Rather, as to the Confiscated Property, the Complaint just restates the "knowingly and intentionally" trafficking element by parroting the statutory language. *See* Compl. ¶¶ 197, 215, 229. The Complaint's conclusory, one-paragraph allegation in each of its first three causes of action, Compl. ¶¶ 197, 215, 229, without more, fails to state a claim for relief for trafficking in the Confiscated Property. *See id.*; *see Gonzalez v. Amazon.com, Inc.*, No. 19-23988-CIV, 2020 WL 1169125, at *2 (S.D. Fla. Mar. 11, 2020) (citing *Twombly*, 550 U.S. at 557) (holding that allegations that a defendant "knowingly and intentionally participated in and profited from the communist Cuban Government's possession of the Subject Property" were conclusory and

therefore insufficient to state a claim); *see also Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 694 (11th Cir. 2016) ("knowledge [and] intent" are "subject to the plausibility pleading standard").

By failing to make a *single* factual allegation that Defendants trafficked in the Confiscated Property (other than Puerto Carupano), Plaintiff has failed to "nudge [its] claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.  Absent allegations of trafficking in those assets – an essential element of pleading a claim under the Act – those dozens of assets cannot form the basis for Plaintiff's Title III claim.  *See Iqbal*, 556 U.S. at 679 ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations.").  Accordingly, Plaintiff's Title III claim for more than $97.37 million based on the value of the assets contained in the Certified Claim – all of the Confiscated Property – should be dismissed because Plaintiff has failed to plead factual allegations to support the basic elements of a Title III cause of action.

## IV.   Plaintiff Is Precluded From Bringing a Count Under
## the Act Along with a Common-Law Count for Conspiracy

Plaintiff's Complaint should also be dismissed because the Act makes clear that a plaintiff may not pursue actions both under the Act and under a common law theory, as Plaintiff attempts to do here.  22 U.S.C. § 6082(f).  This subsection of the Act, titled "Election of Remedies," states:

Election – Subject to paragraph (2) –

(A) any United States national that brings an action under this section may not bring any other civil action or proceeding under the common law, Federal law, or the law of any of the several States, the District of Columbia, or any commonwealth, territory, or possession of the United States, that seeks monetary or nonmonetary compensation by reason of the same subject matter; and

(B) any person who brings, under the common law or any provision of law other than this section, a civil action or proceeding for monetary or nonmonetary compensation arising out of a claim for which an action would otherwise be cognizable under this section may not bring an action under this section on that claim.

*Id.*  By its plain terms, then the Act prohibits a plaintiff from bringing both a claim under Title III ***and*** a claim "under the common law or any provision of law other than" Title III.  But here, Plaintiff alleges causes of action under both Title III (its trafficking counts) ***and*** the common law (its conspiracy count).  Compl. ¶¶ 189–245 (alleging one cause of action under Title III against each of three Defendant groups and a fourth cause of action against all Defendants for common-law conspiracy).  This is impermissible.  *BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 183 (2004) (noting that statutory interpretation begins with the text and "ends there as well if the text is unambiguous").

In analogous contexts, courts in the Eleventh Circuit have strictly enforced similar election of remedies provisions.  For instance, the Northern District of Alabama has routinely dismissed actions in which a plaintiff advances causes of action under both the Alabama Age Discrimination in Employment Act (the "AADEA") and the federal Age Discrimination in Employment Act (the "ADEA").  *Forsyth v. NHC Place/Anniston, LLC, Inc.*, No. 18-CV-00663, 2018 WL 4909953, at *2 (N.D. Ala. Oct. 10, 2018) (dismissing duplicative state law claim, collecting cases, and holding that "[t]he statute intends to create an alternative remedy, not merely to avoid redundant adjudications . . . The entirety of the statute persuades this court to interpret § 25-1-29 [the AADEA] to mean that plaintiffs must 'elect to pursue their remedies under [the ADEA] *or in the alternative*' bring a state law claim under the AADEA") (emphasis in original).[19]

---

[19]     *See also Henry v. Jefferson Cnty. Personnel Bd.*, 519 F. Supp. 2d 1171, 1185–86 (N.D. Ala. 2007) (holding that "the plain language of the Alabama Age Act forces a plaintiff choose *either* suit under the ADEA *or, in the alternative,* suit under the Alabama Age Act") (emphasis in original); *Howard v. Highlands Med. Ctr.*, No. 15-CV-00393-CLS, 2015 WL 4730079, at **3–4 (N.D. Ala. Aug 10, 2015) (same); *King v. Adtran, Inc.*, No. 13-CV-1362-CLS, 2014 WL 6983312, at *6 (N.D. Ala. Dec. 10, 2014) (same); *Collins v. Compass Grp., Inc.*, 965 F. Supp. 2d 1321, 1330–31 (N.D. Ala. 2013) (same).

