## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 20-cv-22471-DPG

---

NORTH AMERICAN SUGAR INDUSTRIES INC.,

                                Plaintiff,

      v.

XINJIANG GOLDWIND SCIENCE & TECHNOLOGY
CO., LTD., GOLDWIND INTERNATIONAL
HOLDINGS (HK) LTD., DSV AIR & SEA INC.,
BBC CHARTERING USA, LLC, and
BBC CHARTERING SINGAPORE PTE LTD.,

                              Defendants.

---

### FIRST AMENDED COMPLAINT

Pursuant to the Court's Orders dated September 24 and October 22, 2021, Dkt. Nos. 167, 187, plaintiff North American Sugar Industries Inc. ("American Sugar"), for its First Amended Complaint against defendants Xinjiang Goldwind Science & Technology Co., Ltd. ("Goldwind Science"), Goldwind International Holdings (HK) Ltd. ("Goldwind International"), DSV Air & Sea Inc. ("DSV"), BBC Chartering USA, LLC ("BBC USA"), and BBC Chartering Singapore Pte Ltd. ("BBC Singapore") (together, "Defendants") in the above-captioned action, alleges as follows:

### NATURE OF ACTION

1.     American Sugar brings this action under the Helms-Burton Act[1] to recover treble damages and interest totaling many hundreds of millions of dollars resulting from Defendants'

---

[1]  Title III of the Cuban Liberty and Democratic Solidarity (LIBERTAD) Act of 1996 (codified at 22 U.S.C. §§ 6081–6085).

deliberate and unlawful trafficking of American Sugar's expropriated property in Cuba for their own financial gain.  Defendants' misuse of American Sugar's confiscated property—certified by the United States to be worth hundreds of millions of dollars today—absent any compensation is precisely the type of harm that the Helms-Burton Act was enacted to redress.

2.      For over 50 years, up until the Cuban Revolution, American Sugar owned and operated a thriving business in Cuba producing, refining, and transporting raw sugar.  Through itself and its Cuba-based subsidiaries, American Sugar owned and maintained a diverse array of assets for its expansive business operations:  land and crops, farm buildings, power-generation systems, a railroad, and large commercial shipping ports, including one named "Puerto Carupano."

3.      American Sugar's lucrative business did not go unnoticed by the regime formed in the aftermath of the Cuban Revolution.  The Cuban government expropriated American Sugar's assets in Cuba absent compensation.  Since then, the Cuban government and those working with it have used American Sugar's confiscated property to further their own ends, including having for-profit businesses such as Defendants use and benefit from that property.

4.      Defendants, which are engaged in the wind power equipment and shipping/transportation businesses, used Puerto Carupano (and/or financially benefitted from each other's and others' use) to enable the Herradura Wind Farm Project—the largest wind power project in Cuba, with a price tag in the hundreds of millions of dollars—to be built.  This wind farm is located just 15 miles away from Puerto Carupano, and there is no dispute that this port was utilized to effectuate the transfer of necessary equipment from China to Cuba via Miami.

5.      Defendants did not act alone.  To complete the wind-farm related shipments to Puerto Carupano, and reap the profit of such transactions, Defendants acted in concert with each other and their respective corporate affiliates.  Together, these companies agreed to (and took steps to ensure the success of) a complex scheme whereby Defendants shipped by ocean transport wind farm equipment from China to Puerto Carupano, in violation of the Helms-Burton Act, for ultimate delivery to the Empresa Importadora-Exportadora de Objetivos Electro-Energéticos ("Energoimport").  As part of their scheme, Defendants planned over the course of nearly a year and made deliberate, interim stops in Miami, Florida in an effort to comply with certain *other* U.S. trade laws unrelated to Helms-Burton while concealing—including through illegal means—the true nature of the shipments from certain interested parties in the United States.  By Defendants' own admissions and understanding, these stops in Miami were a critical, necessary step to carrying out the shipments to Puerto Carupano.

6.      The actions that Defendants undertook to effectuate the shipments included:

i.      Goldwind Science agreed to—and did—supply wind farm equipment to Energoimport, a Cuban state-owned entity associated with the Herradura Wind Farm Project, via Puerto Carupano, including the equipment aboard the two shipments at issue in this case.

ii.     Goldwind International, a wholly owned subsidiary of Goldwind Science that handles Goldwind Science's international business, negotiated and signed the agreement with Energoimport on behalf of Goldwind Science, and with its authorization and as its agent, took charge of the operations related to the shipments to Puerto Carupano, and executed those shipments on Goldwind Science's behalf.

iii.    Pursuant to the scheme set in motion by Goldwind Science, DSV provided transportation and logistical services to facilitate the shipments of wind farm equipment to Puerto Carupano.  DSV was a key participant in analyzing regulatory requirements imposed by certain U.S. trade laws in connection with the delivery of the equipment from China to Cuba, and in leading efforts to attempt to satisfy those requirements—other than the Helms-Burton Act, which Defendants of course completely flouted.  DSV's acts included analyzing the stops in Florida for compliance purposes, providing guidance on U.S. trade law compliance issues, executing filings with U.S. Customs for both shipments' stops in Florida,

and agreeing to efforts to avoid any public statements (such as social media postings) relating to the shipments to American Sugar's port in Cuba in order to mask and conceal Defendants' unlawful conduct.

iv.     BBC Singapore chartered and supported two shipping vessels named the "BBC Jade" and the "BBC Moonstone," which carried and delivered to Puerto Carupano wind farm equipment that Goldwind Science contracted with Energoimport to provide.  BBC Singapore was also aware that U.S. trade laws other than the Helms-Burton Act imposed certain sanctions and licensing requirements that would make it necessary for the vessels to stop in the United States before continuing to Cuba to deliver the wind farm equipment, and accordingly, BBC Singapore participated in discussions of the shipping routes for the two vessels and corresponding licensing analyses.  At BBC Singapore's request, its port agent in Florida prepared and sent a "lessons learned" checklist from the BBC Jade's stop in Miami to help facilitate the BBC Moonstone's subsequent voyage on the same route.

v.      BBC USA assisted BBC Singapore with logistical and compliance issues associated with the BBC Jade's and BBC Moonstone's stopovers in Miami, Florida, and provided logistical support for the delivery and offloading of the equipment at Puerto Carupano.

vi.     Together, BBC Singapore and BBC USA purposefully and illegally obfuscated portions of the vessels' voyages from U.S. authorities and other interested parties in the United States—including by submitting false documentation to U.S. Customs, creating a "fake" stow plan "so we don't show 'cuba,'" and selectively shutting off vessel tracking systems in an attempt to hide their route as they proceeded toward Cuba and Puerto Carupano—to ensure the successful completion of these shipments.

7.     While Defendants and others continue to traffic in and use American Sugar's expropriated property for their own benefit, including (as here) supplying a multi-hundred-million-dollar wind farm project and otherwise enriching the Cuban government and themselves, American Sugar still has received nothing for its confiscated property 60 years after it was stolen.  This despite the fact that in 1969, the U.S. Government officially certified that American Sugar suffered losses equal to just over $97 million—the second-largest claim against the Cuban government ever certified by the United States—as of the time when its property was stolen. That official determination, however, did not authorize American Sugar to seek damages against

the Cuban government or against those who, like Defendants, use American Sugar's property for their own gain.

8.      To redress this problem, in March 1996, President Clinton signed into law the Helms-Burton Act, Title III of which imposes liability against persons who "traffic[]" in property expropriated by the Cuban government.  Title III defines "trafficking" broadly to prohibit even the mere "use" of or "benefiting from" expropriated property.  And where (as in this case) the U.S. Government has certified a person's claim to ownership of expropriated property, a trafficker is subject to treble damages under rules prescribed by the Helms-Burton Act itself:  the "claim" as previously certified by the U.S. Government is deemed conclusive proof of the claimant's ownership of the at-issue property, and the loss amount set forth in that claim is the presumptive base damages amount to be trebled, plus interest, rebuttable only by clear and convincing evidence.

9.      Although the Helms-Burton Act private right of action had been suspended until relatively recently, that suspension never affected the binding character of the law.  Persons trafficking in confiscated property after the enactment of the Helms-Burton Act thus did so at their own peril.  Accordingly, companies—like Defendants here—knew since 1996 that having business dealings with Cuba, and using or benefiting from confiscated property certified by the United States as originally belonging to American Sugar, or profiting or benefitting from such use, carried the risk of steep liability under the Helms-Burton Act.  Defendants—each of whom is a sophisticated commercial enterprise that is familiar with U.S. trade compliance issues and was presumably well-advised by counsel—knew or should have known this.  But despite their efforts to attempt to comply with other U.S. trade laws, Defendants purposefully flouted the Helms-Burton Act, apparently believing they could defy that law with impunity because the

private right of action was suspended.  But that suspension never impacted the binding character of the law since 1996, and did not change the fact that Defendants, who agreed with each other and who joined with others to knowingly and intentionally traffic in American Sugar's confiscated property for their own benefit, violated the Helms-Burton Act.  Defendants bore the risk of trafficking in American Sugar's confiscated property with the possibility that the private right of action would be restored, and must face the consequences.  Now that the private right of action is in force, American Sugar seeks long-overdue relief for the uncompensated exploitation of its confiscated property, including Defendants' knowing and intentional use of that property for their own financial gain.

## JURISDICTION AND VENUE

10.     Subject matter jurisdiction is conferred upon this Court by 28 U.S.C. § 1331 because this action arises under the laws of the United States, specifically Title III of the Helms-Burton Act, 22 U.S.C. §§ 6081–6085.

11.     Subject matter jurisdiction is also conferred upon this Court by 28 U.S.C. § 1367(a), because American Sugar's civil conspiracy claim is "so related" to its Helms-Burton Act claim that they "form part of the same case or controversy under Article III of the United States Constitution."

12.     As required under Title III of the Helms-Burton Act, the amount in controversy in this action exceeds $50,000, exclusive of compounded interest, treble damages, court costs, and reasonable attorneys' fees.  22 U.S.C. § 6082(b).

13.     Personal jurisdiction is conferred upon this Court by Florida Statutes §§ 48.193(1)(a)(1) and 48.193(1)(a)(2) because Defendants have operated, conducted, engaged in, and carried on a business in the State of Florida and have committed a tortious act within Florida.  Alternatively, personal jurisdiction over Defendants Goldwind Science, Goldwind

International, and BBC Singapore is conferred upon this Court by Federal Rule of Civil Procedure 4(k)(2), because those Defendants are not subject to jurisdiction in any state's courts of general jurisdiction; and exercising jurisdiction is consistent with the United States Constitution and laws.

14.     Exercise of personal jurisdiction by this Court over Defendants is consistent with the United States Constitution as this action arises from or relates to Defendants' activities in Florida or the United States, and Defendants have purposefully availed themselves of the benefits and protections of Florida or the United States.

15.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a "substantial part of the events or omissions giving rise to the claim occurred" in the Southern District of Florida.  Alternatively, venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(3) because at least one Defendant is subject to the Court's personal jurisdiction with respect to this action.

16.     American Sugar has paid the special fee for filing an action under Title III of the Helms-Burton Act, 22 U.S.C. § 6082(i), which is $6,548 pursuant to the fee schedule adopted by the Judicial Conference in September 2018.

## PARTIES

17.     Plaintiff American Sugar, originally known as the Cuban-American Sugar Company, is a United States national and a corporation organized and existing under the laws of the State of New Jersey, and has been since September 19, 1906, with its principal place of business in New York, New York.  From its incorporation, American Sugar owned and operated significant commercial operations in Cuba relating to the production, refining, and transportation of raw sugar.  These operations were forcibly terminated in 1959 and 1960 when the Cuban government expropriated American Sugar's underlying Cuban assets.

18.     Defendant Goldwind Science is a corporation organized and existing under the laws of the People's Republic of China, with its principal place of business at 107 Shanghai Road, Economic Tech Development Zone, Urumqi, Xinjiang Urumqi, 830026 China.  Goldwind Science is a developer, manufacturer, and seller of wind turbine generators, equipment, and technology.  Goldwind Science also provides services and other products in support of wind farm development and other related businesses.  Goldwind Science wholly and directly owns Defendant Goldwind International; and wholly and indirectly owns non-parties Goldwind USA, Inc. and Goldwind Service Company, LLC (both formed under Delaware law).  Goldwind Science has indirectly owned additional U.S.-based entities, such as Musselshell Wind Project LLC and Rattlesnake TX, LLC.  Goldwind Science, whose shares trade on the Shenzhen Stock Exchange and the Hong Kong Stock Exchange, has a market capitalization of approximately $11 billion.  In 2019, Goldwind Science reported $5.3 billion in revenue, as well as non-current assets in the United States worth approximately $247 million.  That same year, Goldwind Science also filed 34 applications for patents in the United States.  From 2017 to 2019, Goldwind Science was reported as the shipper for about six shipments, and the consignee (i.e., recipient) for one shipment, for goods unloaded at U.S. ports.  Goldwind Science has also voluntarily agreed to arbitration provisions in its business contracts mandating venue in the United States, and initiated and litigated an arbitration based in Chicago, Illinois between 2015 to 2018.

19.     Defendant Goldwind International is a corporation organized and existing under the laws of the Hong Kong Special Administrative Region of the People's Republic of China, with its principal place of business at 8 Boxing First Road, Economic Tech Development Zone, Beijing, 102600 China.  Goldwind International manufactures and sells wind turbine generators, equipment, and technology, and makes arrangements for the ocean shipping of such goods.

Goldwind Science wholly and directly owns Goldwind International, which operates Goldwind Science's international business.  Goldwind International, in order to do business in the United States, wholly and directly owns a number of U.S. companies, including Goldwind USA, Inc. and Goldwind Service Company, LLC (both formed under Delaware law).  Goldwind International has owned and maintained wind farm projects in the United States, including wind farm projects located in Wheatland County, Montana, which Goldwind International sold in 2019, and for which Goldwind International continues to provide "long-term maintenance services and a warranty package designed to support the project's operations at industry-leading availability levels."[2]  From 2017 to 2019, Goldwind International was reported as the shipper for approximately 46 shipments for goods unloaded at U.S. ports.  Goldwind International has also voluntarily agreed to arbitration provisions in its business contracts mandating venue in the United States, and initiated and litigated an arbitration based in Chicago, Illinois between 2015 to 2018.