Here, Plaintiff's counts are overlapping and precisely the kind of double-pleading that the Act prohibits.[20]  Plaintiff has asserted a cause of action (1) against each Defendant for trafficking in Plaintiff's property in violation of the Act, and (2) against all Defendants for allegedly conspiring to do so.  Compl. ¶¶ 237–45.  For the latter, Plaintiff alleges no fact that is unique to that count, and in fact incorporates *all* prior allegations concerning *each* other count brought under the Act.  *Id.* ¶ 237.  The viability of this claim is thus inherently dependent on whether Defendants' alleged conduct does in fact constitute "trafficking" under the Act.  And this claim is not only premised on the same factual allegations asserted in the other counts – it also seeks *precisely the same relief*: damages under the Act "in the amount of the certified claim, plus applicable pre-judgment interest."  *Id.* ¶ 245; *see also id.* ¶¶ 206, 220, 236 (seeking same damages in each count under the Act).

Plaintiff's Complaint thus violates the express provisions of the Act and, therefore, should be dismissed.

## CONCLUSION

For the foregoing reasons, the Court should enter an Order granting this Motion and dismissing the Complaint with prejudice.

---

[20]    In similar fashion, courts in this District routinely dismiss causes of action where the relief sought in one cause of action is duplicative of others and the requirements for proving those claims overlap.  *E.g., AquaDry Plus Corp. v. Rockhill Ins. Co.*, No. 19-CV-62331-CIV, 2020 WL 927440, at *3 (S.D. Fla. Feb. 26, 2020) (dismissing claim for declaratory relief claim where plaintiff also asserted a breach of contract claim, the determination of which would "allow [plaintiff] to secure complete relief."); *A&M Mgmt. Inc. v. Deme*, No. 18-CV-63099, 2019 WL 7344821, at *5 (S.D. Fla. May 14, 2019) (citations omitted) (dismissing claims for "unjust enrichment" and "money had and received" as duplicative and observing that "[d]uplicative claims are those that stem from identical allegations, that are decided under identical legal standards, and for which identical relief is available"); *Miller v. Gizmodo Media Grp., LLC*, No. 18-24227-CIV, 2019 WL 1790248, at *12 (S.D. Fla. Apr. 24, 2019), *reconsideration denied*, 2019 WL 5864176 (S.D. Fla. June 5, 2019) (citations omitted) (dismissing civil conspiracy count because it "is premised on the same allegations and the same torts asserted elsewhere in the complaint") (citations omitted).

Dated: August 31, 2020.

Respectfully submitted,

Pedro A. Freyre
Florida Bar No.: 192140
Email:  pedro.freyre@akerman.com
Naim S. Surgeon
Florida Bar No.: 101682
Email:  naim.surgeon@akerman.com
AKERMAN LLP
Three Brickell City Centre
98 Southeast Seventh Street, Suite 1100
Miami, Florida 33131
Telephone: (305) 374-5600
Facsimile:  (305) 349-4654

Martin Domb
(*pro hac vice* admission pending)
Email: martin.domb@akerman.com
AKERMAN LLP
520 Madison Ave.
20th Floor
New York, New York 10022
Telephone: (212) 880-3880
Facsimile: (212) 880-8965

By: */s/ Pedro A. Freyre*

*Attorneys for Defendants*
*BBC Chartering USA, LLC and*
*BBC Chartering Singapore Pte Ltd.*

HOGAN LOVELLS US LLP
600 Brickell Avenue
Suite 2700
Miami, Florida  33131
Telephone:     (305) 459-6500
Facsimile:       (305) 459-6550

By:     */s/ Allen P. Pegg*
        Allen P. Pegg
        Fla. Bar No. 597821
        allen.pegg@hoganlovells.com
        Richard C. Lorenzo
        Fla. Bar No. 071412
        richard.lorenzo@hoganlovells.com
        Reginald Cuyler Jr.
        Fla. Bar No. 114062
        reginald.cuyler@hoganlovells.com

*Counsel for Goldwind International*
*Holdings (HK) Ltd.*

Robert M. Brochin
Florida Bar No. 0319661
bobby.brochin@morganlewis.com
Matthew Papkin
Florida Bar No. 106565
matthew.papkin@morganlewis.com
Sarah J. Cohen
Florida Bar No. 1010683
sarah.cohen@morganlewis.com
Morgan, Lewis & Bockius LLP
200 South Biscayne Boulevard
Suite 5300
Miami, Florida  33131-2339
Telephone:  305.415.3000
Facsimile:  305.415.3001

By:*/s/ Robert M. Brochin*

John M. Vassos (admitted *pro hac vice*)
john.vassos@morganlewis.com
101 Park Avenue
New York, NY 10178
Telephone:  212.309.6000
Facsimile:  212.309.6002

Carl A. Valenstein (admitted *pro hac vice*)
carl.valenstein@morganlewis.com
One Federal Street
Boston, MA 02110
Telephone:  617.341.7700
Facsimile:  617.341.7701

*Counsel for Defendant*
*DSV AIR & SEA, INC.*

## CERTIFICATE OF SERVICE

I hereby certify that on August 31, 2020, the foregoing was filed with the Clerk of Court

using CM/ECF, which will serve a Notice of Electronic Filing on all counsel of record.

By: */s/ Allen P. Pegg*

36