       20.     Defendant DSV is a corporation organized and existing under the laws of the State of Delaware with its principal place of business at 100 Walnut Avenue, Suite 405, Clark, New Jersey 07066.  DSV provides air and sea freight forwarding services, including transport, warehousing, and logistics services.  DSV is an affiliate of DSV Air & Sea A/S ("DSV Denmark") and DSV Ocean Transport A/S ("DSV Ocean Transport"), both Danish corporations

---

[2] Goldwind Americas, *Goldwind Confirms Sell-Down of Montana Projects to Canadian Development Potentia Renewables* (May 29, 2019), *available at* https://www.goldwindamericas.com/news/goldwind-confirms-sell-down-montana-projects-canadian-development-potentia-renewables (last visited Nov. 1, 2021); Marathon Capital, *Marathon Capital Announces Sale of Goldwind Project to Funds Advised by Exus Management Partners* (Nov. 10, 2020), *available at* https://www.marathoncapital.com/news/marathon-capital-announces-sale-of-goldwind-project-to-funds-advised-by-exus-management-partners (last visited Nov. 1, 2021).

that similarly provide sea freight-forwarding services.  The ultimate parent company of all three entities is DSV Panalpina A/S, a Danish corporation whose current market capitalization is approximately $50 billion.  DSV operates and maintains branch offices in Orlando and Miami. From 2017 to 2019, DSV has been reported as the shipper for about 24 shipments, the consignee for approximately 175 shipments, and the carrier for 8,799 shipments, for goods unloaded at Florida ports (including Miami).

21.     Defendant BBC USA is a company organized and existing under the laws of the State of Texas, with its principal place of business at 6565 West Loop South, Suite 200, Bellaire, Texas 77401.  BBC USA provides transportation services, specializing in the support of ocean cargo transportation.  BBC USA is wholly owned by BBC Global GmbH & Co. KG ("BBC Global"), and part of a network of transportation companies known as the "Briese Group."  In 2018, Briese Group entities collectively reported at least $1.3 billion in revenue.  BBC USA serves as the Briese Group's general and exclusive agent in North America (i.e., the United States, Canada, Mexico, Central America, and the Caribbean), and as part of that role has the right to be the exclusive provider of certain vessel husbandry services for any shipment that enters the North American region.  These services include, among other things, arranging for entry and clearance of vessels; satisfying customs and port regulation requirements and arranging all related documents; drafting daily reports on the status of vessels in or outside the United States; and drafting bills of lading.  BBC USA and BBC Singapore—in conjunction with other Briese Group entities such as BBC Chartering Carriers GmbH & Co. KG ("BBC Carriers")—are affiliates that coordinate the chartering and operation of commercial shipping vessels, including the ships named the "BBC Moonstone" and "BBC Jade."  BBC USA also serves as agent for shipments that stop all over Florida, including at ports in Pensacola, Panama City, Port

Everglades, Port Manatee, Tampa, Jacksonville, and Fort Lauderdale, in addition to Miami. Further, BBC USA personnel regularly travel to Florida to solicit business and engage with freight forwarders.  As needed, BBC USA personnel also travel to Florida and engage with port agents to assist with shipments on BBC vessels stopping in Florida ports.[3]

22.      Defendant BBC Singapore is a corporation organized and existing under the laws of the Republic of Singapore, with its principal place of business at 8 Shenton Way #22-01, 068811 Singapore.  BBC Singapore provides transportation services, specializing in the support of ocean cargo transportation.  BBC Singapore is wholly owned by BBC Global and part of the Briese Group.  BBC Singapore serves as the Briese Group's general and exclusive agent in Singapore, and as part of that role has the right to be the exclusive provider of certain vessel husbandry services for any shipment from the Singaporean region.  These services include, among other things, arranging for entry and clearance of vessels, satisfying customs and port regulations requirements, and furnishing related shipping documents (including bills of lading). With BBC Carriers and BBC USA, BBC Singapore coordinates the chartering and operation of commercial shipping vessels, including the BBC Moonstone and the BBC Jade.  Between 2017 and 2020, BBC Singapore served as an agent for cargo shipments from Asia that involved at least 70 stops in Florida.

---

[3]  From 2017 to 2019, BBC USA was involved in at least 118 shipments that stopped in Florida.  During that same time period, BBC USA was reported as the shipper for two shipments, and the consignee for about 119 shipments, for goods unloaded at U.S. ports. Among the 119 shipments where BBC USA is reported as the consignee, BBC Carriers is listed as the carrier for 69 shipments, and its affiliate, BBC Chartering & Logistic GmbH & Co. KG, is listed as the carrier for 50 shipments.  Further, of the 119 shipments where BBC USA is reported as the consignee, four shipments of goods—weighing over 56 metric tons in total—were unloaded in Florida ports.

## FACTUAL ALLEGATIONS

I.   **Cuba's Expropriation of American Sugar's Property**

A.   **American Sugar's Property in Cuba**

23.   When it was initially incorporated in 1906, American Sugar held five sugar-producing companies that owned and operated large commercial shipping ports, raw sugar mills, cane land, and a cane sugar refinery in Cuba.  Over the ensuing several decades, American Sugar greatly expanded operations in Cuba, and by 1959 and 1960 it came to hold not only two of the largest raw sugar mills in the world at that time but also two shipping ports integral to its sugar mill operations and various other assets.

24.   American Sugar's property in Cuba (the "Confiscated Property") consisted of various Cuban corporate subsidiaries and their numerous assets across Cuba, including large commercial shipping ports, land and crops, farm buildings, raw sugar mills, power-generating equipment, a railroad, and a sugar refinery.  Exhibit 1 (attached hereto) includes a more detailed description of the Confiscated Property and its value.

25.   The Confiscated Property specifically includes Puerto Carupano, a large commercial shipping port located in Cayo Juan Claro, which is in the Cuban municipality of Puerto Padre and the Cuban province of Las Tunas.  It is the only commercial shipping port in all of Puerto Padre.  Puerto Carupano is also referred to as "Port of Cayo Juan Claro," "Port of Carupano," or "Port of Puerto Padre."

26.   Puerto Carupano (the "Confiscated Port") encompasses associated docks, warehouses, tanks, transportation facilities, pump houses, an electric substation, dwellings, barracks, office buildings, piers, shops, and other related installations.

27.   The Confiscated Port was critical to American Sugar's business operations in Cuba and abroad.  The port was a hub not only for transportation, storage, and shipping of all

exported raw sugar and molasses produced by American Sugar at Central Chaparra and Central Delicias, but also for much of the imported heavy capital equipment, oil, merchandise, and food for the surrounding area.  Because the port was adjacent to fertile lands housing two of American Sugar's largest raw sugar mills, American Sugar incurred minimal expenses in transporting its sugar products to the Confiscated Port for shipment.

**B.** **Cuba Confiscates American Sugar's Property—Including the Confiscated Port**

28.     On January 1, 1959, as part of the Cuban Revolution, Fidel Castro took control of the Cuban government.  His administration confiscated virtually all private property in Cuba owned by U.S. nationals in various economic sectors and made no effort to compensate U.S. nationals for expropriating their property, as required under generally accepted rules of international law.

29.     American Sugar was no exception to this mass seizure of private property.  The Cuban government's expropriation of the Confiscated Property began in 1959 and came to a head on July 20, 1960.  On that date, Cuba's National Agrarian Reform Institute issued Resolution No. 195, through which the Cuban government seized full control and ownership of the Confiscated Property.

30.     Upon seizing the Confiscated Port, the Cuban government openly and notoriously used, and continues to use, that port for its own commercial activities and those of private parties doing business with Cuba.

31.     On January 20, 1978, for example, Fidel Castro made a public speech at the Confiscated Port regarding a new bulk sugar terminal that had been built at the port.  Alluding to the Cuban government's expropriation of commercial ports such as the Confiscated Port, Castro proudly proclaimed in the speech that the ports, which had been previously owned by "property

owners and the capitalists," were now the "property of the [Cuban] people."[4]  He reiterated that the "ports [have] ceased to be operated by private enterprise."[5]

32.     In the 1980s, the Confiscated Port handled approximately 8% of Cuba's annual production of sugar and sugar byproducts, valued in excess of $370 million.  Products from the Central Chaparra mill and the Central Delicias mill—both confiscated from American Sugar— were routinely transported through the Confiscated Port.

33.     To this day, the Confiscated Port remains one of Cuba's key shipping ports and a hub of substantial commercial activity—much of which is in support of, or substantially related to, projects spearheaded by the Cuban government and its state-owned companies.  Indeed, the Cuban government has sought to encourage foreign investment by regularly touting the Confiscated Port as one of the country's principal shipping ports.[6]

34.     American Sugar has not received any compensation for the expropriation of the Confiscated Property, nor has any part of the Confiscated Property been returned to American Sugar.  Moreover, American Sugar's claim to the Confiscated Property has never been settled by an international claims settlement agreement or other settlement agreement between the United States and Cuba.

---

[4]  *See* Fidel Castro, President of Cuba, *Dedication of bulk sugar terminal in Puerto Carupano*, Las Tunas Province (Jan. 20, 1978), *available at* http://lanic.utexas.edu/project/castro/db/ 1978/19780120.html (last visited on Nov. 1, 2021).

[5]  *Id.*

[6]  *See, e.g.*, Cuba Ministry of Foreign Commerce and Investments, *Cuba: Portfolio of Opportunities for Foreign Investment 2016–2017*, at 204 (listing "Carupano" as one of 12 "Principal Cuban Ports"), *available at* https://arwtc.org/wp-content/uploads/2017/05/ Portfolio_Opportunities_Foreign_Investment_2016-2017.pdf (last visited on Nov. 1, 2021).

**C.     American Sugar's Claim Is Certified in 1969 for Over $97 Million**

35.     In response to the expropriation of its Confiscated Property and the resultant financial loss, American Sugar submitted a claim to the United States Foreign Claims Settlement Commission ("FCSC") for determination under the Cuba Claims Program.[7]  American Sugar's certified claim is publicly accessible[8] and has been the subject of multiple news reports.[9]

36.     After an extensive review of the evidence regarding the value of the Confiscated Property, the FCSC "certifie[d] that [American Sugar] suffered a loss, as a result of actions of the Government of Cuba," in the amount of $97,373,414.72.  Exh. 1 at 21.  The amount of American Sugar's loss certified under the Cuba Claims Program is the second-highest amount ever certified by the FCSC for an individual or entity.

**II.     Defendants' Deliberate Use of American Sugar's Confiscated Property**

**A.     The Herradura Wind Farm Project**

37.     The Confiscated Port has been the main artery for imports of (among other things) wind turbines, related equipment, structures, and other materials needed to build one of Cuba's

---

[7]   In response to (among other things) the Castro regime's expropriation of Cuban property belonging to U.S. nationals, on October 16, 1964, Congress enacted Title V of the International Claims Settlement Act of 1949 ("ICSA"), Pub. L. No. 88-666, 78 Stat. 1110 (1964) (codified at 22 U.S.C. §§ 1643–1643k (1964)), which established the Cuba Claims Program to be administered by the FCSC.  The FCSC is an independent federal agency that determines the validity and amount of each claim of expropriation that U.S. nationals have against a foreign government, so that those nationals may be compensated for their losses and injuries pursuant to specific programs authorized by law.  *See* Reorganization Plan No. 1 of 1954, 68 Stat. 1279 (1954).

[8]   *See* FCSC, Final Opinions and Orders, https://www.justice.gov/fcsc/final-opinions-and-orders-5 (last visited on Nov. 1, 2021).

[9]   *See, e.g.*, Nick Miroff, *The 20 Largest U.S. Property Claims in Cuba*, WASH. POST (Dec. 8, 2015) (American Sugar has second-largest certified claim), *available at* https://www.washingtonpost.com/news/worldviews/wp/2015/12/08/the-20-largest-u-s-property-claims-in-cuba/ (last visited on Nov. 1, 2021).

largest ongoing public works projects:  the Herradura Wind Farm Project, which is located in the

Jesús Menéndez municipality of the Cuban province of Las Tunas, about 15 miles from the

Confiscated Port.[10]

38.     A host of Cuban state-owned entities are involved in the planning, construction,

and implementation of the Herradura Wind Farm Project, including Energoimport—a component

of Cuba's Ministry of Energy and Mining.  Energoimport arranges the logistics supporting the

delivery of wind farm equipment through the Confiscated Port and to the Herradura Wind Farm

Project.  Energoimport describes itself as in charge of guaranteeing the delivery of the supplies

necessary for the execution of investments, imports and exports, and the maintenance and

operation of Cuba's National Electro-energy System.[11]

> **B.     Defendant Goldwind Science, with Defendant Goldwind International Acting on Its Behalf, Signs on to the Herradura Project**
>
>> i.     <u>Goldwind International Negotiates and Signs the Consortium Agreement on Goldwind Science's Behalf</u>

39.     In early 2013, Energoimport invited Chinese companies to bid on the Herradura

Wind Farm Project.  On November 28, 2013, Goldwind Science and non-party Avic

International Holding Corporation ("Avic") entered into an agreement to form a consortium

under which the parties would jointly submit a bid to Energoimport for the Herradura Wind

Farm Project (the "Consortium Agreement").  Under the Consortium Agreement's terms,

Goldwind Science would be responsible for supplying and delivering wind turbine units,

---

[10]   *See* Raimundo Urrechaga, *Chinese Technology Helps Cuba Build Largest Wind Farm*, Xɪɴʜᴜᴀ (Jan. 22, 2018), http://www.xinhuanet.com/english/2018-01/22/c_136914462.htm (last visited on Nov. 1, 2021).

[11]   UNE, *ENERGOIMPORT*, UNE: Unión Eléctrica, https://www.unionelectrica.cu/energo import/ (last visited on Nov. 1, 2021).

including wind turbine blades and other constituent parts, to Energoimport at the project site in Cuba.

40.     Multiple Goldwind International employees participated in negotiating the Consortium Agreement on behalf of Goldwind Science.  In addition, Goldwind International's Deputy General Manager, who at the time did not hold a position at Goldwind Science, signed the Consortium Agreement on behalf of Goldwind Science and as Goldwind Science's authorized representative.

ii.     <u>Goldwind International Negotiates and Signs the Wind Farm Agreement on Goldwind Science's Behalf</u>

41.     On December 16, 2013, Goldwind Science and Avic entered into a commercial agreement with Energoimport to provide wind farm designs, equipment, supplies, technical support, operations, and maintenance for the Herradura Wind Farm Project (the "Wind Farm Agreement").

42.     Under the Wind Farm Agreement, Goldwind Science was responsible for providing all of the wind turbines at the Herradura Wind Farm Project, and agreed to supply (among other equipment) 34 customized and complete units of its GW 77/1500 KW wind turbines.  Each GW 77/1500 KW wind turbine unit included a set of three wind turbine blades, for a total of 102 wind turbine blades to be provided by Goldwind Science.  Per the Wind Farm Agreement, the blades would be manufactured by a non-party Danish company that is a subsidiary of a U.S. company (the "Blade Manufacturer").

43.     Under the Wind Farm Agreement, Goldwind Science agreed to deliver any equipment requiring ocean transport (such as the wind turbine blades it agreed to provide) to Energoimport at the Confiscated Port in Cuba, and submit various shipping documents, including bills of lading identifying Energoimport as the consignee (i.e., recipient) and the Confiscated

Port as the destination, and expressly stating that transshipments or stopovers in the United States or any of its territories was prohibited.

44.    In addition, under the Wind Farm Agreement, Goldwind Science agreed that no shipments to the Confiscated Port would have a stopover in the United States or any of its territories, and that Goldwind Science would be responsible for any damages caused to Energoimport for failing to comply with this prohibition.

45.    In exchange for providing the equipment and services specified in the Wind Farm Agreement, Goldwind Science contracted to receive substantial compensation from Energoimport.

46.    Goldwind International acted directly and as Goldwind Science's agent to support Goldwind Science in executing and facilitating the Wind Farm Agreement.  Multiple Goldwind International employees negotiated the Wind Farm Agreement on behalf of Goldwind Science. Further, Goldwind Science authorized Goldwind International's Deputy General Manager to sign the Wind Farm Agreement on Goldwind Science's behalf.  The Wind Farm Agreement expressly designates Goldwind International's Deputy General Manager as Goldwind Science's "authorized representative" and states that he has been granted power of attorney and "sufficient faculties" to sign the Wind Farm Agreement for Goldwind Science.

47.    In two written statements published roughly four years apart, Goldwind Science and Goldwind International each announced that Goldwind International (not Goldwind Science) had entered into the Wind Farm Agreement.[12]  For example, in a December 2013 press release,

---

[12]    *See* Goldwind International, *Goldwind Wins 51MW Wind Turbine Order in Cuba* (Dec. 18, 2013), *available at* http://www.goldwindinternational.com/content/details_16_298.html ?_sm_au_=iVVKNjJT4S4QP54MFcVTvKQkcK8MG (last visited on Sept. 29, 2020); Goldwind International, GWI Quarterly Q2 2017, Vols. 8, 10, *available at*

Goldwind Science announced that its "international business has achieved another success," and that "'Goldwind International'[], a wholly-owned subsidiary of [Goldwind Science], has signed a 51MW wind turbine supply contract with Energoimport." These public statements, which were available on Goldwind International's website until at least September 29, 2020, are no longer available on that website, which is currently inaccessible.

48.     Later, in November 2018, pursuant to the Wind Farm Agreement, Goldwind Science secured a certificate of transit insurance issued by an insurer located in New York for coverage of "All Risks" relating to the wind farm equipment aboard the BBC Jade and BBC Moonstone until its delivery at the Confiscated Port in Cuba. As part of the insurance procurement process, Goldwind Science provided information to the U.S.-based insurance provider. The certificate of insurance states that Goldwind Science is the "Certificate Holder" of the insurance and that the wind farm equipment shipments were covered until delivered at place ("DAP") at the Confiscated Port. This insurance was procured to meet Goldwind Science's specific agreement and obligation under the Wind Farm Agreement to secure insurance for the wind farm equipment shipments. Bills of lading for the BBC Jade and BBC Moonstone shipments on which the wind farm equipment were shipped noted the same DAP term.

49.     While Goldwind Science was the official "Seller" under and signatory party to the Wind Farm Agreement, operational responsibility for executing the contract rested with Goldwind International, which acted on Goldwind Science's behalf in doing so. Indeed, Goldwind International employed personnel in Cuba to help facilitate execution of the contract.

---

http://www.goldwindinternational.com/upload/contents/2017/07/
20170711143813_72618.pdf (last visited on Sept. 29, 2020).

iii.     Goldwind Science Signs the Blade Supply Agreement

50.     To fulfill its obligations under the Wind Farm Agreement, in 2018 Goldwind

Science entered into a commercial agreement with the Blade Manufacturer to purchase 34 sets of

wind turbine blades (102 individual blades in total) and deliver them to Energoimport at the

Confiscated Port (the "Blade Supply Agreement").  Goldwind Science agreed to prepare the

transportation frames, specifically the "root" frames and "tip" frames, that would hold the 34 sets

of wind turbine blades during their shipment to the Confiscated Port and to make all payments to

the Blade Manufacturer in U.S. dollars.  The Blade Manufacturer, a subsidiary of a U.S.

company, manufactured the wind turbine blades.  The Blade Manufacturer's identity as the

subsidiary of a U.S. company ultimately caused Defendants to conclude that their shipments to

Cuba required stops in the United States in order to comply with U.S. trade laws other than the

Helms-Burton Act, and to arrange for stops for each voyage in Miami, Florida.

51.     Goldwind International assisted Goldwind Science with negotiating the Blade

Supply Agreement, including certain international shipping terms (i.e., "Incoterms").

52.     Under the Blade Supply Agreement, Goldwind Science agreed that the wind

turbine blades would be inspected for quality certification in Tianjin, China.  The Blade Supply

Agreement further specified that within one week of the blade shipments' departure from China,

Goldwind Science was contractually entitled to all relevant shipping documentation, including

all bills of lading, commercial invoices, and documents that Goldwind Science needed to apply

for an import customs declaration to Cuba.  Goldwind Science was also contractually entitled to

at least 10 updates on the shipments' estimated time of arrival to the Confiscated Port at

specified points of time, with the first update due 30 days from arrival and the final update due

one day from arrival.

53.     Under the Blade Supply Agreement, once the wind turbine blades were delivered to the Confiscated Port, Goldwind Science was responsible for preparing trucks to pick up the wind turbine blades for final delivery to Energoimport at the wind farm's location.

**C.     Defendants' Involvement in Arranging Shipments of Wind Farm Equipment**

54.     In 2018 and early 2019, Defendants were involved in and took deliberate steps to plan, execute, or assist the completion of two deliveries of the wind turbine blades and transportation frames specified in the Consortium Agreement, the Wind Farm Agreement, and the Blade Supply Agreement to the Confiscated Port via the BBC Moonstone and the BBC Jade. In an attempt to comply with U.S. trade law requirements (excluding the Helms-Burton Act), Defendants planned, coordinated, executed, or assisted with the shipments' stops in Miami, Florida before delivery at the Confiscated Port.  Further, the BBC Moonstone also carried goods intended for one of BBC USA's clients for delivery in Port Arthur, Texas only three days after the stop in Puerto Carupano, which contravened both U.S. law prohibiting the vessel from unloading any goods in the United States for 180 days after departing from Cuba, and BBC USA's contractual obligation with that client not to stop in Cuba.  Defendants took additional, apparently illegal, steps to conceal the nature of the Cuba stop from U.S. authorities and other interested parties.

i.     Arranging Stops in Florida in an Attempt to Gain OFAC Authorization

55.     To ship wind farm equipment by sea, one or more carriers are typically hired to handle transportation logistics that include, among other things, identifying and booking available space on a shipping vessel, operating the vessel itself, coordinating pick-up and drop-off of the equipment, and planning the shipping route.

56.     In 2018, DSV Denmark was engaged as the NVOCC[13] to handle the logistics for ocean shipment of the wind turbine blades and transportation frames specified in the Consortium Agreement, Wind Farm Agreement, and Blade Supply Agreement—all of which were to be picked up in Tianjin, China.

57.     DSV Denmark in turn engaged BBC Carriers as the VOCC to charter and arrange for shipping vessels owned and operated by the Briese Group to carry the wind turbine blades and transportation frames from Tianjin, China to the Confiscated Port.  While BBC Carriers was the VOCC for these shipments, BBC Carriers in turn engaged BBC Singapore to carry out relevant chartering and shipping duties as BBC Carriers' agent.

58.     Because the Blade Manufacturer, a foreign subsidiary of a U.S. company, manufactured certain components of the wind turbine blades, DSV and DSV Denmark, in coordination with the Blade Manufacturer, determined that the shipments of the relevant wind turbine blades to the Confiscated Port required authorization by both the U.S. Department of Commerce's Bureau of Industry and Security ("BIS") and the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC").[14]  DSV Denmark communicated this conclusion to BBC Singapore in providing instructions to carry out the shipments.

---

[13]  There are two types of carriers:  those that operate shipping vessels (known as Vessel Operating Common Carriers ("VOCCs")), and those that do not (known as Non-Vessel Operating Common Carriers ("NVOCCs")).  *See, e.g.*, 46 U.S.C. § 40102(17)(A) (NVOCCs are common carriers that "do[] not operate the vessels by which the ocean transportation is provided").  If an exporter hires an NVOCC to execute a shipment, that NVOCC must then engage a VOCC to charter space on and operate the vessel carrying the transported goods. Together, the NVOCC(s) and VOCC(s) determine which vessels are able to hold and transport the relevant cargo; plan the voyage for the cargo from port of origin to port of destination with input from other stakeholders; and provide operational and logistical support at all ports of entry.

[14]  Consistent with the U.S. embargo on trade with Cuba, shipments to Cuba of goods containing U.S.-manufactured components and involving U.S. entities or individuals must

59.     On April 17, 2018, BIS issued an export license for the wind turbine blades (the "Herradura Export License").  The Herradura Export License identifies "Goldwind" as the Purchaser and an Approved End User, and "Energoimport" as an authorized ultimate consignee. The Herradura Wind Farm Project itself is also an Approved End User with its listed address, "Playa Herradura, Las Tunas Province, Jesus Menendez, Cuba," about 15 miles away from the Confiscated Port.

60.     While the Herradura Export License provided the requisite BIS authorization, shipping the relevant wind turbine blades to Cuba still required OFAC authorization.  DSV employees believed it was necessary to obtain a separate OFAC license, but ultimately decided against doing so because OFAC authorization would be both time consuming and unlikely.  As such, rather than apply for a license from OFAC, and in an apparent attempt to qualify for OFAC regulations generally authorizing BIS-licensed exports "from" the United States,[15] after conducting a detailed analysis of their options, Defendants BBC Singapore and DSV, as well as DSV Denmark, decided on shipping routes for the two at-issue shipments that included prior

---

generally be authorized by BIS and OFAC.  *See* 15 C.F.R. § 746.2 (requiring either a license or license exception to export items subject to the Export Administration Regulations to Cuba); 31 C.F.R. § 515.201 (generally prohibiting transactions involving the property of a Cuban national that also involve U.S. persons or property subject to U.S. jurisdiction).  With certain exceptions, such shipments require separate licenses from each of these two agencies unless those shipments are automatically authorized under BIS and OFAC regulations. Authorization from OFAC and/or BIS to ship goods to Cuba is separate from—and does not shield the participants of said shipment from—Helms-Burton Act liability if they traffic in confiscated property in the process.  *See, e.g.*, 31 C.F.R. § 515.101(b).

[15]  If an export license from BIS is obtained to cover a particular shipment of goods to Cuba, that shipment will also be deemed authorized under OFAC regulations *if* those goods are exported *from* the United States.  *See* 31 C.F.R. § 515.533(a) ("All transactions ordinarily incident to the exportation of items from the United States, or the reexportation of items from a third country, to any person within Cuba are authorized, provided that . . . [t]he exportation or reexportation is licensed or otherwise authorized by the Department of Commerce . . . .").

stops in the United States (without offloading and reloading the wind turbine blades and transport frames on U.S. soil) before proceeding to the Confiscated Port.

61.      Because of the U.S.-related logistical and compliance requirements that accompanied stops in the United States, DSV Denmark engaged its affiliate, Defendant DSV, to assist with these requirements.  Defendants DSV and BBC Singapore, along with DSV Denmark, were all aware that the stops in the United States were attempts to qualify the shipments for OFAC authorization as exports "from" the United States, in lieu of obtaining a separate OFAC license, which, as early as February 2018, DSV employees recognized could be problematic for business reasons given potential delays and the likelihood of denial.  Defendants were also all aware that stops in the United States were believed to be a necessary precondition to delivering the wind farm equipment to the Confiscated Port in Cuba.  From February to October 2018, Defendants DSV and BBC Singapore, along with DSV Denmark, coordinated with one another to discuss and determine the specifics of a preferred route and the documentation that would need to accompany the vessels while carrying out that route.  DSV compliance personnel from no fewer than four different U.S. offices contributed to these communications.  In its role as agent for BBC Carriers in facilitating the voyages, BBC Singapore believed it had a duty to highlight sanctions risks associated with the Cuba stops to its affiliates, including in the United States.  And, as of March 15, 2018, BBC Singapore, BBC USA, and DSV were all aware that the proposed route created the potential for liability under U.S. sanctions laws.

62.      As part of the effort to satisfy U.S. trade law requirements, DSV called the U.S. Department of Commerce to discuss the Herradura Export License covering the wind turbine blades and to inquire as to what U.S. Customs filings would be necessary in connection with the Florida stops.

63.     Despite these efforts, several Defendants continued to express uncertainty over whether the BIS export license (along with the requisite stops in the United States) would be sufficient to insulate the shipments from sanctions liability.  For example, a DSV employee in mid-October 2018 described the proposed stop in Miami as "manipulating the routing of the vessel / trying to be creative to 'qualify' for a license," noting her belief that BIS only issued licenses for actual exports from the United States, rather than for goods on ships that were manufactured elsewhere and were merely making a stopover in a United States port.  Other DSV personnel also raised concerns in late October 2018 about the shipments heading to Cuba, in light of tensions between the United States and Cuba and the embargo with Cuba.  DSV personnel would later express a belief that the export license itself may have been erroneously issued.

64.     BBC Singapore personnel in September and October 2018 had similar concerns over whether the BIS license and stops in the United States would suffice.  Given that uncertainty, in addition to the potential public relations fallout from shipping to Cuba, BBC Singapore instructed its affiliates, as well as DSV, and could not "stress this enough" that "we should NOT market this shipment publicly until we are 100% sure on the licensing," further directing that no photos, press releases, or LinkedIn postings regarding the shipment should be made because "[t]he US is a HUGE market for BBC and DSV as well and the current political climate in the US would not side with us on a potentially 'un-sanctioned' shipment to Cuba." BBC Singapore added that "[o]ur competitors would also love to have something like this to use against us in the market."

65.     For its part, BBC Singapore, on at least one occasion, consulted with Dan-Gulf Shipping, Inc. ("Dan-Gulf"), a U.S.-based and -incorporated company experienced in shipments

to Cuba, about the wind farm equipment shipments to Cuba and anticipated Miami stop, and whether it could be done "without getting in trouble with [U]ncle [S]am."  Internal correspondence among Dan-Gulf employees indicated that they were not aware of a means by which to ship wind farm equipment to Cuba without violating U.S. sanctions regulations.

66.     Ultimately, in coordination with DSV, DSV Denmark, BBC Singapore, and BBC USA, the Port of Miami was selected as the site of the U.S. stopover, given its proximity and ease of access to the Confiscated Port.  DSV and DSV Denmark discussed and corresponded regarding the Miami stop with Carol Scheid, DSV's Miami, Florida-based customs broker. Miami, however, was not a regular port of call for BBC Carriers vessels.

67.     Once it was determined that the shipments would stop in the United States, and because of the U.S.-related logistical and compliance requirements associated with a stopover in Florida, BBC Singapore engaged its affiliate BBC USA to assist on these issues.  During the planning and execution stages of the voyages, no fewer than 11 BBC USA employees received regular e-mail correspondence regarding the BBC Jade's and BBC Moonstone's stops in the United States and Cuba, including correspondence referencing concerns over sanctions liability associated with the stops.  BBC Singapore also engaged BBC USA's general counsel to advise on the sanctions ramifications of the shipments' stops in Miami en route to the Confiscated Port in Cuba.

68.     BBC Singapore, in coordination with BBC USA, selected the BBC Moonstone and the BBC Jade to carry the wind farm equipment to the Confiscated Port by way of Florida.

69.     BBC Singapore corresponded and coordinated with port agents in the United States, namely Fort Lauderdale, Florida-based USA Maritime Enterprises ("USA Maritime") as primary agent, and Miami, Florida-based Seaport Hub Agencies ("Seaport Hub") as sub-agent,

to help facilitate the BBC Jade's and BBC Moonstone's stops in Florida, including by helping to secure clearance from U.S. Customs while in Florida.  BBC Singapore, satisfied with the clearance of the BBC Jade through the Port of Miami en route to Puerto Carupano and "happy" with the service USA Maritime provided in Florida, requested that USA Maritime prepare a "lessons learned" document, which was subsequently used to facilitate the voyage of the BBC Moonstone and its stop in Florida.

70.     Goldwind Science and Goldwind International were aware of and discussed internally and with Energoimport and the Blade Manufacturer the shipping route for the deliveries of the wind turbine blades and transportation frames to the Confiscated Port, including the interim stopovers in Miami, Florida.

71.     In September 2018, a Goldwind Science employee informed various Goldwind International employees that the shipments would stop in the United States, that a report to the U.S. Department of Commerce would be made prior to arriving in Cuba, and that the route included a stop in Miami, Florida.  The Goldwind Science employee provided this information to one of Goldwind International's employees because that Goldwind International employee was working on behalf of Goldwind Science and as Goldwind Science's point of contact for Energoimport regarding the shipment of equipment to the Herradura Wind Farm Project.

72.     On September 29, 2018, a Goldwind International employee asked high-level officers at Goldwind Science for shipping information regarding the wind turbine blades, informing them that Energoimport had concerns over the U.S. Government's hostility towards Cuban interests.  The Blade Manufacturer confirmed with the aforementioned individuals that the blades would transship Miami, Florida.

73.     Goldwind Science and Goldwind International understood that the stopovers in Miami were intended to attempt to comply with, and were necessitated by, U.S. requirements based on the deemed American provenance of the wind turbine blades.

74.     Goldwind Science and Goldwind International each agreed to the Florida stops, despite the fact that the Wind Farm Agreement with Energoimport expressly forbade transshipments in the United States.  Goldwind International was responsible for communicating the shipping route to Energoimport.

75.     Separately, with respect to the blade tip and root transport frames Goldwind Science provided, Defendant DSV and/or DSV Denmark requested that Goldwind International provide on behalf of Goldwind Science "Export Control Declarations" for each shipment acknowledging that there may be embargoes, prohibitions, restrictions, or sanctions on exporting or reexporting of goods to, from, or in transit to the Republic of Cuba, including legislation adopted by the United States applicable to exports or reexports of goods, to, from or in transit via Cuba.  Both Export Control Declarations were stamped with the Goldwind Science seal, with one signed by a Goldwind International employee as an authorized representative of Goldwind Science.  Goldwind Science also declared in both documents that "[w]e understand and accept to provide DSV with all necessary information on the intended shipment, goods, end use as well as intended consignee upon request."  Both Export Control Declarations identified Goldwind Science as the "customer" of "DSV."

ii.     BBC Singapore's Chartering Agreement with DSV Denmark

76.     In September 2018, DSV Denmark and BBC Singapore (on behalf of BBC Carriers) entered into a formal chartering agreement in which BBC Singapore agreed to carry out the two relevant shipments (the "DSV-BBC Chartering Agreement").  For each shipment, BBC Singapore was required to arrange for a shipping vessel owned by the Briese Group to pick up

the wind turbine blades specified in the Consortium Agreement, Wind Farm Agreement, and Blade Supply Agreement, as well as the blade transport frames Goldwind Science provided, in Tianjin, China and deliver them to the Confiscated Port by way of Miami, Florida.

77.     Per the DSV-BBC Chartering Agreement, BBC Singapore was required to provide DSV Denmark with daily reports of the shipments' position upon pickup of the equipment in China and while en route to Florida and the Confiscated Port.  BBC Singapore was also required to confirm the shipments' compliance with any port restrictions.

78.     Per the DSV-BBC Chartering Agreement, BBC Singapore was also required to provide (and did provide) bill of lading[16] instructions prior to the pickup of equipment in China, and to issue and release final bills of lading to DSV Denmark immediately after pickup of the wind turbine blades and the transport frames.

### D.     The BBC Jade Voyage

79.     As detailed below, Defendants arranged for the BBC Jade to pick up in Tianjin, China 51 wind turbine blades (half of the total blades to be shipped to the Confiscated Port) and the transport frames Goldwind Science provided, stop in Florida, and dock at the Confiscated Port in January 2019 and unload the cargo for Energoimport (hereinafter, the "BBC Jade

---

[16]  A bill of lading is a legal document prepared by carriers and shippers that memorializes certain information regarding a given ocean shipment, including the cargo being shipped, the vessel carrying the cargo, the origin and destination of the cargo, the ports of lading and unlading (i.e., loading and unloading), and the exporter, carrier, and consignee (i.e., recipient) of the cargo.  There are two types of bills of lading:  the "house" bill of lading issued by the NVOCC and the "master" bill of lading issued by the VOCC ("master" refers to the master of the relevant shipping vessel).  At a shipment's origin, the bills of lading function as receipts verifying that the goods have transferred from the shipper to the NVOCC, and then from the NVOCC to the VOCC.  At a shipment's destination, the bills of lading function as proof of title to the goods, with the consignee presenting the house bill of lading to the carrier in order to secure release of the shipment and claim ownership.

Voyage").  The BBC Jade, International Maritime Organization ("IMO") No. 9421116, is a vessel owned by a Briese Group entity.

80.      On October 3, 2018, the BBC Singapore employee in charge of renewable energy equipment from Asia, and responsible for the shipments to Cuba, discussed the nomination of the BBC Jade in the context of broader commercial interests for BBC Singapore, BBC USA, and DSV.  In e-mail correspondence, the BBC Singapore employee noted the business sensitivities associated with shipping to Cuba and the potential for sanctions, writing: "Please keep in mind we should NOT market this shipment publicly until we are 100% sure on the licensing. DSV to respect the same and follow suit (no photos / press releases / linkedin adverts / etc).  The US is a HUGE market for BBC and DSV as well and the current political climate in the US would not side with us on a potentially "un-sanctioned" shipment to Cuba. Our competitors would also love to have something like this to use against us in the market."  The same BBC Singapore representative also noted the potential risk of sanctions in connection with the shipments on September 3, 2018.

> i.      Preparing the Relevant Shipping Documentation

81.      Pursuant to its obligations under the DSV-BBC Chartering Agreement, BBC Singapore issued the master bills of lading for the BBC Jade, which reflect the following information:

| Master Bill of Lading Number | TIACAR001 |
|---|---|
| Cargo | 51 Blades (17 sets of blades) |
| Vessel | BBC Jade |
| Port of Loading | Tianjin, China |
| Port of Discharge | Carupano, Cuba [the Confiscated Port] |
| Shipper | DSV Air & Sea Co., Ltd. Tianjin Branch |
| Consignee | DSV Denmark |
| Description | "Cargo in transit via port of Miami, U.S." |

| Master Bill of Lading Number | TIACAR002 |
|---|---|
| Cargo | 51 Blade Root Frames, 51 Blade Tip Frames |
| Vessel | BBC Jade |
| Port of Loading | Tianjin, China |
| Port of Discharge | Carupano, Cuba [the Confiscated Port] |
| Shipper | DSV Air & Sea Co., Ltd. Tianjin Branch |
| Consignee | DSV Denmark |
| Description | "Cargo in transit via Miami, US" |

82.     DSV Denmark issued the two house bills of lading for the BBC Jade, which

reflect the following information:

| House Bill of Lading Number | HPR0023508 |
|---|---|
| Cargo | 51 Blades (17 sets of blades) |
| Vessel | BBC Jade |
| Place of Delivery | Carupano, Cuba [the Confiscated Port] |
| Port of Loading | Tianjin, China |
| Port of Discharge | Carupano, Cuba |
| Consignee | Energoimport |
| Shipper | Blade Manufacturer |
| Incoterm | Delivered-at-Place (shipper responsible for all costs and risks associated with the delivery to the Confiscated Port) |

| House Bill of Lading Number | HPR0023522 |
|---|---|
| Cargo | 51 Blade Root Frames, 51 Blade Tip Frames |
| Vessel | BBC Jade |
| Place of Delivery | Carupano, Cuba [the Confiscated Port] |
| Port of Loading | Tianjin, China |
| Port of Discharge | Carupano, Cuba |
| Consignee | Energoimport |
| Shipper | Goldwind Science |
| Description | "Cargo in transit via Port of Miami, US" |
| Incoterm | Delivered-at-Place (shipper responsible for all costs and risks associated with the delivery to the Confiscated Port) |

83.     Goldwind International, acting on behalf of Goldwind Science, played an integral

role in the preparation and finalization of the bills of lading and other shipping documents for the

BBC Jade shipment.  For example, Goldwind International engaged in discussions regarding the

shipping information to be included in the bills of lading; sought confirmation of the contents of shipping documents from Energoimport and assurance that the bills of lading would be sufficient to enable delivery of the wind farm equipment; ensured necessary revisions were made to the documents; circulated draft bills of lading internally and to Energoimport, received and circulated an insurance certificate for the shipment; signed the commercial invoices for the wind turbine blades on behalf of Goldwind Science; and submitted an Export Control Declaration at DSV's and/or DSV Denmark's request on behalf of Goldwind Science.

84.    Goldwind International also assisted in coordinating the transport of the cargo at the Confiscated Port.

85.    All of this was to fulfill Goldwind Science's contractual obligation, per the Wind Farm Agreement, to provide Energoimport with shipping documents, including the bills of lading and commercial invoices for the BBC Jade shipment as well as any other shipments carrying relevant cargo to the Confiscated Port, and more generally to facilitate the execution of Goldwind Science's contract with Energoimport.

86.    On or around October 25, 2018, DSV filed with the U.S. Department of Homeland Security's Customs and Border Protection ("CBP") an Importer Security Filing ("ISF") form, required for all ocean cargo imports to the United States, for the BBC Jade shipment's stop in Miami, Florida.  BBC USA's customs documentation specialist also reviewed and approved these filings prior to the BBC Jade's stop in Florida, noting that "[e]verything looks good and correct to me."  On information and belief, the same customs documentation specialist from BBC USA was also involved in issuing additional shipping documents for the BBC Jade.  The BBC Jade ISF form listed DSV's Miami, Florida address as that of the filing party.  Later, in December 2018, DSV also separately filed with CBP two additional ISF notices

regarding the BBC Jade shipment.  On October 30, DSV filed with CBP the relevant Cargo

Declarations through the Automated Manifest System ("AMS"), providing detailed shipping and

cargo information for the BBC Jade shipment.[17]  Both the ISF and AMS filings contain

essentially the same information included in the relevant bills of lading, which DSV Denmark

and BBC Singapore had issued, and which Goldwind International was involved in preparing.

ii.   <u>Executing and Tracking the BBC Jade Shipment</u>

87.    On November 13, 2018, the BBC Jade arrived at Tianjin, China, picked up 51

wind turbine blades and the transport frames Goldwind Science provided, and departed two days

later on November 15, for the Panama Canal.

88.    On December 25, 2018, the BBC Jade arrived at and passed through the Panama

Canal and departed the next day, December 26, to Miami, Florida.

89.    On December 30, 2018, the BBC Jade entered the Miami Seaport.  Prior to that

date, DSV electronically submitted cargo declarations and related information to CBP in order to

clear the BBC Jade's entrance into Florida and the United States.

90.    The wind turbine blades and transport frames were not unloaded in Miami.

Instead, Defendants arranged for the BBC Jade to stop in Miami in an effort to qualify the

---

[17]   A shipping vessel entering a U.S. port and carrying foreign-origin, Cuba-bound cargo must
electronically submit information regarding such cargo to CBP at least 24 hours before the
cargo is picked up at the foreign port (a "Cargo Declaration").  *See* 19 C.F.R. § 4.7(b)(2).  An
NVOCC must either itself submit the Cargo Declaration to CBP, or forward it to another
NVOCC or VOCC to make the required submission.  *See id.* § 4.7(b)(3)(i).  A Cargo
Declaration may be submitted electronically using CBP's electronic filing system called
AMS.  *See id.* § 4.7(b)(2).  A Cargo Declaration must also contain accurate information
regarding the relevant bills of lading.  *See id.* § 4.7a(c), (f).  CBP authorization for a shipping
vessel to enter the United States en route to Cuba does not shield the participants of the
relevant shipment from Helms-Burton Act liability if they traffic in confiscated property in
the process.

shipment as an export "from" the United States under OFAC regulations.  The vessel also "bunkered" (that is, refueled and resupplied) at the Miami Seaport.

91.     USA Maritime and Seaport Hub, on behalf of BBC Singapore, prepared a Statement of Facts memorializing the events that occurred while the BBC Jade was in Miami, including the clearance by CBP officials and bunkering activities.  At BBC Singapore's request, USA Maritime also prepared and sent along "lessons learned" from the Jade Shipment's stop in Miami, which BBC Singapore used for the second shipment on the BBC Moonstone and its stop in Miami.  The "lessons learned" noted that USA Maritime and Seaport Hub took the following actions in Florida on BBC Singapore's behalf to facilitate the Jade Shipment's stop there: contacting U.S. authorities—including CBP, the Coast Guard, and U.S. immigration authorities—to determine what documentation or procedures were required for the shipment; collecting such documentation, including the BIS license, from the shippers or charterers and providing them to CBP officials at the Customs Marine Section of the Port of Miami; and, once confirmation was granted from U.S. Customs, making the necessary arrangements for the vessel's pre-arrival in port, including contacting the Port Authorities (such as the U.S. Coast Guard, Immigration, Pilot, Harbormaster, and tugs), for berthing and additional clearance procedures.  BBC Singapore thanked USA Maritime for its help "getting mv BBC Jade pushed through Miami," and indicated they had "no complaints" and were "happy with the service [USA Maritime] provided."

92.     On December 31, 2018, the BBC Jade departed Miami for the Confiscated Port. Prior to departure, CBP approved the BBC Jade's Clearance Application,[18] which stated that the

---

[18]  A shipping vessel intending to depart from a U.S. port to deliver foreign-origin cargo to Cuba must obtain clearance from CBP to do so.  *See* 19 C.F.R. § 4.60(a).  To obtain CBP

ship would proceed to the Confiscated Port in Cuba.  Attached to the Clearance Application was the Herradura Export License.

93.     On January 6, 2019, the BBC Jade arrived at the Confiscated Port, and over the course of three days, unloaded the wind turbine blades and transportation frames—delivering it to Energoimport for transportation by road to the Herradura Wind Farm Project with the transporting trucks arranged by Goldwind Science.  Per the Wind Farm Agreement, Goldwind Science was responsible for providing the finalized house bills of lading to Energoimport in advance of the pickup.  Accordingly, on information and belief, at or around the time of delivery, the relevant house bills of lading regarding the wind turbine blades and transportation frames were presented by Energoimport to the operators of the BBC Jade.

94.     On January 9, 2019, the BBC Jade departed the Confiscated Port.

95.     In sum, and in relevant part, the BBC Jade (1) stopped in Tianjin, China, to pick up the wind farm equipment; (2) passed through the Panama Canal; (3) stopped in Miami, Florida, in an attempt to satisfy certain U.S. trade laws other than the Helms-Burton Act; and (4) stopped at the Confiscated Port in Cuba to unload the wind farm equipment.  These events are depicted in Figure 1 below.

---

clearance, shipping vessels must present a completed "Clearance Application" to the relevant CBP port director.  *Id.* § 4.61(a).  Such applications must include any relevant export licenses.  Applications must also include a travel itinerary of the ports that will be visited after departure from the United States.  *See id.* § 4.61(f) ("Clearance in order of itinerary. Unless otherwise provided in this section, every vessel bound for a foreign port or ports will be cleared for a definite port or ports in the order of its itinerary . . . .").  CBP authorization for a shipping vessel to depart the United States for Cuba does not shield the participants of the relevant shipment from Helms-Burton Act liability if they traffic in confiscated property in the process.



*Figure 1: BBC Jade Voyage*

96.    A DSV Denmark employee updated a group of interested parties, including a Goldwind International employee, regarding the location of the BBC Jade as the ship approached and stopped in Miami and subsequently departed Miami for the Confiscated Port.  Goldwind International, on behalf of Goldwind Science, communicated this information to Energoimport.

97.    DSV allowed Goldwind Science and other shippers to utilize the "Track & Trace" function on its website to "[f]ollow [their] shipments [on the BBC Jade] online from the moment [they] place the order to delivery at the final destination."[19]

---

[19]   DSV, *About DSV: DSV Global Transport and Logistics*, https://www.us.dsv.com/about-DSV (last visited on Nov. 1, 2021).

### E.    The BBC Moonstone Voyage

98.    As detailed below, Defendants arranged for the BBC Moonstone to pick up the other 51 wind turbine blades and transport frames Goldwind Science provided in Tianjin, China, stop in Florida, and dock at the Confiscated Port in February 2019 and unload the cargo for Energoimport (hereinafter, the "BBC Moonstone Voyage").  The BBC Moonstone, IMO No. 9563732, is a vessel owned by a Briese Group entity.

### i.    Preparing the Relevant Shipping Documentation

99.    Pursuant to its obligations under the DSV-BBC Chartering Agreement, BBC Singapore issued two master bills of lading for the BBC Moonstone, which reflect the following information:

| Master Bill of Lading Number | TIACAR001 |
|---|---|
| Cargo | 51 Blades (17 sets of blades) |
| Vessel | BBC Moonstone |
| Port of Loading | Tianjin, China |
| Port of Discharge | Carupano, Cuba [the Confiscated Port] |
| Shipper | DSV Air & Sea Co., Ltd. Tianjin Branch |
| Consignee | DSV Denmark |

| Master Bill of Lading Number | TIACAR002 |
|---|---|
| Cargo | 51 Blade Root Frames, 51 Blade Tip Frames |
| Vessel | BBC Moonstone |
| Port of Loading | Tianjin, China |
| Port of Discharge | Carupano, Cuba [the Confiscated Port] |
| Shipper | DSV Air & Sea Co., Ltd. Tianjin Branch |
| Consignee | DSV Denmark |

100.    DSV Denmark issued the two house bills of lading for the BBC Moonstone, which reflect the following information:

| House Bill of Lading Number | HPR0023752 |
|---|---|
| Cargo | 51 Blades (17 sets of blades) |
| Vessel | BBC Moonstone |
| Place of Delivery | Carupano, Cuba [the Confiscated Port] |
| Port of Loading | Tianjin, China |

| Port of Discharge | Carupano, Cuba |
|---|---|
| Consignee | Energoimport |
| Shipper | Blade Manufacturer |
| Description | "Cargo in transit via Port of Miami, US" |
| Incoterm | Delivered-at-Place (shipper responsible for all costs and risks associated with the delivery to the Confiscated Port) |

| House Bill of Lading Number | HPR0023755 |
|---|---|
| Cargo | 51 Blade Root Frames, 51 Blade Tip Frames |
| Vessel | BBC Moonstone |
| Place of Delivery | Carupano, Cuba [the Confiscated Port] |
| Port of Loading | Tianjin, China |
| Port of Discharge | Carupano, Cuba |
| Consignee | Energoimport |
| Shipper | Goldwind Science |
| Description | "Cargo in transit via Port of Miami, US." |
| Incoterm | Delivered-at-Place (shipper responsible for all costs and risks associated with the delivery to the Confiscated Port) |

101.    Goldwind International, acting on behalf of Goldwind Science, played an integral role in the preparation and finalization of the bills of lading and other shipping documents for the BBC Moonstone shipment.  For example, Goldwind International was engaged in discussions about fundamental issues such as the number of bills of lading necessary and for which goods; confirmed the contents of bills of lading; was tasked with destroying an original (and allegedly incorrect) version of a bill of lading at DSV Denmark's request; communicated with Energoimport for approval of the bills of lading; notified Energoimport that house and master bills of lading would be issued; signed the commercial invoices for the wind turbine blades on behalf of Goldwind Science; sent packing invoices, bills of lading, an insurance certificate, and other shipping documents to personnel in Cuba; and submitted an Export Control Declaration at DSV's and/or DSV Denmark's request on behalf of Goldwind Science.

102.     All of this was to fulfill Goldwind Science's contractual obligation, per the Wind Farm Agreement, to provide Energoimport with the bills of lading and commercial invoices for the BBC Moonstone shipment as well as any other shipments carrying relevant cargo to the Confiscated Port, and more generally to facilitate the execution of Goldwind Science's contract with Energoimport.

103.     On or around December 21, 2018, BBC Singapore's local shipping agent in Tianjin, China submitted an Inward Cargo Declaration AMS filing for the BBC Moonstone to CBP on behalf of BBC Singapore, prior to the vessel's departure from Tianjin, which falsely listed the "Port of Discharge" as Miami, Florida.

104.     On or around December 28, 2018, DSV also submitted to CBP the relevant Cargo Declarations via AMS, and as well as accompanying ISF forms, to facilitate the BBC Moonstone shipment's stop in Miami, Florida.  Correspondence among DSV and DSV Denmark reflected that DSV's submission of the customs forms for the Florida stop was "the foundation of the entire project," that the shipment was "a big project for the company," and that the companies had "a lot riding on" the project.  Both the ISF and AMS filings contained essentially the same information included in the relevant bills of lading.  The Manifest Details on this filing listed the Carrier Code "DSVF," which refers to DSV.[20]  Although DSV now claims that use of the "DSVF" code was a clerical mistake, DSV never corrected the filing or resubmitted accurate documentation to CBP.

---

[20]  Carriers that have registered with the National Motor Freight Traffic Association must use their unique Standard Carrier Alpha Code in their Cargo Declarations.  *See* 19 C.F.R. § 4.7a(c)(2)(iii).

ii.   <u>Executing and Tracking the Delivery</u>

105.    On December 24, 2018, the BBC Moonstone arrived in Tianjin, China, to pick up the other 51 wind turbine blades and the transportation frames Goldwind Science provided.  The BBC Moonstone departed Tianjin on December 25, 2018, for the Panama Canal.

106.    On January 16, 2019, while preparing for the BBC Moonstone's arrival in Puerto Carupano, Cuba, BBC Carriers, and BBC Singapore personnel asked their Cuban port agent whether "the departure clearance for the next port (Port Arthur) will mention a different port than Carupano, or if there is no problem because we have the [BIS] export license for the shipment." That same day, the port agent in Cuba emailed BBC Singapore and BBC Carriers personnel warning that if they had not obtained an OFAC license, there would be a problem because the BBC Moonstone would not be permitted to call on U.S. ports within six months after the Cuba call, according to the U.S. Torricelli Act of 1992,[21] and Title I of the Helms-Burton Act.[22]  BBC Singapore was thus clearly aware of the Helms-Burton Act by mid-January 2019 at the latest—before the BBC Moonstone arrived in Cuba, and just 10 days after the BBC Jade made its arrival.

107.    On January 26, 2019, the BBC Moonstone arrived at the Panama Canal, and proceeded to travel to Miami, Florida.  Prior to that date, DSV electronically submitted to CBP

---

[21]  *See* 22 U.S.C. § 6005(b)(1) ("[A] vessel which enters a port or place in Cuba to engage in the trade of goods or services may not, within 180 days after departure from such port or place in Cuba, load or unload any freight at any place in the United States, except pursuant to a license issued by the Secretary of the Treasury.").

[22]  Separate from the private right of action for trafficking in confiscated property under Title III, Title I of the Helms-Burton Act mandates the full enforcement of existing regulatory trade restrictions with Cuba.  *See, e.g.*, 22 U.S.C. § 6032(c), (h).

the cargo declarations and related information in order to clear the BBC Moonstone's entrance into Florida and the United States.

108.     On January 30, 2019, the BBC Moonstone entered the Miami Seaport.

109.     The wind turbine blades and transportation frames were not unloaded in Miami. Instead, Defendants arranged for the BBC Moonstone to stop in Miami in an effort to qualify the shipment as an export "from" the United States under OFAC regulations.  The vessel also "bunkered," (that is, refueled and resupplied) at the Miami Seaport.

110.     USA Maritime and Seaport Hub, on behalf of BBC Singapore, prepared a Statement of Facts memorializing the events that occurred while the BBC Moonstone was in Miami, including the clearance by CBP officials and bunkering activities.

111.     Later that same day, on January 30, 2019, the BBC Moonstone departed the Port of Miami for the Confiscated Port.  On or around the same day, a BBC Singapore representative also corresponded with USA Maritime in Florida regarding the present status of the BBC Moonstone shipment and estimated time of arrival at the Confiscated Port, and asked a BBC Carriers representative to obtain the documents from the Miami stop from USA Maritime and send them to DSV Denmark.

112.     BBC Singapore took several steps to deliberately conceal the BBC Moonstone's stop in Puerto Carupano from various U.S. entities in order to achieve the vessel's subsequent stop in Port Arthur, Texas to deliver other goods that BBC USA contracted to transport.  For example, the vessel entrance or clearance forms for the BBC Moonstone that were submitted to and stamped by CBP officials in Florida incorrectly listed "Rio Haina"—a port in the Dominican Republic—as an upcoming port of call.  That was no accident.  BBC Singapore and BBC USA employees intentionally used "Rio Haina" internally and externally to refer to Puerto Carupano

in an effort to conceal the stop in Cuba.  BBC Singapore employees also knowingly falsified shipping, cargo and stow plans to replace references to Puerto Carupano, Cuba with "Rio Haina" as the next stop after Miami.  Indeed, a BBC Singapore employee specifically requested a "fake" version of the stow plan for the shipment showing Rio Haina "and not Carupano" "so we don't show 'cuba.'"  The purpose of this latter concealment was to ensure that a third-party customer transporting cargo on the BBC Moonstone, to which BBC USA was contractually obligated to not stop in Cuba, never became aware of the Puerto Carupano delivery.  However, the BBC Moonstone shipment did not stop, and was never actually scheduled to stop, in Rio Haina.

113.    BBC Singapore also agreed and instructed others, including BBC Carriers, to speak with BBC USA personnel in relation to the BBC Moonstone "via PHONE ONLY," and to avoid copying BBC USA on emails discussing the Puerto Carupano stop, so that written correspondence did not reflect the Cuba stop.

114.    BBC Singapore also instructed others, including the BBC Moonstone's ship captain, to turn off the ship's IMOS and AIS tracking systems following departure from Miami and before arrival in Houston—which is illegal, *see* 33 C.F.R. § 164.46(d)—in an effort to avoid being tracked when transshipping Cuba.  Indeed, the Managing Director of BBC Singapore's Headquarters in Singapore originally instructed that the tracking systems be turned off for both the Florida and Cuba portions of the voyage; it was subsequently determined, however, that doing so could raise additional unwanted scrutiny surrounding the Miami stop.  Consequently, it was ultimately agreed that the tracking systems would be turned off upon departing Miami, and turned back on after the Cuba stop, prior to entering Port Arthur, Texas.  BBC Singapore knew that shutting off its vessel tracking systems may cause "trouble with the U.S. Coast Guard" and "might even cause more attention."  One BBC Singapore employee also stated that if a U.S.

entity noticed the BBC Moonstone's tracking system was off, she "would have to find a little lie."

115.    On February 4, 2019, the BBC Moonstone arrived at the Confiscated Port, and over the course of three days, unloaded the wind turbine blades and associated tip and root frames, delivering it to Energoimport for transportation by road to the Herradura Wind Farm Project with the transporting trucks arranged by Goldwind Science.  Per the Wind Farm Agreement, Goldwind Science was responsible for providing the finalized house bills of lading to Energoimport in advance of the pickup.  Accordingly, on information and belief, at or around the time of delivery, the relevant house bills of lading regarding the wind turbine blades and transportation frames were presented by Energoimport to the operators of the BBC Moonstone.

116.    On February 7, 2019, the BBC Moonstone departed the Confiscated Port for Port Arthur, Texas, and arrived in Port Arthur on February 10, 2019.  In an apparent further attempt to conceal the BBC Moonstone's stop in Cuba from U.S. authorities and entities, BBC USA submitted an Inward Cargo Declaration form to CBP in connection with the stop in Port Arthur, Texas that incorrectly listed Tianjin, China (and not Puerto Carupano) as the "Last Foreign Port Before U.S."  This was the third submission to U.S. Customs in connection with the BBC Moonstone shipment listing false information that obfuscated the Puerto Carupano, Cuba stop (misleading submissions were also made to CBP while the BBC Moonstone was in Tianjin, falsely listing Miami as the Port of Discharge, and while in Miami, falsely listing Rio Haina as a port of call).  Submitting altered or false cargo declarations and AMS filings is prohibited by law.  *See* 19 C.F.R. § 4.7a(f).  While at Port Arthur, the BBC Moonstone delivered to a U.S. customer of BBC USA equipment which had been picked up prior to stopping in Tianjin on

December 24, 2018.  In arranging for this delivery, which stopped first at the Confiscated Port, BBC USA used, and engaged in a transaction benefiting from, the Confiscated Port.

117.     On February 17, 2019, the BBC Moonstone departed Port Arthur.

118.     In sum, and in relevant part, the BBC Moonstone (1) stopped in Tianjin, China, to pick up the wind farm equipment for receipt by Energoimport; (2) passed through the Panama Canal; (3) stopped in Miami, Florida, in an attempt to satisfy certain U.S. trade laws other than the Helms-Burton Act; (4) stopped at the Confiscated Port in Cuba to unload the wind farm equipment; and (5) stopped in Port Arthur, Texas, to unload equipment to BBC USA's U.S. customer.  These events are depicted in Figure 2 below.



**BBC Moonstone Voyage**

|   | Port of Call | Date(s) | Action Taken |
|---|---|---|---|
| 1 | Tianjin, China | Dec. 25, 2018 (Departure) | Loaded wind mill blades, tip frames and root frames |
| 2 | Panama Canal | Jan. 26, 2019  (Arrival and Departure) | Passage |
| 3 | Miami, Florida | Jan. 30, 2019  (Arrival and Departure) | Stopped in U.S. to attempt to gain OFAC authorization; cleared entrance and departure with CBP; refueled and resupplied |
| 4 | Puerto Carupano, Cuba (the Confiscated Port) | Feb. 4, 2019 (Arrival) – Feb. 7, 2019 (Departure) | Unloaded wind mill blades, tip frames and root frames |
| 5 | Port Arthur, Texas | Feb. 10, 2019 (Arrival) | Unloaded cargo for BBC USA customer (which had been loaded prior to Tianjin) |

*Figure 2: BBC Moonstone Voyage*

119.    A DSV Denmark employee updated a group of interested parties, including a

Goldwind International employee, regarding the location of the BBC Moonstone as the ship

approached and stopped in Miami and subsequently departed Miami for the Confiscated Port.

Goldwind International, acting on behalf of Goldwind Science, communicated this information

to Energoimport.

120.    BBC Singapore employees also monitored closely the location of the BBC

Moonstone as the ship approached and stopped in Miami and subsequently departed Miami for

the Confiscated Port.

121.    DSV allowed Goldwind Science and other shippers to utilize the "Track & Trace"

function on its website to "[f]ollow [their] shipments [on the BBC Moonstone] online from the

moment [they] place the order to delivery at the final destination."[23]

122.    All of the above-described actions were undertaken to fulfill Goldwind Science's

contractual obligation to supply wind farm equipment to Energoimport via the Confiscated Port.

## THE HELMS-BURTON ACT

### I.    Background

123.    On March 12, 1996, President Clinton signed the Helms-Burton Act into law, not

only to further strengthen international sanctions and the trade embargo against the Government

of Cuba, 22 U.S.C. § 6022(2), but also to "protect United States nationals against confiscatory

takings and the wrongful trafficking in property confiscated by the Castro regime," *id.* § 6022(6).

---

[23]   DSV, *About DSV: DSV Global Transport and Logistics*, https://www.us.dsv.com/about-DSV
(last visited on Nov. 1, 2021).

124.     To this end, Title III of the Helms-Burton Act, entitled "Protection of Property Rights of United States Nationals," imposes liability on persons trafficking in property confiscated from a U.S. national by the Cuban government on or after January 1, 1959, and authorizes a private right of action for damages against such traffickers.  *See* 22 U.S.C. § 6082.

125.     On July 16, 1996, President Clinton suspended the private right of action under Title III for six months.  The August 1, 1996 effective date, however, was not suspended.

126.     On August 1, 1996, Title III of the Act came into effect.  Starting on that date, traffickers of confiscated property were liable to U.S. nationals with certified claims to that property but could not be sued while the private right of action remained suspended.

127.     Because the operative provisions of the Act became effective and have remained continually in full force and effect since 1996, traffickers in confiscated property had no assurances that they would be forever shielded from liability by a President's discretionary suspension of the private right of action, which could be reinstated at any time, triggering civil liability for any violation of the Act within the two-year limitation period.  Thus, in the event that the suspension was lifted, trafficking from up to two years prior could be the subject of a lawsuit.

128.     President Clinton and subsequent administrations continuously renewed the suspension of the Title III private right of action, typically for six months at a time, by decision of the President and Secretary of State.

129.     On March 19, 2019, Secretary of State Pompeo partially lifted the suspension of Title III's private right of action, allowing United States nationals to sue certain Cuban state-owned entities.  Then, on May 2, 2019, Secretary Pompeo fully lifted the suspension.[24]

---

[24]   Michael R. Pompeo, Secretary of State, *Remarks to the Press* (Apr. 17, 2019), https://cuembassy.gov/remarks-to-the-press-3/ (last visited on Nov. 1, 2021).

130.     While traffickers in confiscated property have—until recently—benefitted from the suspension of Title III lawsuits, they have been subject to potential consequences since March 12, 1996.  Under Title IV of the Act, the Secretary of State "shall deny a visa to, and the Attorney General shall exclude from the United States, any alien who the Secretary of State determines is a person who . . . [has] traffic[ked] in confiscated property."  22 U.S.C. § 6091(a). Indeed, this denial and exclusion applies to not only the trafficker in question, but also to the trafficker's agents, corporate officers, principals, and controlling shareholders.  *See id.*

## II.     The Helms-Burton Act's Private Right of Action

131.     Title III of the Helms-Burton Act provides the following private right of action:

(1) Liability for trafficking.—(A) Except as otherwise provided in this section, any person that, after the end of the 3-month period beginning on the effective date of this [title], traffics in property which was confiscated by the Cuban Government on or after January 1, 1959, shall be liable to any United States national who owns the claim to such property for money damages . . . .

22 U.S.C. § 6082(a)(1).

132.     A person "traffics" in confiscated property if that person "knowingly, and intentionally":

(i)   sells, transfers, distributes, dispenses, brokers, manages, or otherwise disposes of confiscated property, or purchases, leases, receives, possesses, obtains control of, manages, uses, or otherwise acquires or holds an interest in confiscated property,

(ii)  engages in a commercial activity using or otherwise benefiting from confiscated property, or

(iii) causes, directs, participates in, or profits from, trafficking (as described in clause (i) or (ii)) by another person, or otherwise engages in trafficking (as described in clause (i) or (ii)) through another person,

without the authorization of any United States national who holds a claim to the property.

22 U.S.C. § 6023(13)(A).

133.     The Act defines "confiscated" in relevant part as "the nationalization, expropriation, or other seizure by the Cuban government of ownership or control of property, on or after January 1, 1959—(i) without the property having been returned or adequate and effective compensation provided; or (ii) without the claim to the property having been settled pursuant to an international claims settlement agreement or other mutually accepted settlement procedure." 22 U.S.C. § 6023(4)(A).

134.     A person who "traffics" in a U.S. national's confiscated property under the Helms-Burton Act is liable to a plaintiff for money damages equal to:

(i) the amount which is *the greater of*—

>   (I) *the amount, if any, certified to the claimant by the [FCSC] under the [ICSA], plus interest;*
>
>   (II) the amount determined [by a court-appointed special master, which may include the FCSC], plus interest; or
>
>   (III) the fair market value of that property, calculated as being either the current value of the property, or the value of the property when confiscated plus interest, whichever is greater[.]

22 U.S.C. § 6082(a)(1)(A) (emphases added).  In addition, the Helms-Burton Act adopts "a presumption that the amount for which a person is liable . . . is the amount that is certified [by the FCSC under the ICSA]."  *Id.* § 6082(a)(2).

**FIRST CAUSE OF ACTION**
**Trafficking in Confiscated Property in Violation of 22 U.S.C. § 6082**
**(Against Goldwind Science)**

135.     American Sugar is incorporated in New Jersey with its principal place of business in New York, and is thereby a "United States National" under the Helms-Burton Act.  *See* 22 U.S.C. § 6023(15).

136.     As a "United States National," American Sugar is entitled to sue "any person that . . . traffics in property which was confiscated by the Cuban Government on or after January

48

1, 1959." 22 U.S.C. § 6082(a)(1).  Goldwind Science is a "person" under the Act.  *See id.* § 6023(11).

137.     As detailed in this Amended Complaint, the Confiscated Property was expropriated by Cuba on or after January 1, 1959.

138.     American Sugar in 1969 filed a claim with the FCSC for determination under the Cuba Claims Program.  The FCSC certified that American Sugar has a claim in the amount of $97,373,414.72.  That certified claim is "conclusive proof of ownership" of American Sugar's interest in the Confiscated Property.  22 U.S.C. § 6083(a)(1).

139.     American Sugar's certified claim has never been settled pursuant to an international claims settlement agreement or other mutually accepted settlement procedure.

140.     As detailed in this Amended Complaint, Goldwind Science contracted with Energoimport to supply wind farm equipment for the Herradura Wind Farm Project.  *See, e.g.*, *supra* paragraphs 41–45.  Under the Wind Farm Agreement, Goldwind Science agreed to deliver, and did deliver, the wind turbine equipment to Energoimport at the Confiscated Port in Cuba, and agreed to submit the necessary shipping documents to effectuate those shipments.  *See, e.g.*, *supra* paragraphs 42–43.  Through Goldwind International, which executed the Wind Farm Agreement on Goldwind Science's behalf, the wind farm equipment for which Goldwind Science contracted to provide was delivered to Energoimport on the BBC Moonstone and BBC Jade, which docked and unloaded the equipment at the Confiscated Port.  *See, e.g.*, *supra* paragraphs 46, 49, 75, 83–85, 93, 101–102, 115.  Under the Blade Supply Agreement, Goldwind Science also agreed to arrange for the pickup of the wind farm equipment at the Confiscated Port.  *See supra* paragraph 53.  To satisfy its contractual obligations under the Wind Farm Agreement, Goldwind Science also provided information to secure insurance in the United

States, and knew in advance that the stops in Miami, Florida were part of an effort to comply with U.S. trade laws separate from the Helms-Burton Act.  *See, e.g.*, *supra* paragraphs 48, 70–74. Goldwind Science thereby "knowingly and intentionally" "use[d]" the Confiscated Property.  22 U.S.C. § 6023(13)(A)(i).

141.    As detailed in this Amended Complaint, Goldwind Science entered into agreements, namely the Consortium Agreement, Wind Farm Agreement, and Blade Supply Agreement, and conducted additional commercial activity, including with other Defendants and non-parties, to facilitate these shipments with the purpose of delivering the wind farm equipment to Energoimport by way of the Confiscated Port in exchange for monetary compensation from Energoimport.  Under the Consortium Agreement, Goldwind Science agreed to a form a consortium to submit a bid to Energoimport for the Herradura Wind Farm Project, and to supply and deliver wind turbine units, including wind turbine blades and other constituent parts, to Energoimport in Cuba.  *See supra* paragraph 39.  Under the Wind Farm Agreement, Goldwind Science contracted with Energoimport to supply (among other equipment) 34 wind turbine units, including wind turbine blades and other constituent parts, for the Herradura Wind Farm Project, and deliver that equipment to Energoimport at the Confiscated Port in Cuba.  *See, e.g.*, *supra* paragraphs 41–45.  Under the Blade Supply Agreement, Goldwind Science contracted with the Blade Manufacturer for the purchase of the necessary wind turbine blades and the delivery of the blades to Energoimport at the Confiscated Port.  *See, e.g.*, *supra* paragraphs 50, 52–53. Goldwind Science commercially benefited and, per the terms of the agreements, profited from the delivery of the wind farm equipment to the Confiscated Port.  *See supra* paragraph 45. Additionally, through Goldwind International, which was in charge of operations related to the relevant shipments, Goldwind Science facilitated the delivery of the wind farm equipment to the

Confiscated Port with the cooperation and assistance of DSV Denmark, DSV, BBC Carriers, BBC Singapore, and BBC USA. *See, e.g.*, *supra* paragraphs 46, 49, 75, 83–85, 93, 101–102, 115. And to satisfy its contractual obligations under the Wind Farm Agreement, Goldwind Science provided information to secure insurance in the United States detailing the use of the Confiscated Port for its shipments, and knew in advance that the stops in Miami, Florida were part of an effort to comply with U.S. trade laws separate from the Helms-Burton Act. *See, e.g.*, *supra* paragraphs 48, 70–74. At all times in its various roles Goldwind Science was aware that the end result of a successful shipment would be that the wind farm equipment was delivered at the Confiscated Port. Goldwind Science thereby "knowingly and intentionally" "engage[d] in a commercial activity using or otherwise benefiting from confiscated property." 22 U.S.C. § 6023(13)(A)(ii).

142. As detailed in this Amended Complaint, Goldwind Science caused, directed, participated in or profited from business relationships with other Defendants and non-parties to facilitate the delivery of the wind farm equipment to the Confiscated Port. These relationships included causing and relying on Goldwind International to assist in negotiating the relevant contracts and executing the shipments to the Confiscated Port, causing and participating in a customer relationship with DSV and/or DSV Denmark for the provision of transportation and logistical services in transporting the wind farm equipment to the Confiscated Port, and causing BBC Carriers, BBC Singapore and BBC USA to charter or support the voyages of the BBC Moonstone and BBC Jade to the Confiscated Port. *See, e.g.*, *supra* paragraphs 40, 46, 49, 51, 75, 83–85, 101–102. Goldwind Science profited from the delivery of the wind farm equipment to the Confiscated Port as assisted by these persons. Goldwind Science thereby "knowingly and intentionally" "cause[d], direct[ed], participate[d] in, [and] profit[ed] from, trafficking" by or

through another person, namely, Goldwind  International, DSV, BBC Singapore, BBC USA, and non-parties BBC Carriers and Energoimport.  22 U.S.C. § 6023(13)(A)(iii).

143.    At no point did Goldwind Science use the Confiscated Property with the authorization of American Sugar.  *See* 22 U.S.C. § 6023(13).

144.    Goldwind Science engaged in unlawful trafficking after November 1, 1996, the end of the three-month grace period the Helms-Burton Act provided after it became effective on August 1, 1996.  *See* 22 U.S.C. § 6082(a)(1)(A).

145.    Therefore, American Sugar is entitled to damages in the amount of the certified claim, plus applicable pre-judgment interest.  American Sugar is also entitled to treble damages, attorneys' fees, costs, and post-judgment interest.  *See* 22 U.S.C. § 6082(a)(1), (3); 28 U.S.C. § 1961.

## SECOND CAUSE OF ACTION
### Trafficking in Confiscated Property in Violation of 22 U.S.C. § 6082
### (Against Goldwind International)

146.    American Sugar is incorporated in New Jersey with its principal place of business in New York, and is thereby a "United States National" under the Helms-Burton Act.  *See* 22 U.S.C. § 6023(15).

147.    As a "United States National," American Sugar is entitled to sue "any person that . . . traffics in property which was confiscated by the Cuban Government on or after January 1, 1959."  22 U.S.C. § 6082(a)(1).  Goldwind International is a "person" under the Act.  *See id.* § 6023(11).

148.    As detailed in this Amended Complaint, the Confiscated Property was expropriated by Cuba on or after January 1, 1959.

149.    American Sugar in 1969 filed a claim with the FCSC for determination under the Cuba Claims Program.  The FCSC certified that American Sugar has a claim in the amount of

$97,373,414.72.  That certified claim is "conclusive proof of ownership" of American Sugar's interest in the Confiscated Property.  22 U.S.C. § 6083(a)(1).

150.    American Sugar's certified claim has never been settled pursuant to an international claims settlement agreement or other mutually accepted settlement procedure.

151.    As detailed in this Amended Complaint, Goldwind International negotiated and executed the shipments of the wind farm equipment on the BBC Moonstone and BBC Jade to the Confiscated Port on behalf of Goldwind Science.  For example, Goldwind International helped negotiate the terms of the Wind Farm Agreement with Energoimport on Goldwind Science's behalf, signed the Wind Farm Agreement on Goldwind Science's behalf, and participated in the preparation and finalizing of bills of lading necessary to effectuate the shipments, including by confirming the number of required bills of lading and their contents.  *See, e.g.*, *supra* paragraphs 46, 49, 83–85, 101–102.  Goldwind International also communicated with Energoimport regarding the shipping documents; ensured necessary revisions were made to the documents; destroyed an outdated bill of lading; circulated draft bills of lading internally and to Energoimport; signed the commercial invoices for the wind turbine blades on behalf of Goldwind Science; tracked the status and location of the shipments during their voyages; received and circulated an insurance certificate covering the shipments; submitted, at DSV and/or DSV Denmark's request, Export Control Declarations on behalf of Goldwind Science acknowledging the risk of U.S. sanctions in connection with shipments to Cuba; employed personnel in Cuba to facilitate the shipments; and sent shipping documents to Cuba.  *See, e.g.*, *supra* paragraphs 75, 83–85, 96, 101–102, 119.  All of these actions were taken in order to effectuate delivery of the wind farm equipment Goldwind Science had contracted to supply Energoimport via the Confiscated Port.  *See, e.g.*, *supra* paragraphs 85, 102.  Goldwind

International thereby "knowingly and intentionally" "use[d]" the Confiscated Property.  22 U.S.C. § 6023(13)(A)(i).

152.    As detailed in this Amended Complaint, Goldwind International personnel negotiated and signed the Consortium Agreement and Wind Farm Agreement on behalf of Goldwind Science, and helped negotiate on behalf of Goldwind Science the Blade Supply Agreement.  *See, e.g.*, *supra* paragraphs 40, 46, 51.  Goldwind International conducted additional commercial activity to facilitate these shipments with the purpose of delivering the wind farm equipment to Energoimport by way of the Confiscated Port.  For example, Goldwind International participated in the preparation and finalizing of bills of lading necessary to effectuate the shipments, including by confirming the number of required bills of lading and their contents.  *See, e.g.*, *supra* paragraphs 83–85, 101–102.  Goldwind International also communicated with Energoimport regarding the shipping documents; circulated draft bills of lading internally and to Energoimport; signed the commercial invoices for the wind turbine blades on behalf of Goldwind Science; tracked the status and location of the shipments during their voyages; received and circulated an insurance certificate covering the shipments; submitted, at DSV and/or DSV Denmark's request, Export Control Declarations on behalf of Goldwind Science acknowledging the risk of U.S. sanctions in connection with shipments to Cuba; had personnel in Cuba to facilitate the shipments; and sent shipping documents to Cuba.  *See, e.g.*, *supra* paragraphs 49, 75, 83–85, 96, 101–102, 119.  At all times in its various roles Goldwind International was aware that the end result of a successful shipment would be that the wind farm equipment was delivered at the Confiscated Port.  *See, e.g.*, *supra* paragraphs 85, 102.  Goldwind International thereby "knowingly and intentionally" "engage[d] in a commercial activity using or otherwise benefiting from confiscated property."  22 U.S.C. § 6023(13)(A)(ii).

153.    As detailed in this Amended Complaint, in addition to the assistance it provided Goldwind Science to facilitate the shipments, Goldwind International participated in discussions regarding the shipping routes for the BBC Moonstone and BBC Jade, including the vessels' stop in Miami, Florida in an attempt to satisfy U.S. trade law requirements (which was a necessary and critical component of effectuating the delivery of the wind farm equipment to the Confiscated Port) and contributed to decisions regarding the master and house bills of lading and shipping information contained therein submitted by other Defendants.  *See, e.g.*, *supra* paragraphs 70–74, 83, 101.  Goldwind International thereby "knowingly and intentionally" "cause[d], direct[ed], participate[d] in, [and] profit[ed] from, trafficking" by or through another person, namely, Goldwind Science, DSV, BBC Singapore, and non-parties DSV Denmark and Energoimport.  22 U.S.C. § 6023(13)(A)(iii).

154.    At no point did Goldwind International use the Confiscated Property with the authorization of American Sugar.  *See* 22 U.S.C. § 6023(13).

155.    Goldwind International engaged in unlawful trafficking after November 1, 1996, the end of the three-month grace period the Helms-Burton Act provided after it became effective on August 1, 1996.  *See* 22 U.S.C. § 6082(a)(1)(A).

156.    Therefore, American Sugar is entitled to damages in the amount of the certified claim, plus applicable pre-judgment interest.  American Sugar is also entitled to treble damages, attorneys' fees, costs, and post-judgment interest.  *See* 22 U.S.C. § 6082(a)(1), (3); 28 U.S.C. § 1961.

**THIRD CAUSE OF ACTION**
**Trafficking in Confiscated Property in Violation of 22 U.S.C. § 6082**
**(Against DSV)**

157.     American Sugar is incorporated in New Jersey with its principal place of business

in New York, and is thereby a "United States National" under the Helms-Burton Act.  *See* 22

U.S.C. § 6023(15).

158.     As a "United States National," American Sugar is entitled to sue "any person

that . . . traffics in property which was confiscated by the Cuban Government on or after January

1, 1959."  22 U.S.C. § 6082(a)(1).  DSV is a "person" under the Act.  *See id.* § 6023(11).

159.     As detailed in this Amended Complaint, the Confiscated Property was

expropriated by Cuba on or after January 1, 1959.

160.     American Sugar in 1969 filed a claim with the FCSC for determination under the

Cuba Claims Program.  The FCSC certified that American Sugar has a claim in the amount of

$97,373,414.72.  That certified claim is "conclusive proof of ownership" of American Sugar's

interest in the Confiscated Property.  22 U.S.C. § 6083(a)(1).

161.     American Sugar's certified claim has never been settled pursuant to an

international claims settlement agreement or other mutually accepted settlement procedure.

162.     As detailed in this Amended Complaint, DSV was a key participant in the

determinations over a eleven month period of how to route the vessels to comply with U.S. trade

law requirements and execute critical U.S. Customs filings to attempt to comply with a U.S.

Department of Commerce license for the wind farm equipment.  *See, e.g.*, *supra* paragraphs 58,

60–63.  DSV's participation included the performance of extensive and determinative U.S. trade

law compliance analyses regarding the BBC Jade and BBC Moonstone shipments and their stops

in Florida critical to the vessels' successful delivery of the wind farm equipment to the

Confiscated Port.  *See, e.g.*, *id.*  DSV also called the U.S. Department of Commerce to discuss

export licensing issues, and submitted requisite documentation and filings—including ISF notices and cargo declarations to CBP—to facilitate the Miami stops and the ultimate delivery of wind blades to the Confiscated Port.  *See, e.g.*, *supra* paragraphs 62, 86, 89, 104, 107.  DSV thereby "knowingly and intentionally" "use[d]" the Confiscated Property.  22 U.S.C. § 6023(13)(A)(i).

163.    As detailed in this Amended Complaint, DSV supported DSV Denmark's business relationship with Goldwind Science and Goldwind International to facilitate the shipment of the wind farm equipment to Energoimport via the Confiscated Port.  *See, e.g.*, *supra* paragraphs 58, 60–61, 75, 86, 104.  DSV also supported DSV Denmark's business relationship with BBC Carriers, as memorialized in the DSV-BBC Chartering Agreement, to facilitate the shipment of the wind farm equipment to Energoimport via the Confiscated Port.  *See, e.g.*, *supra* paragraphs 58, 60–61, 75–78, 86, 104.  At all times in its various roles DSV was aware that the end result of a successful shipment would be that the wind farm equipment was delivered at the Confiscated Port.  DSV thereby "knowingly and intentionally" "engage[d] in a commercial activity using or otherwise benefiting from confiscated property."  22 U.S.C. § 6023(13)(A)(ii).

164.    As detailed in this Amended Complaint, by providing transportation and logistical services to Goldwind Science, Goldwind International, BBC Singapore, and BBC USA, including through its support of DSV Denmark, DSV participated in and profited from the shipment of the wind farm equipment to the Confiscated Port.  *See, e.g.*, *supra* paragraphs 58, 60–61, 66, 86, 89, 104, 107.  DSV thereby "knowingly and intentionally" "cause[d], direct[ed], participate[d] in, [and] profit[ed] from, trafficking" by or through another person, namely, Goldwind Science, Goldwind International, BBC Singapore, BBC USA, and non-parties DSV Denmark, BBC Carriers, and Energoimport.  22 U.S.C. § 6023(13)(A)(iii).

165.     At no point did DSV use the Confiscated Property with the authorization of American Sugar.  *See* 22 U.S.C. § 6023(13).

166.     DSV engaged in unlawful trafficking after November 1, 1996, the end of the three-month grace period the Helms-Burton Act provided after it became effective on August 1, 1996.  *See* 22 U.S.C. § 6082(a)(1)(A).

167.     Therefore, American Sugar is entitled to damages in the amount of the certified claim, plus applicable pre-judgment interest.  American Sugar is also entitled to treble damages, attorneys' fees, costs, and post-judgment interest.  *See* 22 U.S.C. § 6082(a)(1), (3); 28 U.S.C. § 1961.

## FOURTH CAUSE OF ACTION
### Trafficking in Confiscated Property in Violation of 22 U.S.C. § 6082
### (Against BBC Singapore)

168.     American Sugar is incorporated in New Jersey with its principal place of business in New York, and is thereby a "United States National" under the Helms-Burton Act.  *See* 22 U.S.C. § 6023(15).

169.     As a "United States National," American Sugar is entitled to sue "any person that . . . traffics in property which was confiscated by the Cuban Government on or after January 1, 1959."  22 U.S.C. § 6082(a)(1).  BBC Singapore is a "person" under the Act.  *See* 22 U.S.C. § 6023(11).

170.     As detailed in this Amended Complaint, the Confiscated Property was expropriated by Cuba on or after January 1, 1959.

171.     American Sugar in 1969 filed a claim with the FCSC for determination under the Cuba Claims Program.  The FCSC certified that American Sugar has a claim in the amount of $97,373,414.72.  That certified claim is "conclusive proof of ownership" of American Sugar's interest in the Confiscated Property.  22 U.S.C. § 6083(a)(1).

172.    American Sugar's certified claim has never been settled pursuant to an international claims settlement agreement or other mutually accepted settlement procedure.

173.    As detailed in this Amended Complaint, BBC Singapore was responsible for facilitating the voyages of the two vessels, including the ultimate delivery of the wind farm equipment to the Confiscated Port.  BBC Singapore selected the BBC Moonstone and BBC Jade to carry the wind farm equipment to the Confiscated Port and provided ship operation, chartering, and logistical services in support of those voyages and the delivery of the cargo at the Confiscated Port.  *See, e.g.*, *supra* paragraphs 68, 76–78, 80–81.  BBC Singapore assessed compliance issues and sanctions liability associated with the two vessels' stops in Florida and Cuba, consulting with BBC USA, DSV, DSV Denmark, and a U.S.-based company experienced in shipments to Cuba to do so.  *See, e.g.*, *supra* paragraphs 61, 64–67.  BBC Singapore also corresponded and coordinated directly with port agents in Florida to facilitate the vessels' stopover in Miami, including arranging for customs clearance while in Florida, as well as with Cuban port agents to facilitate the deliveries at the Confiscated Port.  *See, e.g.*, *supra* paragraphs 69, 80, 91.  BBC Singapore also undertook several deliberate efforts to conceal the nature of the deliveries to the Confiscated Port from various U.S. entities and the public, including intentionally providing false shipping information that was submitted to U.S. Customs in Florida.  *See, e.g.*, *supra* paragraphs 112–114.  BBC Singapore also issued master bills of lading for the BBC Jade and BBC Moonstone specifying the Confiscated Port as the port of discharge.  *See, e.g.*, *supra* paragraphs 81, 99.  BBC Singapore thereby "knowingly and intentionally" "use[d]" the Confiscated Property.  22 U.S.C. § 6023(13)(A)(i).

174.    As detailed in this Amended Complaint, BBC Singapore entered into a formal chartering agreement with DSV Denmark in which they agreed to carry out the BBC Moonstone

and BBC Jade shipments, designed the shipping route for these shipments, and provided other logistical and compliance services to facilitate the delivery of wind farm equipment to the Confiscated Port.  *See, e.g.*, *supra* paragraphs 76–78.  At all times in its various roles BBC Singapore was aware that the end result of a successful shipment would be that the wind farm equipment was delivered at the Confiscated Port.  BBC Singapore thereby "knowingly and intentionally" "engage[d] in a commercial activity using or otherwise benefiting from confiscated property."  22 U.S.C. § 6023(13)(A)(ii).

175.    As detailed in this Amended Complaint, BBC Singapore coordinated with its affiliate BBC USA to assist with logistical and compliance requirements associated with the Miami, Florida stopover of the BBC Moonstone and BBC Jade.  *See, e.g.*, *supra* paragraphs 67–68, 112.  BBC Singapore also corresponded and coordinated with non-parties USA Maritime and Seaport Hub to facilitate the BBC Jade and BBC Moonstone's stops in Florida.  *See, e.g.*, *supra* paragraphs 69, 80, 91.  BBC Singapore thereby "knowingly and intentionally" "cause[d], direct[ed], participate[d] in, [and] profit[ed] from, trafficking" by or through another person, namely, DSV, BBC USA, and non-parties USA Maritime, Seaport Hub and Energoimport.  22 U.S.C. § 6023(13)(A)(iii).

176.    At no point did BBC Singapore use the Confiscated Property with the authorization of American Sugar.  *See* 22 U.S.C. § 6023(13).

177.    BBC Singapore engaged in unlawful trafficking after November 1, 1996, the end of the three-month grace period the Helms-Burton Act provided after it became effective on August 1, 1996.  *See* 22 U.S.C. § 6082(a)(1)(A).

178.    Therefore, American Sugar is entitled to damages in the amount of the certified claim, plus applicable pre-judgment interest.  American Sugar is also entitled to treble damages,

attorneys' fees, costs, and post-judgment interest.  *See* 22 U.S.C. § 6082(a)(1), (3); 28 U.S.C.
§ 1961.

### FIFTH CAUSE OF ACTION
**Trafficking in Confiscated Property in Violation of 22 U.S.C. § 6082**
**(Against BBC USA)**

179.    American Sugar is incorporated in New Jersey with its principal place of business

in New York, and is thereby a "United States National" under the Helms-Burton Act.  *See* 22

U.S.C. § 6023(15).

180.    As a "United States National," American Sugar is entitled to sue "any person

that . . . traffics in property which was confiscated by the Cuban Government on or after January

1, 1959."  22 U.S.C. § 6082(a)(1).  BBC USA is a "person" under the Act.  *See id.* § 6023(11).

181.    As detailed in this Amended Complaint, the Confiscated Property was

expropriated by Cuba on or after January 1, 1959.

182.    American Sugar in 1969 filed a claim with the FCSC for determination under the

Cuba Claims Program.  The FCSC certified that American Sugar has a claim in the amount of

$97,373,414.72.  That certified claim is "conclusive proof of ownership" of American Sugar's

interest in the Confiscated Property.  22 U.S.C. § 6083(a)(1).

183.    American Sugar's certified claim has never been settled pursuant to an

international claims settlement agreement or other mutually accepted settlement procedure.

184.    As detailed in this Amended Complaint, BBC USA assisted BBC Singapore in

providing ship operation, chartering, compliance, and delivery services for the BBC Moonstone

and BBC Jade in carrying the wind farm equipment to the Confiscated Port.  Specifically, BBC

USA's customs documentation specialist reviewed and approved ISF filings submitted to CBP

for the BBC Jade shipment's stop in Miami.  *See supra* paragraph 86.  BBC USA also supported

the delivery and unloading of the wind blade equipment at the Confiscated Port, assisted BBC

Singapore with its efforts to hide the Cuba stops from U.S. entities and BBC USA's U.S.-based customers, and arranged for the BBC Moonstone to subsequently carry and deliver cargo to its U.S. customer at Port Arthur, Texas, following its stop at the Confiscated Port. *See, e.g.*, *supra* paragraphs 112–114. To that end, BBC USA submitted a cargo declaration form to CBP in connection with the stop in Port Arthur, Texas that incorrectly listed Tianjin, China (and not Puerto Carupano) as the last foreign port before the United States. *See supra* paragraph 116. BBC USA was aware of, and directly benefited from, BBC Singapore's deliberate attempts to conceal the nature of the BBC Moonstone's stop in Puerto Carupano in order to ensure customs clearance and facilitate the delivery of third party goods to Port Arthur, Texas. At all times in its various roles BBC USA was aware that the end result of a successful shipment would be that the wind farm equipment was delivered at the Confiscated Port. BBC USA thereby "knowingly and intentionally" "use[d]" the Confiscated Property. 22 U.S.C. § 6023(13)(A)(i). BBC USA thereby also "knowingly and intentionally" "engage[d] in a commercial activity using or otherwise benefiting from confiscated property." 22 U.S.C. § 6023(13)(A)(ii).

185.    As detailed in this Amended Complaint, BBC USA assisted BBC Singapore with the delivery and unloading of the wind farm equipment at the Confiscated Port, and assisted in fulfilling compliance requirements for the vessels' stopover in Florida, including by reviewing and approving customs documentation submitted by DSV. *See, e.g.*, *supra* paragraphs 67–68, 86, 112. BBC USA thereby "knowingly and intentionally" "cause[d], direct[ed], participate[d] in, [and] profit[ed] from, trafficking" by or through another person, namely, BBC Singapore, DSV and non-party Energoimport. 22 U.S.C. § 6023(13)(A)(iii).

186.    At no point did BBC USA use the Confiscated Property with the authorization of American Sugar. *See* 22 U.S.C. § 6023(13).

187.     BBC USA engaged in unlawful trafficking after November 1, 1996, the end of the

three-month grace period the Helms-Burton Act provided after it became effective on August 1,

1996.  *See* 22 U.S.C. § 6082(a)(1)(A).

188.     Therefore, American Sugar is entitled to damages in the amount of the certified

claim, plus applicable pre-judgment interest.  American Sugar is also entitled to treble damages,

attorneys' fees, costs, and post-judgment interest.  *See* 22 U.S.C. § 6082(a)(1), (3); 28 U.S.C.

§ 1961.

**SIXTH CAUSE OF ACTION**
**Civil Conspiracy under Florida Law**
**(Against All Defendants)**

189.     Each of the Defendants conspired to violate the Helms-Burton Act by agreeing to

help transport wind farm equipment from China to Energoimport in Cuba via the Confiscated

Port.  Defendants knew that the wind farm equipment was to be delivered to Energoimport at the

Confiscated Port in Cuba and were on notice that the shipment of the wind farm equipment to

Energoimport would subject them to the risk of liability or penalties under the Helms-Burton Act

and other U.S. laws, including economic sanctions related to Cuba and U.S. export controls laws.

190.     In order to further their conspiracy, and in an effort to avoid potential liabilities or

penalties from U.S. economic sanctions related to Cuba, Defendants implemented a scheme

whereby each of DSV Denmark, DSV, BBC Singapore, and BBC USA took overt actions to

facilitate the BBC Moonstone's and BBC Jade's stops in Miami, Florida in an effort to comply

with the requirements of U.S. trade laws before proceeding to the Confiscated Port.  In doing so,

certain Defendants took illegal actions to conceal the nature of the Cuba stop in order to preserve

their business interests and complete a subsequent delivery in Port Arthur, Texas.

191.     The stopovers of the BBC Moonstone and BBC Jade in Miami comprised an

essential aspect of Defendants' use of the Confiscated Port in violation of the Helms-Burton Act

because they were made in an attempt to avoid liability and penalties under U.S. trade laws, which are separate from the Helms-Burton Act.

192.     Each of the Defendants took overt actions to further the scheme to transport the wind farm equipment from China to Energoimport in Cuba by way of Miami, Florida.  Goldwind Science, with the assistance of its subsidiary Goldwind International, supplied and shipped the wind farm equipment to the Confiscated Port pursuant to its agreement with Energoimport.  To facilitate these deliveries, DSV was engaged to support DSV Denmark in providing transportation and logistical services for Goldwind Science in order to ship the wind farm equipment to Energoimport.  In turn, BBC Singapore, at the behest of non-party BBC Carriers as directed by DSV Denmark and with the assistance of BBC USA, chartered and supported the BBC Jade and BBC Moonstone to carry and unload the equipment at the Confiscated Port.  BBC USA assisted BBC Singapore and DSV Denmark with logistical and compliance issues associated with the BBC Jade and BBC Moonstone's stopover in Miami, Florida, and also assisted with the deliveries at the Confiscated Port.  Further, as detailed in this Amended Complaint, to facilitate customs clearance in Miami, and to insulate themselves from potential compliance and public relations consequences from the subsequent delivery in Cuba, BBC Singapore, BBC USA, and DSV took additional steps to conceal the Puerto Carupano stop from U.S. entities.  In furtherance of that scheme, BBC Singapore and BBC USA facilitated the filing of false customs and commercial documentation meant to obfuscate the vessels' shipment to Cuba.  BBC Singapore took the additional illegal step of directing the BBC Moonstone to turn off its IMOS and AIS tracking systems in an effort to avoid being tracked when transshipping Cuba.

193.    As a result of the aforementioned acts in furtherance of their conspiracy, Defendants trafficked in the Confiscated Port, without authorization from, or compensation to, American Sugar.

194.    Therefore, American Sugar is entitled to damages from all Defendants in the amount of the certified claim, plus applicable pre-judgment interest.  American Sugar is also entitled to treble damages, court costs, reasonable attorney's fees, and post-judgment interest. *See* 22 U.S.C. § 6082(a)(1), (3); 28 U.S.C. § 1961.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, American Sugar demands a trial by jury in this action of all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, American Sugar respectfully requests that judgment be entered in its favor and against Defendants:

1. Awarding American Sugar actual damages in the amount of the certified claim, namely $97,373,414.72;

2. Awarding American Sugar pre-judgment compounded interest pursuant to 22 U.S.C. § 6082(a)(1)(B) accruing from the relevant dates of confiscation;

3. Awarding American Sugar treble damages pursuant to 22 U.S.C. § 6082(a)(3);

4. Ordering Defendants to pay American Sugar's reasonable attorneys' fees and costs incurred in this action pursuant to 22 U.S.C. § 6082(a)(1)(A)(ii);

5. Awarding American Sugar post-judgment interest pursuant to 28 U.S.C. § 1961; and

6. Granting all other relief that the Court deems just and proper.

Respectfully submitted,

Miguel A. Estrada (*pro hac vice*)
Jason R. Meltzer (*pro hac vice*)
Audi K. Syarief (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, NW
Washington, DC 20036-5306
Telephone: (202) 955-8257
Facsimile:  (202) 530-9616
mestrada@gibsondunn.com
jmeltzer@gibsondunn.com
asyarief@gibsondunn.com

Andrea E. Neuman (*pro hac vice*)
Rahim Moloo (*pro hac vice*)
Casey Kyung-Se Lee (*pro hac vice*)
Timothy Sun (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue, 47th Floor
New York, NY 10166-0193
Telephone: (212) 351-3883
Facsimile:  (212) 351-5303
aneuman@gibsondunn.com
rmoloo@gibsondunn.com
clee@gibsondunn.com
tsun@gibsondunn.com


 */s/ David S. Mandel*
David S. Mandel
FBN 38040
MANDEL & MANDEL LLP
169 East Flagler Street, Suite 1224
Miami, FL 33131
Telephone:  (305) 374-7771
Facsimile:   (305) 374 7776
dsm@mandel.law

*Counsel for Plaintiff*
*North American Sugar Industries Inc.*